FILED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION** 2015 APR 15 P 1: 19

|  |  |
|---|---|
| **JO-ANN BROWN, MARY ELISE PIZARRO, and MICHELE OSBORNE, on Behalf of Themselves and All Others Similarly Situated,**<br><br>**Plaintiffs,**<br><br>vs.<br><br>**TRANSURBAN USA, INC.; TRANSURBAN DRIVE, USA LLC; FLUOR ENTERPRISES, INC.; CAPITAL BELTWAY EXPRESS, LLC; 95 EXPRESS LANES, LLC; FANEUIL, INC.; and LAW ENFORCEMENT SYSTEMS, LLC,**<br><br>**Defendants.** | **CLASS ACTION COMPLAINT**<br>ALEXANDRIA, VIRGINIA<br>**JURY TRIAL DEMANDED**<br><br><br>CASE NO. *1:15cv494*<br>*JCC/MSN* |

## CLASS ACTION COMPLAINT

Plaintiffs Jo-Ann Brown, Mary Elise Pizarro, and Michele Osborne ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based on personal knowledge as to allegations regarding themselves and based on the investigation of Plaintiffs' counsel, which included a review of relevant press releases, public statements, news articles, and other publications.

### INTRODUCTION

1.     Plaintiffs bring this action on behalf of themselves and Classes of all similarly situated individuals and entities against Defendants Transurban USA, Inc. ("Transurban"); Transurban DRIVE, USA LLC; ("Drive"); Fluor Enterprises Inc. ("Fluor"); Capital Beltway Express, LLC ("CBE"); 95 Express Lanes, LLC ("95 Express") (collectively the "Transurban Defendants"); Faneuil, Inc. ("Faneuil"); and Law Enforcement Systems, LLC ("LES")

1

(collectively the "Collection Defendants"), arising from their unfair, illegal, and unconscionable assessment of administrative fees and civil penalties on Plaintiffs and the Classes relating to their purported failures to pay for usage of toll roads that the Transurban Defendants operate in the Commonwealth of Virginia. At all relevant times, the Collection Defendants have acted as agents of and on behalf of the Transurban Defendants. The Transurban Defendants and the Collection Defendants have all profited from the scheme alleged herein.

2.      In order to reduce their travel times, commuters in the Washington, DC metro region may choose to use dedicated high-occupancy toll lanes ("HOT Lanes") on the "Capital Beltway" or on feeder roads that connect to the Capital Beltway. As used herein, the Capital Beltway is comprised of federal interstate I-495 -- a 64-mile (103 km) interstate highway that surrounds Washington, D.C., and the city's inner suburbs in adjacent Maryland and Virginia. The HOT Lanes on I-495 are called the "495 Express Lanes" and the HOT Lanes on I-95/I-395 are called the "95 Express Lanes." The Transurban Defendants have contracted with the Virginia Department of Transportation ("VDOT") to maintain and operate these toll lanes in the commonwealth of Virginia. The Transurban Defendants are private, for-profit entities that operate separately from VDOT.

3.      Drivers who use the HOT Lanes are charged tolls ranging from $0.20 to $1.25 per mile each way. The pricing is dynamic and varies according to real-time traffic conditions: the more drivers using the HOT Lanes, the more expensive the toll, and vice-versa.

4.      Consumers must pay the tolls via a windshield-mounted transponder (or one placed somewhere in the car) known as an "E-Z Pass." The E-Z Pass is linked to the consumer's bank account or credit card through the consumer's E-Z Pass account. When the E-Z Pass account runs out of money to pay tolls, the consumer's bank account or credit card is

automatically charged to "reload" the E-Z Pass account.

5.      When a toll payment fails to execute properly, often through no fault of a HOT Lanes' user,[1] the Transurban Defendants illegally assess – and Collection Defendants illegally attempt to collect on Transurban Defendants' behalf – hundreds or thousands of dollars in illegal penalties and fees against that driver.

6.      The Transurban Defendants routinely fail to ensure timely and proper delivery of notices of purported toll violations, as detailed herein.

7.      The Transurban Defendants assert that they can collect "reasonable" administrative expenses under an individual consumer's contract with E-Z Pass. But they do not content themselves to remain within this limited contractual authority. Instead, the Transurban Defendants turn minor toll violations into huge, crippling fines and penalties—and routinely sue drivers (with the assistance of the Collection Defendants) to recover their inflated and illegal "fines" and fees.

8.      Upon information and belief, the Transurban Defendants have pursued this moneymaking scheme because the HOT Lanes have not been as lucrative as they had initially projected.

9.      For example, the 495 Express Lanes lost $11.3 million in their first six weeks of operation. The lanes raked in $800,000 in tolls and $200,000 in fees and other revenue, but had $3.2 million in operating costs, as well as depreciation of $2.1 million and financing costs of $7 million, according to documents Transurban's Australian parent showed investors.  An average

---

[1]     While the reason for the failure of a toll payment is irrelevant to this underlying lawsuit which concerns Defendants' actions *after* a purported toll violation occurs, such failures often occur because the Transurban Defendants' own faulty equipment fails to scan the user's E-Z Pass or, less commonly, because a user inadvertently does not update the payment information linked to her E-Z Pass account.

of 23,308 vehicles took the lanes every day in the first six weeks, less than half of the 66,000 cars a traffic consultant for the project predicted in 2007. The number of cars using the lanes have remained below projections and the 495 Express Lanes lost $51 million in 2013. As such, Transurban Defendants have sought to make up this "lost" revenue through the scheme outlined herein.

10. Once the Transurban Defendants send a "final" notice of the invoice (again, often failing to ensure timely receipt of any prior notices), they send these illegal debts to Defendant LES, a debt collector. LES then sends notices that violate the Fair Debt Collections Practices Act ("FDCPA") to these consumers in an effort to recover these improper charges.

11. If LES is unsuccessful in collecting the invoice amount, the Transurban Defendants then engage the services of Defendant Faneuil to represent their interests in Court. Faneuil sends non-lawyers (such as Alexis Brach) to attempt to negotiate with those who the Transurban Defendants sue. Defendant Transurban reportedly filed *26,000* such lawsuits in 2014.

12. Media reports indicate that thousands of Virginia, Maryland, and DC residents have been subject to the Transurban Defendants' excessive fines and fees. For example, one toll road user was assessed a punitive $17,000 fine for $36 in unpaid tolls; the tolls were unpaid because the Transurban Defendants' equipment failed to read the user's E-Z Pass for roughly one month. Other examples abound: the Transurban Defendants sued "Chris" for $31,000 based on less than $50 in supposedly missed tolls; "Sherri" purportedly owes the Transurban Defendants $9,000 for just $30 of supposedly missed tolls; and the Transurban Defendants charged "Derek" $3,600 for $13 of supposedly missed tolls. The tolls charged to the named representatives are also detailed herein.

13. In addition to excessive and devastating financial penalties, the Transurban

4

Defendants' enforcement mechanism has resulted in thousands of users losing their driver's licenses.

14.     Regardless of the underlying reason for the purported toll violation, the Defendants' attempts to levy and collect excessive fines and fees are improper for, at least, the following reasons:

(a)     The Transurban Defendants assess punitive and ascending "civil penalties" of up to $1,000 per toll violation against drivers via notices and summonses when those drivers have had no prior adjudications—even though Virginia law *only* allows for such ascending civil penalties *where an actual court has adjudicated prior toll violations* (*i.e.*, until a Court has determined an actual violation occurred, consumers do not owe any penalties, and they certainly do not owe ascending penalties);

(b)     The Transurban Defendants' seek to enforce the EZ Pass contract that consumers, including Plaintiffs and the Classes, entered into and which allows them to collect "reasonable" administrative fee (capped by statute at $100 and limited to "actual costs"), but the fees these Defendants seek are well beyond reason and are not related to their actual costs;

(c)     The Transurban Defendants instruct the Collection Defendants to assess and seek civil penalties and file suit beyond the one year time limitations period for doing so;

(d)     The Transurban Defendants' cumulative penalties have no reasonable relationship or proportionality to the amount of unpaid tolls;

(e)     The Transurban Defendants do not reasonably allow a consumer to dispute the existence of a toll violation or the amounts assessed for such a violation;

(f)     The Transurban Defendants and Defendant Faneuil initiate lawsuits against consumers with attestations and summonses that are "robo-signed" and never signed by a human person as is required under Virginia law; and

(g)     The Transurban Defendants and Defendant Faneuil do not "appear" or hire lawyers to prosecute these actions (given the high costs of doing so), and instead, send non-lawyers such as Faneuil's Alexis Brach to appear and negotiate "settlements" on their behalf. Several actions have already been dismissed due to the Transurban Defendants' failure to appear.

15.     The Collection Defendants, operating as agents of and on behalf of the Transurban Defendants, are participants in and profit from this illegal scheme.

16.     Plaintiffs seek, on behalf of themselves and the members of the Classes, injunctive relief, declaratory relief, actual and statutory damages and their attorneys' fees and costs.

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Transurban. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, due to federal questions raised by the complaint. Further, this Court has jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d). Moreover, this Court also has jurisdiction over the state law claims by supplemental jurisdiction under 28 U.S.C. § 1367.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant

Transurban is subject to personal jurisdiction here and regularly conducts business in the Eastern District of Virginia, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

**PARTIES**

**A.      Plaintiffs**

19.      Plaintiff Jo-Ann Brown ("Brown") is a citizen of the Commonwealth of Virginia. In or around 2002, Brown signed up for an E-Z Pass account through E-Pass New York, and at all relevant times, her E-Z Pass was properly mounted in her vehicle and linked to a valid payment method. However, the Transurban Defendants found that in October 2013, Brown had missed $4.95 in tolls (for five purported violations) on the 495 Express Lanes, and by October 2014, the Transurban Defendants were claiming that Brown owed them $3,413.75 for these alleged violations.

20.      Plaintiff Mary Elise Pizarro ("Pizarro") is a citizen of the Commonwealth of Virginia. In or around 2003, Pizarro signed up for an E-Z Pass account through E-Pass Virginia, and at all relevant times, her E-Z Pass was properly mounted in her vehicle and linked to a valid payment method. However, the Transurban Defendants found that in May 2013, Pizarro had missed $20.15 in tolls (for seven purported violations) on the 495 Express Lanes, and by September 2014, the Transurban Defendants were claiming that Pizarro owed them $9,440.90 for these alleged violations.

21.      Plaintiff Michele Osborne ("Osborne") is a citizen of the State of Maryland. In or around 2008, Osborne signed up for an E-Z Pass account through E-Pass Virginia (using her maiden name, Irving), and at all relevant times, her E-Z Pass was properly mounted in her vehicle and linked to a valid payment method. However, the Transurban Defendants found that

7

in November 2013, Osborne had missed $16.75 in tolls (for four purported violations) on the 495 Express Lanes, and by December 2014, the Transurban Defendants were claiming that Osborne owed them $2,293.30 for these alleged violations.

**B.      Defendants**

22.      Defendant Transurban is a Delaware corporation with its principal place of business at 589 8th Ave., 21st Floor, New York, New York. Transurban is the North American subsidiary of Transurban Group, an Australian corporation. Transurban Group had revenues of $1.2 billion and consolidated net profit of $174,541,000 in the fiscal year ended June 30, 2013. At all relevant times, Defendant Transurban has managed, overseen, and controlled the operations of Drive.

23.      Defendant Drive is a subsidiary of Transurban and a Delaware limited liability company. With Defendant Fluor, Drive is the holder of the concession for operation of the HOT Lanes.

24.      Defendant Fluor is a California corporation with its principal place of business at 3 Polaris Way, Aliso Viejo, California 92656. Fluor is a fully-owned subsidiary of Fluor Corporation, a Fortune 500 company that delivers engineering, procurement, construction, and project management to governments and other clients. Fluor Corporation maintains its headquarters in Irving, Texas.

25.      Defendant CBE is a Delaware limited liability company with its principal place of business at 405 Lexington Avenue, 43rd Floor, New York, New York 10174. Defendants Transurban and Fluor formed CBE as a joint venture/special purpose vehicle to handle the 495 Express Lanes. Transurban is the majority shareholder with 90% and Fluor is the 10% minority owner.

26.     Defendant 95 Express is a Delaware limited liability company. Defendants Transurban and Fluor formed 95 Express as a joint venture/special purpose vehicle to handle the 95 Express Lanes. Transurban is the majority shareholder with 90% and Fluor is the 10% minority owner.

27.     Defendant Faneuil, is a Virginia corporation with its headquarters located at 2 Eaton Street, Suite 1002, Hampton, Virginia 23669. According to its website, Faneuil is "a nationally recognized leader in technology-enabled in-person and automated service delivery, particularly in regulated, highly complex environments in which precision and mastery of guidelines are of critical importance. The company provides business processing solutions for an extensive client portfolio that includes both commercial and government entities. Utilizing advanced applications and a team of more than 3,300 service professionals, Faneuil delivers broad outsourcing support, ranging from customer care centers, fulfillment operations, and IT Services, to manual and electronic toll collection, violation processing, and medical device tracking . . . ."

28.     Defendant LES is a Delaware limited liability company with its primary place of business at 633 West Wisconsin Avenue, Suite 1600, Milwaukee, Wisconsin 53203. LES's principal business is the collection of debts, and in its capacity as a debt collector, LES regularly uses the mails and telephone to collect or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due for other parties and is a "debt collector" within the meaning of the FDCPA, as defined by 15 U.S.C. § 1692a(6).

## FACTUAL ALLEGATIONS

### A.     Northern Virginia's HOT Lanes

29.     In 1995, the Virginia General Assembly passed the Public-Private Transportation

Act ("PPTA"), which authorized VDOT and other public agencies to enter into long term concession agreements with private, for-profit firms to develop and/or operate transportation facilities in the Commonwealth.

30.     The PPTA resulted in two separate highway toll projects in Northern Virginia: the 95 Express Lane and the 495 Express Lane projects.

31.     Buses, motorcycles, and vehicles with three or more people ("High Occupancy Vehicles," or "HOVs") are able to use any of the HOT Lanes for free (the "HOV provision"); other vehicles must pay a toll. The toll rates change according to traffic volume, which, in theory, regulates demand for the lanes and keep them operating at higher speeds. No cash toll booths are offered. Rather, all tolls are collected through the use of E-Z Passes, and all vehicles using the 95 or 495 Express Lanes, including those traveling free under the HOV provision, must have an E-Z Pass.

32.     On information and belief, because the 95 Express Lanes only recently opened, the Transurban Defendants have only brought suit against violators of the 495 Express Lanes, which opened in 2012. Nevertheless, the injunctive relief Plaintiffs seek applies to both projects.

1.     **The 95 Express Lane Project**

33.     The first proposed project under the PPTA was the 95 Express Lane project. This project involved converting and extending the existing reversible high-occupancy vehicle ("HOV") lanes on I-95 and I-395 (some of the oldest such lanes in the country) to HOT Lanes from Stafford, Virginia to near Alexandria, Virginia.

34.     The 95 Express Lane project first came about in September 2003, when a group led by Clark Construction and Shirley Contracting submitted an unsolicited proposal to VDOT to convert the existing I-95 HOV lanes to high occupancy/toll lanes, while also widening the

10

existing lanes and extending them to the south. Consistent with the PPTA, VDOT then invited requests for competing proposals from developers; Defendants Fluor and Transurban submitted the only competing proposal (the "FTU proposal").

35.     Under the FTU proposal, the already existing HOV lanes on I-95/395 would be widened to three lanes and converted to HOT Lanes. The lanes would also be extended by 25 miles southward to Spotsylvania County and include the creation of an integrated Bus Rapid Transit system throughout the length of the 56-mile corridor. Under the financial projections in the proposal, toll revenues were expected to be sufficient to fund a $250 million upfront payment to VDOT that could be applied toward the costs of operating transit service in the corridor, in addition to covering other capital and operating costs of the project.

36.     In November 2005, following an internal review and the submission of proposals by both teams, an advisory panel recommended that VDOT proceed with the FTU proposal. VDOT, Fluor, and Transurban then signed an interim agreement in October 2006 to move forward with preliminary engineering and detailed planning and operations studies for the project, with the costs of those studies to be shared between VDOT, Fluor and Transurban.

37.     VDOT and 95 Express executed a concession agreement in July 2012 to develop the first phase of the project, including improvements to the new lanes and the initial nine-mile extension. The remaining 16 miles of the extension were to be developed under a separate project at a later date.

38.     Construction on the 95 Express Lanes project began in August 2012, and the HOT Lanes began operating on December 29, 2014.

39.     In total, VDOT contributed $83 million toward the costs of the project, using a combination of federal and state funds. This represented a significant departure from the FTU

proposal, which had anticipated a payment to VDOT as part of the concession.

40.     The elimination of the segment inside I-395 from the project (which had been expected to produce significant revenues) played a key role in this shift in the cost burden for the project. VDOT also incurred an additional $46 million in costs for preliminary engineering on the project under the 2006 interim agreement.

### 2.     The 495 Express Lane Project

41.     The second proposed project (although completed first), the 495 Express Lanes, added HOT Lanes to I-495 in Fairfax County.

42.     The 495 Express Lane project began when VDOT signed an agreement with Defendant Fluor and Defendant Transurban in April 2005 to create HOT Lanes between Springfield, Virginia and Georgetown Pike. A contract was finalized on December 20, 2007 and construction began in the summer of 2008.

43.     The 495 Express Lanes are a 14-mile segment of HOT Lanes on I-495 extending from the Springfield Interchange to a point north of the Dulles Toll Road.

44.     The 495 Express Lanes opened on November 17, 2012.

### B.     Virginia Law Authorizes Private Contractors to Administer Toll Lanes

45.     Virginia law governs the creation of high-occupancy toll roads. *See* Va. Code Ann. § 33.2-502. According to the statute:

> Any person operating a motor vehicle on designated HOT lanes shall make arrangements with the HOT lanes operator for payment of the required toll prior to entering such HOT lanes. The driver of a vehicle who enters the HOT lanes in an unauthorized vehicle, in violation of the conditions for use of such HOT lanes established pursuant to § 33.2-502, without payment of the required toll or without having made arrangements with the HOT lanes operator for payment of the required toll shall have committed a violation of this section, which may be enforced in the following manner: . . .

2. a. A HOT lanes operator shall install and operate, or cause to be installed or operated, a photo-enforcement system at locations where tolls are collected for the use of such HOT lanes.

b. A summons for civil violation of this section may be executed pursuant to this subdivision, when such violation is evidenced by information obtained from a photo-enforcement system as defined in this chapter. *A certificate, sworn to or affirmed by a technician employed or authorized by the HOT lanes operator*, or a facsimile of such a certificate, based on inspection of photographs, microphotographs, videotapes, or other recorded images produced by a photo-enforcement system, shall be prima facie evidence of the facts contained therein[.]

c. On a form prescribed by the Supreme Court, a summons issued under this subdivision may be executed pursuant to § 19.2-76.2. Such form shall contain the option for the driver or registered owner to prepay the unpaid toll and all penalties, administrative fees, and costs. HOT lanes operator personnel or their agents mailing such summons shall be considered conservators of the peace for the sole and limited purpose of mailing such summons. Notwithstanding the provisions of § 19.2-76, a summons for a violation of this section may be executed by mailing by first-class mail a copy thereof to the address of the owner of the vehicle as shown on the records of the Department of Motor Vehicles[.]

d. *The registered owner of such vehicle shall be given reasonable notice* by way of a summons as provided in this subdivision that his vehicle had been used in violation of this section, and such owner shall be given notice of the time and place of the hearing and notice of the civil penalty and costs for such offense.

3. a. The HOT lanes operator may impose and collect an administrative fee in addition to the unpaid toll so as to recover the expenses of collecting the unpaid toll, which *administrative fee shall be reasonably related to the actual cost of collecting the unpaid toll and not exceed $100 per violation.* The operator of the vehicle shall pay the unpaid tolls and any administrative fee detailed in a notice or invoice issued by a HOT lanes operator. If paid within 30 days of notification, the administrative fee shall not exceed $25.

b. *Upon a finding by a court of competent jurisdiction* that the driver of the vehicle observed by a law-enforcement officer under subdivision 1 or the vehicle described in the summons for civil violation issued pursuant to evidence obtained by a photo-

> enforcement system under subdivision 2 was in violation of this
> section, ***the court shall impose a civil penalty…payable to the
> HOT lanes operator as follows: for a first offense, \$50; for a
> second offense, \$250; for a third offense within a period of two
> years of the second offense, \$500; and for a fourth and
> subsequent offense within a period of three years of the second
> offense, \$1,000, together with, in each case, the unpaid toll, all
> accrued administrative fees imposed by the HOT lanes operator
> as authorized by this section, and applicable court costs . . . .***

Va. Code Ann. § 33.2-503 (emphases added).[2]

46.     Contrary to the statute, the administrative fees charged by the Transurban Defendants are not "reasonable," as described herein.

47.     Contrary to the statute, the administrative fees charged by the Transurban Defendants are not "reasonably related to the actual cost of collecting the unpaid toll." For example, users are often sued for multiple violations. For every instance, whether one or several, the Transurban Defendants seek the maximum penalty of \$100 per purported toll violation (or, in some instances, an even higher penalty).

48.     Contrary to the statute, the Transurban Defendants impose ascending civil penalties, based on prior purported violations, even where no "court of competent jurisdiction" has found even the first violation was valid.

49.     Contrary to the statute and applicable Virginia law, the Transurban Defendants issue summonses not affirmed and signed by humans.

## C.     The E-Z Pass Contract

50.     Plaintiffs and members of the Classes signed up for E-Z Pass accounts through E-Z Pass entities in Virginia, Maryland, or New York (the "E-Z Pass Entities").

---

[2]     Prior to October 2014, this section was promulgated as Virginia Code § 33.1-56.3. For purposes of this action, there are no material differences between these two statutes. For some users who were sued prior to October 2014, Transurban improperly brought suit pursuant to the prior expired statute, however, which is no longer in force.

51.     As to each of the named Plaintiffs, the EZ Pass accounts were opened and the tolls were incurred primarily for personal, family, or household purposes, bringing Collection Defendants' collection activities within the purview of the FDCPA, 15 U.S.C. § 1692a(5).

52.     At the time of account creation, the Virginia resident Plaintiffs were presented with an "E-Z Pass Customer Service Agreement" (attached hereto as Exhibit 1) which contained the following terms:

> User agrees: . . . d) That failure to maintain a positive *E-ZPass* balance could result in unpaid tolls, denied passage, ***violations, administrative fees and/or a court summons depending on the circumstances . . . .***
>
> **PREPAID ACCOUNT**
>
> User agrees to maintain a Prepaid Account with the Service Center to cover User's applicable tolls, charges and fees as described in this Agreement. ***Failure to maintain a positive balance shall constitute a breach of this Agreement and may subject the User to the loss of discounts, administrative costs, any unpaid toll charges as determined by the Virginia Department of Transportation (VDOT)***, the Toll Facility or any State where usage occurred, and termination of this agreement...***User shall be responsible for any violations, fees, claims, tolls and/or any other charges assessed as a result of failure to maintain a positive balance . . . .***
>
> **TOLLS, CHARGES AND FEES**
>
> An *E-ZPass* User's Prepaid Account will be reduced by charges for:
>
> a) Applicable tolls charged each time the *E-ZPass* is used to obtain passage on, continue upon, or exit from an *E-ZPass* or participating *E-ZPass* collection area.
>
> b) **Statement Fees:** Quarterly summary statements are available to the User at no charge. Monthly detailed statements are available by mail for $2.00 per each complete or partial group of three *E-ZPass* transponders in the account. Monthly detailed statements are

available online for $1.00 per account.

c) Any other fees or costs chargeable under this Agreement, including but not limited to returned check fees, credit card decline fees, lost, stolen or damaged *E-ZPass* costs, unpaid tolls, **associated administrative costs and legal fees**.

53.   The Maryland Plaintiffs entered into a User Agreement with E-Z Pass Maryland

that had similar provisions (attached as Exhibit 2):

### I. GENERAL CONDITIONS

...

g. You acknowledge and understand that you and your vehicle may be recorded on a video monitoring system / or digitally photographed while traveling through a Maryland toll collection facility that have an agreement with *E-ZPass* Maryland and/or accept *E-ZPass*. You expressly understand that *E-ZPass* Maryland and other Facilities monitor the use of the transponder for the purpose of toll collection, traffic monitoring and detecting violations of this Agreement.

h. **You authorize *E-ZPass* Maryland to process through your Account, the payment of tolls and fees incurred from the use of Facilities**.

i. Failure to comply with this Agreement may result in any or all of the following: **video toll transactions, citations including civil penalties, suspension of your Account, Account closure, refusal or suspension of your motor vehicle registration and referral to the State of Maryland Central Collection Unit ("CCU"). The Maryland Motor Vehicle Administration (MVA) and CCU may assess additional fees. . . .**

### XV. SCHEDULE OF FEES
Nonrefundable   Transponder   fee: Prices   vary   by   model
Monthly Account Maintenance Fee, if applicable (see Section II.e)
Insufficient   Funds   Fee (Returned   check   fee):   $25.00
**Civil penalty: $50.00**

(emphases added).

54.   Plaintiff Brown, who initially signed up for an E-Z Pass through E-Z Pass New

York, had a contract with E-Z Pass New York with similar provisions (attached as Exhibit 3):

Violations

16

**If you use the Tag when your Account is in a negative balance, suspended or revoked as a result of E-ZPass speed violations or any other reason, or after the Tag has been reported lost or stolen, you may: incur administrative fees of up to $50 per occurrence**; be charged the full, undiscounted charge; and/or be asked to surrender the Tag to E-ZPass via certified mail or to plaza personnel. . . . .

Schedule of Deposits/Administrative Fees . . .

Account revocation fee         $25.00

Tag retention fee         $25.00

**Other Tag misuse/violation administrative fees  Up to $50.00**
E-ZPass and the entities providing E-ZPass services reserve the right to assess additional fees. . . .

**If you use the Tag when your bank account has insufficient funds and payment is not made by means of your back-up credit card, you may incur administrative fees of up to $50 per occurrence; be charged the full, undiscounted charge; and/or be asked to surrender the Tag to E-ZPass via certified mail or to plaza personnel.**

(emphases added).

### D.     The Transurban Defendants' Equipment Routinely Fails to Read E-Z Passes Through No Fault of Users

55.     The underlying reason for any particular purported toll violation is irrelevant for the purposes of the claims herein. Regardless of the reason for the violation, Transurban Defendants' enforcement procedures for purported toll violations are illegal.

56.     However, in many cases, the Transurban Defendants' equipment registers a "violation" even where a valid, fully funded E-Z Pass account is in existence. In other words, the Transurban Defendants assess fines and penalties for purported toll violations that were not violations at all, simply because their electronic toll reading equipment (called a gantry) fails to pick up a valid E-Z Pass.

57.     In addition to faulty gantries, the Transurban Defendants are aware that E-Z Pass readings can fail for myriad other reasons—including a tinted windshield, the position of the car in the toll lane, or a dead E-Z Pass battery. Plaintiffs and members of the Classes do not (and cannot) know when the Transurban Defendants' equipment fails to read their E-Z Pass.

58.     Despite their knowledge of E-Z Pass gantries may fail to pick up a valid transponder, the Transurban Defendants fail to adequately warn consumers of this fact because they reap significant profits from their equipment "malfunctions." Moreover, the Transurban Defendants fail to notify customers of any purported problems with their accounts until several violations have accrued. As described herein, the Transurban Defendants then illegally seek additional fines and penalties based on their own delay.

59.     Because equipment that scans E-Z Passes on the HOT Lanes does not confirm that an E-Z Pass is registered (like a toll booth would) a user receives no immediate indication that his E-Z Pass has not been read. Indeed a user may not find out for months (or even over a year), when the Transurban Defendants finally send him a letter or summons.

**E.      The Transurban Defendants Assess Excessive Fines When They Register a Real or Perceived Violation**

60.     If the Transurban Defendants' E-Z Pass scanning equipment does not read an E-Z Pass, if an E-Z Pass account is not adequately funded, or if a driver inadvertently enters a toll lane without an E-Z Pass transponder, the Transurban Defendants immediately begin to assess fines and penalties.

61.     If a driver somehow "knows" that she has committed a toll violation, within 5 days of that violation, she can pay the toll and a fee of $1.50 per trip through the "Missed a Toll" process on Defendant Transurban's website. If a driver does not know she missed a toll, as is most often the case, the driver cannot pay on Defendant Transurban's website. Instead,

Defendant Transurban sends a toll invoice, which increases the administrative fee to $12.50 per trip. Because users generally do not know when they have committed a toll violation, as outlined above and below, the only way HOT Lanes users can check for violations and avoid incurring the $12.50 per trip administrative fee is to check Defendant Transurban's website for missed tolls *at least* every five days, even if they have no reason to believe they have committed a toll violation.

62.     If the toll is not paid within 30 days, Transurban assesses an administrative fee of $100 *per trip* (or more) on top of the toll payment.

63.     The "administrative fees" are not reasonably related to the actual cost of collecting the unpaid toll; there is no possible way the Transurban Defendants' costs increase by $87.50 over the course of 25 days when they take no further steps to collect the unpaid toll. Moreover, in the case of multiple violations against the same driver, the Transurban Defendants attempt to collect the $100 fee *per violation*.

64.     According to the Transurban Defendants, the administrative fees cover the cost associated with locating and contacting the driver. If this were the case, however, this should be a one-time fee rather than a per violation fee. In any event, because the Transurban Defendants locate the driver based on a state records search that takes minutes, at most, to complete, the administrative fee amount has no relationship to Transurban Defendants' actual costs.

65.     The Transurban Defendants also assess a "civil penalty" if they believe a toll has not been not paid after two invoices have been sent. There is a $50 penalty for the first purportedly missed toll, $250 for the second purportedly missed toll, $500 for the third purportedly missed toll, and $1000 for the fourth and all subsequent purportedly missed tolls.

66.     Under the statute governing the Transurban Defendants' conduct, however, civil

19

penalties are allowed to be collected *only* "upon a finding by a court of competent jurisdiction" that a violation has actually occurred. The Transurban Defendants assess these ascending penalties even though no court has adjudicated liability even for the first purported toll violation.

67.     In this way, a user whose E-Z Pass is not read on just four occasions—even on the same day and even through no fault of her own—can end up with *$2,200 in fines and fees*.

68.     Such civil penalties are unreasonable, unconscionable, and illegal and in no way related or proportional to the toll incurred by using the roadway.

**F.     The Transurban Defendants Allow No Reasonable Opportunity to Dispute or To Cure**

69.     After a purportedly missed toll, the Transurban Defendants send an invoice via regular mail to the address of the registered owner of the vehicle requesting payment of the toll and the administrative fee.

70.     The Transurban Defendants take no efforts to ensure or confirm that these invoices actually reach their intended recipients. Instead, the Transurban Defendants simply send such letters to the address listed in DMV records and take no further action (*e.g.*, further address research) even when these invoices are returned as undeliverable.

71.     Prior to recent policy changes, drivers' fees would accrue even if the Transurban Defendants sent the invoice to the incorrect address.

72.     As discussed below, the Transurban Defendants and the Collection Defendants ignore consumers' attempts to dispute the existence of, or amounts of, purported toll violations and/or the fees and fines associated with them.

**G.     Defendant LES Regularly Violates the FDCPA**

73.     Defendant LES regularly demands payment from consumers of unpaid tolls and administrative fees and provides consumers itemizations of amounts that Defendant LES is

attempting to collect. Defendant LES did so as to the Plaintiffs.

74.     Defendant LES regularly tells consumers in correspondence that "this is an attempt to collect a debt and any information obtained will be used for that purpose" and/or that the communication is from a debt collector The FDCPA, at 15 U.S.C. § 1692e(11), requires that debt collectors provide these disclosures in all written communications (other than a formal pleading) sent "in connection with the collection of any debt" ("the § 1692e(11) disclosure"). They did so as to some communications with the Plaintiffs. Defendant LES regularly attempts to provide the disclosures mandated by 15 U.S.C. § 1692g and did so as to the Plaintiffs.

75.     Upon information and belief, this is a form notice mailed to all consumers, including Plaintiffs herein, when Defendant LES attempts to make the debt validation disclosure for unpaid tolls.

76.     This letter states in relevant part as follows:

> **If you wish to dispute the validity of this debt or any portion thereof, you must notify this office, in writing, using the affidavit on the reverse side of this notice within 30 days. Otherwise, we will assume the debt is valid and will pursue all means available for its collection. This collection agency is licensed by the Division of Banking in the Wisconsin Department of Financial Institutions, www.wdfl.org**

(emphasis in original).

77.     This letter does not comply with the FDCPA in several respects.

78.     For example, and without limitation, the validation notice requires any dispute be "in writing" and "using the affidavit on the reverse side of this notice."

79.     This is contrary to the plain language of 15 U.S.C. § 1692g(3) which does not require disputes to be in writing, much less by affidavit.

80.     In addition, it fails to identify the creditor (e.g., Transurban) to whom the debt is owed.

81.     It also fails to include *any* of the required disclosures pursuant to 15 U.S.C. § 1692g(4) and (5).

82.     Defendant LES also falsely represents the character and amount of the debt in violation 15 U.S.C. § 1692e(2)(A) and demands payments far in excess of what is allowed by Plaintiffs' contract and law in violations of 15 U.S.C. § 1692f(1).

83.     Specifically, Defendant LES demands payments for the alleged unpaid tolls and administrative fees pursuant to the contracts in an amount of $100.00 *per* alleged unpaid toll.

**H.     Summonses are Not Timely Issued and are Not Signed by Humans**

84.     Pursuant to statute, the Transurban Defendants may initiate collection lawsuits by first executing a summonses and mailing the same to the "address of the owner of the vehicle as shown on the records of the Department of Motor Vehicles."

85.     In the last year alone, the Transurban Defendants have issued tens of thousands of summonses through Faneuil.

86.     The statute requires such summonses to be executed and include a "***certificate, sworn to or affirmed by a technician employed or authorized by the HOT lanes operator***, or a facsimile of such a certificate, based on inspection of photographs, microphotographs, videotapes, or other recorded images produced by a photo-enforcement system, shall be prima facie evidence of the facts contained therein . . . ."

87.     However, the Transurban Defendants issue electronically-produced summonses robo-signed by machines. They do not issue summonses sworn to or affirmed by humans, as required by Virginia law.

88.     Indeed, the Transurban Defendants' summonses include an identical pre-printed signature, placed and proportioned on the forms in the same manner for all summonses.

89.     Moreover, under Virginia law, signatures "affixed by rubber stamp, typing, photographic process, or by electronic or mechanical printing" are not permitted in "pleadings filed in Virginia tribunals." *Shipe v. Hunter*, 280 Va. 480, 484 (2010).

90.     The Transurban Defendants' summonses are therefore invalid on their face.

91.     Moreover, the Transurban Defendants often issues summonses more than one year after the purported toll violation.

92.     According to Virginia Code § 19.2-8, summonses of this nature must be issued within one year of the purported violation.

93.     The Transurban Defendants' summonses, which are issued more than one year after the alleged violation, are therefore invalid on their face for this additional reason.

94.     The Transurban Defendants also fail to appear in Court when they do file suit. In one instance, Fairfax District Court Judge Thomas E. Gallahue dismissed two cases because Defendant Transurban was not present in Court. Instead, Defendant Transurban sent Alexis Brach (a non-lawyer) to appear on its behalf. Because Ms. Brach is an independent contractor for Defendant Faneuil, Judge Gallahue ruled she could not and cannot represent the Transurban Defendants in court.

95.     Despite this ruling, Ms. Brach still regularly negotiates with drivers on behalf of the Transurban Defendants. She does so in the Virginia courthouses and regularly appears for Defendant Transurban in such proceedings.

**I.      The Transurban Defendants Have Recently Changed Some Practices**

96.     On October 27, 2014, after numerous news reports heavily criticized the Transurban Defendants' practices complained of herein, Defendant Transurban announced the implementation of a "First-Time Forgiveness" program for E-Z Pass customers using the HOT

Lanes. This program includes the following provisions:

       (a)     If a consumer contacts Defendant Transurban within 60 days of toll violation, the company will remove automatically-assessed administrative fees, where toll violation arose from insufficient funds in an E-Z Pass account, failure to link a license plate to the E-Z Pass account or an incorrectly mounted E-Z Pass;

       (b)     In the event that Defendant Transurban sends an E-Z Pass customer an invoice and the letter is returned with an unknown address, Defendant Transurban will send the invoice to a debt collection agency but will waive all fees if the customer contacts it and provide evidence the customer has resolved the account issues with E-Z Pass and has paid his tolls; and

       (c)     Defendant Transurban will continue to collect through court action, but "will put a cap on the number of trips sent to court and pursue a maximum of $2,200 (which includes the administrative fee + civil penalties), plus tolls and court fees, regardless of the number of violations."

97.    These new policies fail to resolve the problem of the Transurban Defendants' excessive, illegal, and unreasonable fees and fines.

98.    These new policies fail to resolve the issue of untimely notices being issued to drivers. If a driver is unaware of a violation, there is no reason that they would contact the Transurban Defendants within 60 days to report one.

99.    These new policies are no help to the tens of thousands of HOT Lanes users who have already paid unjustified fines and administrative fees to Defendants or have had punitive judgments entered against them for supposed HOT Lanes violations. For instance, these polices do nothing to address consumers like "Chris," who was sued for $31,000 for less than $50 in

supposedly missed tolls and agreed to a settlement of $4,600.

**J.     Plaintiffs Were Assessed Massive Fees and Penalties for Minor Toll Violations**

      **1.     Plaintiff Brown's Experience**

100.    Jo-Ann Brown signed up for an E-Z Pass account through E-Z Pass New York in or around 2002. At all relevant times, her E-Z Pass was mounted on her windshield and her E-Z Pass account was linked to a valid payment method for automatic replenishment.

101.    Ms. Brown had never used the 495 Express Lanes before October 4, 2013.

102.    On that day, Ms. Brown entered the 495 Express Lanes at Jones Branch Drive. The toll gantries gave no indication that her E-Z Pass was unread or maintained an insufficient balance.

103.    Unbeknownst to Ms. Brown, however, the Transurban Defendants determined that Ms. Brown had a toll violation for the 40 cent toll.

104.    On four other occasions between October 4 and October 12, 2013, Ms. Brown entered the 495 Express Lanes and—again, unbeknownst to her—was assessed purported toll violations for tolls in the amounts of $0.40, $0.60, $0.60, and $2.15.

105.    Over the 8 day period, Ms. Brown's tolls amounted to $4.15

106.    Ms. Brown received no notice of the purported toll violations until approximately 60 days later, when she received a letter stating from 495 Express Lanes stating that she owed $4.15 in tolls and $100 in administrative fees.

107.    Ms. Brown protested but agreed to pay the amount due, in the interest of putting the matter behind her.

108.    495 Express Lanes declined to take Ms. Brown's payment.

109.    Several months later, in October 2014, Ms. Brown was served with summonses

by the Transurban Defendants, which indicated that they were seeking $3,413.75 in total as a result of Ms. Brown's $4.15 in purportedly missed tolls.

(a)    For the first purported toll violation, which purportedly occurred on October 4, 2013 in an amount of $0.40, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $50 civil penalty, for a total of $222.40.

(b)    For the second purported toll violation, which purportedly occurred on October 4, 2013 in an amount of $0.40, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $250 civil penalty, for a total of $272.40.

(c)    For the third purported toll violation, which purportedly occurred on October 6, 2013 in an amount of $0.60, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $500 civil penalty, for a total of $672.40.

(d)    For the fourth purported toll violation, which purportedly occurred on October 8, 2013 in an amount of $0.40, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $1,000 civil penalty, for a total of $1,172.40.

(e)    For the fifth purported toll violation, which purportedly occurred on October 12, 2013 in an amount of $2.15, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $1,000 civil penalty, for a total of $1,174.15.

110.    The summonses were all "signed" by an automated computer program, not a human as required by Virginia law.

111.    The administrative fees assessed to Ms. Brown are unreasonable and are not related to the true costs the Transurban Defendants incurred to "administer" Ms. Brown's file.

112.    The Transurban Defendants have improperly assessed ascending "civil penalties" up to $1,000 per violation, even though Ms. Brown has never been found guilty of even one toll

26

violation.

113.    Prior to the issuance of the summons, Ms. Brown was provided with no meaningful or adequate means to contest the fines and fees.

114.    Ms. Brown has a court date in Fairfax County General District Court on June 9, 2015.

115.    No judgment of any sort has been entered against her to date.

### 2.    Plaintiff Pizarro's Experience

116.    Mary Elise Pizarro signed up for an E-Z Pass through E-Z Pass Virginia in or around 2003. At all relevant times, her E-Z Pass was mounted in her automobile and her E-Z Pass account was linked to a valid credit card number for automatic replenishment.

117.    Ms. Pizarro used the 495 Express Lanes regularly and without incident.

118.    However, on May 8, 2013 Ms. Pizarro entered the 495 Express Lanes. Unbeknownst to Ms. Pizarro, however, the Transurban Defendants determined that Ms. Pizarro had a toll violation for the $3.65 toll. The toll gantries gave no indication that her transponder was unread or maintained an insufficient balance.

119.    On six other occasions between May 10 and May 28, 2013, Ms. Pizarro entered the 495 Express Lanes and—again, unbeknownst to her—was assessed purported toll violations for tolls in the amounts of $1.35, $3.55, $3.15, $2.40, $3.85, and $2.55.

120.    Over the two week period, Ms. Pizarro's tolls amounted to $20.50.  Mr. Pizarro received additional notices of violations in July.

121.    For Ms. Pizarro, the very first indication of any problem occurred approximately one month later, when she received four "Final Notice" invoices in the mail stating that she had owed tolls and associated administrative fees. Ms. Pizarro had not received any notices prior to

the purportedly "Final Notices".

122.    Ms. Pizarro regularly used the 495 Express Lanes to travel both to and from work. However, the invoices indicated that the Transurban Defendants' toll gantries recorded purported violations for only part of the round trip—a clear indication that some form of equipment failure was to blame for the purported toll violations.

123.    Ms. Pizarro immediately called Defendant Transurban to question the charges. The representative opined that the toll violations may have resulted from how Ms. Pizarro's transponder was mounted. Ms. Pizarro asked the representative to debit the toll amounts from her active and fully-funded E-Z Pass account. Ms. Pizarro understood that Defendant Transurban would assess the tolls and fees in this manner.

124.    After this call, two additional "Final Notices" arrived for other purported toll violations.

125.    Ms. Pizarro immediately disputed these and all other charges on the Transurban Defendants' website.

126.    In July 18, 2013, Ms. Pizarro finally heard back from the Transurban Defendants when she received an email stating that due to insufficient funds, her request was denied. However, at all times during the relevant period, Ms. Pizarro maintained a sufficient balance on her E-Z Pass account.

127.    Ms. Pizarro ceased using the 495 Express Lanes in January 2014. She closed her account at that time.

128.    Shortly after Ms. Pizarro closed her account, E-Z Pass refunded her approximately $83, which had existed as a positive balance on her account—which had existed the entire time, even while Transurban was claiming Ms. Pizarro had toll "violations."

129.    Ms. Pizarro had no further communication from the Transurban Defendants until she was served with 10 summonses in September 2014 seeking a total of $9,440.90.

(a)    For the first purported toll violation, which purportedly occurred on May 8, 2013 in an amount of $3.65, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $50 civil penalty, for a total of $215.65.

(b)    For the second purported toll violation, which purportedly occurred on May 10, 2013 in an amount of $1.35, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $250 civil penalty, for a total of $323.35.

(c)    For the third purported toll violation, which purportedly occurred on May 14, 2013 in an amount of $3.55, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $500 civil penalty, for a total of $675.55.

(d)    For the fourth purported toll violation, which purportedly occurred on May 15, 2013 in an amount of $3.15, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $1000 civil penalty, for a total of $1,175.15.

(e)    For the fifth purported toll violation, which purportedly occurred on May 15, 2013 in an amount of $2.40, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $1000 civil penalty, for a total of $1,174.40.

(f)    For the sixth purported toll violation, which purportedly occurred on May 16, 2013 in an amount of $3.85, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $1000 civil penalty, for a total of $1,175.85.

(g)    For the seventh purported toll violation, which purportedly occurred on May 15, 2013 in an amount of $2.55, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $1000 civil penalty, for a total of $1,174.55.

(h)     For the eighth purported toll violation, which purportedly occurred on July 3, 2013 in an amount of $3.75, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $1000 civil penalty, for a total of $1,175.75.

(i)     For the ninth purported toll violation, which purportedly occurred on July 3, 2013 in an amount of $3.75, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $1000 civil penalty, for a total of $1,175.75.

(j)     For the tenth purported toll violation, which purportedly occurred on May 15, 2013 in an amount of $2.90, the Transurban Defendants assessed $100 in "administrative fees," $72 in "costs," and a $1000 civil penalty, for a total of $1,174.90.

130.    In sum, the Transurban Defendants claimed Ms. Pizarro owed $9,440 as a result of approximately $20 in purportedly missed tolls.

131.    The administrative fees assessed to Ms. Pizarro were unreasonable and are not related to the true costs the Transurban Defendants incurred to "administer" Ms. Pizarro's file.

132.    The Transurban Defendants have improperly assessed ascending "civil penalties" up to $1,000 per violation, even before Ms. Pizarro had been found guilty of even one toll violation.

133.    The summonses were all "signed" by an automated computer program, not a person.

134.    The summonses were all issued more than one year after the date of the purported toll violation.

135.    Prior to the issuance of the summonses, Ms. Pizarro was provided with no meaningful or adequate means to contest the fines and fees.

136.    Upon receiving the summonses, Ms. Pizarro immediately contacted the

Case 1:15-cv-00494-JCC-MSN Document 1 Filed 04/15/15 Page 31 of 49 PageID# 31

Transurban Defendants.

137.    During this conversation, Ms. Pizarro was informed by a Transurban employee that she allegedly committed four additional toll violations in July 2013 that she was not yet aware of. The Transurban employee never provided documentation of these alleged violations to Ms. Pizarro, and instead, offered to "settle" these additional charges for $413.90 "to avoid having them go to court."

138.    Feeling enormous pressure to resolve the matter, and facing a massive potential liability of while at the same time maintaining the gross excessiveness of the fines and fees, Ms. Pizarro was pressured into entering into a settlement agreement with the Transurban Defendants in the amount of $1,100 for the above-noted alleged violations and $413.90 for the four additional alleged violations.

### 3.    **Plaintiff Osborne's Experience**

139.    Michele Osborne signed up for an E-Z Pass Virginia account in or around 2008. At all relevant times, her E-Z Pass was mounted on the windshield of her automobile and her E-Z Pass account was linked to a valid payment method for automatic replenishment.

140.    Ms. Osborne had repeatedly used the 495 Express Lanes—without incident—before November 13, 2013.

141.    On that day, Ms. Osborne entered the 495 Express Lanes. The toll gantries gave no indication that her E-Z Pass was unread or maintained an insufficient balance.

142.    Unbeknownst to Ms. Osborne, however, the Transurban Defendants determined that Ms. Osborne had a toll violation for the $4.45 toll.

143.    On three other occasions between November 19, 2013 and November 21, 2013, Ms. Osborne entered the 495 Express Lanes and—again, unbeknownst to her—was assessed

purported toll violations for tolls in the amounts of $3.65, $3.95, and $4.70.

144. Over the 7 day period, Ms. Osborne's tolls amounted to $16.75.

145. Ms. Osborne received no notice of the purported toll violations until approximately four months later, when she received a "Demand for Payment and Credit Bureau Warning" letter from Defendant LES stating that she owed $312.20 for the purported November 19, 20 and 21 toll violations (though not for the November 13 toll violation, which was not listed).

146. Several months later, in December 2014, Ms. Osborne was served with summonses by the Transurban Defendants, which indicated that they were seeking $2,293.30 in total as a result of Ms. Osborne's $16.75 in purportedly missed tolls.

    (a)    For the first purported toll violation, which purportedly occurred on November 13, 2013 in an amount of $4.45, the Transurban Defendants assessed $100 in "administrative fees," $77 in "costs," and a $50 civil penalty, for a total of $231.45.

    (b)    For the second purported toll violation, which purportedly occurred on November 19, 2013 in an amount of $3.65, the Transurban Defendants assessed $100 in "administrative fees," $77 in "costs," and a $250 civil penalty, for a total of $430.65.

    (c)    For the third purported toll violation, which purportedly occurred on November 20, 2013 in an amount of $3.95, the Transurban Defendants assessed $100 in "administrative fees," $77 in "costs," and a $500 civil penalty, for a total of $680.95.

    (d)    For the fourth purported toll violation, which purportedly occurred on November 21, 2013 in an amount of $4.70, the Transurban Defendants assessed $100 in "administrative fees," $77 in "costs," and a $1000 civil penalty, for a total of $1,181.70.

147. The summonses were all "signed" by an automated computer program, not a

32

human as required by Virginia law.

148.    The administrative fees assessed to Ms. Osborne are unreasonable and are not related to the true costs the Transurban Defendants incurred to "administer" Ms. Osborne's file.

149.    The Transurban Defendants have improperly assessed ascending "civil penalties" up to $1,000 per violation, even though Ms. Osborne has never been found guilty of even one toll violation.

150.    Prior to the issuance of the summonses, Ms. Osborne was provided with no meaningful or adequate means to contest the fines and fees.

151.    Ms. Osborne has a court date in Fairfax County General District Court on June 9, 2015.

152.    No judgment of any sort has been entered against her to date.

## CLASS ALLEGATIONS

153.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. As detailed further below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

154.    The proposed classes are defined as:

**Class 1 (the "Outstanding Fee or Civil Penalties Class")**
All users of HOT Lanes in Virginia who hold or held an E-Z Pass at the time of the purported violation and who have been assessed an administrative fee and/or civil penalties by the Transurban Defendants, but who have not yet resolved a summons or had judgment entered against them.

Class Representatives: Plaintiffs Brown, Osborne.

**Class 2 (the "Resolution/Judgment Class")**
All users of HOT Lanes in Virginia who hold or held an E-Z Pass at the time of the purported violation and who have been assessed

an administrative fee and/or civil penalties by the Transurban Defendants, have been issued a summons by the Transurban Defendants, and have resolved the summons by settlement or judgment.

Class Representative: Plaintiff Pizarro

**Class 3 (the "LES Fair Debt Collection Practices Class")**
All natural persons who received correspondence from the Defendant LES (i) in an attempt to collect a debt on behalf of Defendant Transurban, (ii) that was incurred primarily for personal, household or family purposes (iii) during the one year period prior to the filing of the Complaint in this matter; and all natural persons who received correspondence from the Defendant LES stating "If you wish to dispute the validity of this debt or any portion thereof, you must notify this office, in writing, using the affidavit on the reverse side of this notice within 30 days. Otherwise, we will assume the debt is valid and will pursue all means available for its collection."

Class Representatives: Plaintiffs Pizarro, Osborne

155. Classes 1 through 3 are collectively referred to herein as the "Classes."

156. Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

157. Excluded from the Classes are Defendants, their parents, subsidiaries, affiliates, officers and directors, any entity in which Defendants have a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

158. **Numerosity.** The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be readily ascertained through Defendants' records. According to various sources, Transurban filed suit against 26,000 HOT lane users in 2014 alone.

159. **Commonality.** The claims of the representative Plaintiffs are typical of the claims

34

of the Classes that they seek to represent in that the representative Plaintiffs, like all Class members, were assessed illegitimate fee and fines by Transurban through notices, summonses, resolution, and/or judgment. The representative Plaintiffs, like all Class members, have been damaged by Defendants' misconduct in that Defendants have assessed unfair and unconscionable charges against them. Furthermore, the factual basis of Defendants' misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

160.     **Predominance.** There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

161.     Among the questions of law and fact common to the Classes are whether:

(a)      The Transurban Defendants tortiously interfered with the contract Plaintiffs and the classes had with the E-Z Pass Entities;

(b)      The Transurban Defendants were unjustly enriched through their fee and fine policies and practices;

(c)      Defendant LES is a debt collector under the FDCPA;

(d)      The Collection Defendants Violated the FDCPA;

(e)      The Transurban Defendants and the Collection Defendants violated the Maryland Consumer Protection Act and the Virginia Consumer Protection Act;

(f)      The Transurban Defendants violated the Eighth and Fourteen Amendments of the U.S. Constitution.

162.     Other questions of law and fact common to the Classes include:

(a)      The proper method or methods by which to measure damages; and

35

(b)     The declaratory relief to which the Classes are entitled.

163.     **Typicality.** Plaintiffs' claims are typical of the claims of other members of the Classes in that they arise out of the same wrongful policies and practices of the EZ Pass User Agreement and other related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Classes.

164.     **Adequacy.** Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly, each Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class(es) in which he or she is a proposed Class Representative.

165.     **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy.

166.     Even if members of the Classes themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer

management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

167. In the alternative, a class action as particular issues is appropriate here.

## FIRST CLAIM FOR RELIEF
### Tortious Interference with Contract
### (On Behalf of the Classes)

168. Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

169. Plaintiffs and E-Z Pass have contracted for toll road use services.

170. As part of that contract, Plaintiffs and the class members are entitled to, *inter alia*, use toll roads and may be assessed tolls and reasonable administrative fees and civil penalties where appropriate.

171. At all times, the Transurban Defendants were aware of the existence of the User Agreement between, on the one hand, Plaintiffs and the class members and, on the other hand, the E-Z Pass because the Transurban Defendants' business model for operation of the HOT Lanes assumes the existence of E-Z Pass users with E-Z Pass transponders. Indeed, cash payments are not accepted at any HOT Lanes toll gantries.

172. Transurban tortiously interferes with this contractual relationship and prevents Plaintiffs and the class members from obtaining the full benefits of this contractual relationship with the E-Z Pass Entities.

173. The E-Z Pass contracts nowhere authorize E-Z Pass or the Transurban Defendants to charge excessive and unreasonable administrative fees and civil penalties.

174. Virginia law specifically governs the fees and penalties the Transurban

37

Defendants may charge, as well as the time period for bringing suit for such fees and penalties.

175. The Transurban Defendants charged fees and penalties outside contrary to the Virginia law and contrary to the Plaintiffs' contracts with the E-Z Pass Entities. The Collection Defendants sought to collect those fees on Transurban Defendants' behalf.

176. Therefore, the Transurban Defendants tortiously interfered with the performance of the EZ Pass User Agreement.

177. The Transurban Defendants' tortious interference with the contract between Plaintiffs and the class members and the E-Z Pass Entities has resulted in an actual breach of these contracts because, as a result of the Transurban Defendants' tortious interference, Plaintiffs have been assessed fees and civil penalties not authorized by the User Agreements.

178. With respect to the Maryland members of the Classes, the Transurban Defendants additionally tortiously interfered with the Maryland E-Z Pass User Agreement, which expressly stated, in the "Schedule of Fees," that "Civil Penalties" would be no more than $50. Instead, the Transurban Defendants caused the assessment of civil penalties of up to $1,000 per violation.

179. With respect to the Maryland members of the Classes, the Transurban Defendants additionally tortiously interfered with the Maryland E-Z Pass User Agreement, which nowhere authorized the assessment of "administrative fees."

180. With respect to the Maryland members of the Classes, the Transurban Defendants and the Collection Defendants additionally tortiously interfered with the Maryland E-Z Pass User Agreement by attempting to collect debts purportedly owing for use of HOT Lanes. The Maryland E-Z Pass User Agreement only authorizes "referral to the State of Maryland Central Collection Unit ("CCU"). The Maryland Motor Vehicle Administration (MVA) and CCU may assess additional fees." It does not authorize debt collection by the Transurban Defendants or the

Collection Defendants.

181. With respect to users, like Plaintiff Brown, who initially opened their EZ-Pass account with E-Z Pass New York, the Transurban Defendants additionally tortiously interfered with the New York E-Z Pass User Agreement, which expressly stated, in the "Schedule of Fees," that "administrative" would be no more than "$50 per occurrence." Instead, the Transurban Defendants caused the assessment of administrative fees of $100 per violation.

182. With respect to Virginia members of the classes, the Transurban Defendants additionally tortiously interfered with the Virginia E-Z Pass User Agreement, which expressly stated, that any fees would be set by VDOT. Instead, the Transurban Defendants caused the assessment of fees and penalties beyond those set by VDOT.

183. As a direct, proximate, and foreseeable result of the Transurban Defendants' tortious interference with Plaintiffs and the class members' contracts with the E-Z Pass Entities, Plaintiffs and the class members have been legally injured and sustained damages by not receiving the full benefit of their contractual bargain.

184. Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the User Agreement.

185. Plaintiffs and members of the Classes have sustained damages as a result of the Transurban Defendants' tortious interference with the User Agreement.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the Classes)**

186. Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

187. Plaintiffs, on behalf of themselves and the Classes, assert a common law claim for

39

unjust enrichment, in the alternative.

188.    By means of the Defendants' wrongful conduct alleged herein, Defendants knowingly assessed charges on Plaintiffs and members of the Classes that were unfair, unconscionable, and/or oppressive.

189.    The Defendants knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes. In so doing, the Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Classes.

190.    As a result of the Defendants' wrongful conduct as alleged herein, the Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

191.    The Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

192.    It is inequitable for the Defendants to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of fees and fines on Plaintiffs and members of the Classes in an unfair, unconscionable, and oppressive manner. The Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

193.    The financial benefits derived by the Defendants rightfully belong to Plaintiffs and members of the Classes. The Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Classes all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by the Defendants traceable to Plaintiffs and the members of the Classes.

194.    Plaintiffs and members of the Classes have no adequate remedy at law.

40

### THIRD CLAIM FOR RELIEF
### Violation of 15 U.S.C. § 1692e(2), 1692f(1), and/or 1692g
### (On Behalf of the LES Fair Debt Collection Practices Class )

195.   Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

196.   As set forth above, the Collection Defendants violated the FDCPA by making false and misleading representations, and engaging in unfair and abusive practices in violation of § 1692g.

197.   The Collection Defendants also attempted to collect knowingly excessive and inflated fines and fees in violation of § 1692e(2), and/or 1692f(1).

198.   The Collection Defendants' violations of the FDCPA entitle Plaintiffs and members of the Classes to their actual damages (for only the e and f claims) in an amount to be proved at trial, to statutory damages (for the g claim), costs and attorneys' fees, and to any additional relief this Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
### Violation of the Maryland Consumer Protection Act
### Md. Code, Com. Law §§ 13-101, et seq.
### (On Behalf of Maryland Residents of the Classes)

199.   Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

200.   This cause of action is brought pursuant to Maryland's Consumer Protection Act, Md. Code, Com. Law § 13-101, et seq. ("MCPA").

201.   The MCPA declare unlawful deceptive and unfair trade practices such as, making false or misleading statements and other representations that have the capacity, tendency, or effect of deceiving or misleading consumers, failing to state material facts where the failure deceives or tends to deceive consumers, and engaging in deception, misrepresentation, or

knowing concealment, suppression, or omission of material facts with the intent that consumers rely on the same in connection with the promotion and sale of consumer goods or services.

202. Under the MCPA, Defendants' assessment of, and misleading representations regarding, excessive and unjustified administrative fees and civil penalties are unfair, deceptive and unconscionable.

203. Specifically, the summonses and debt collection letters discussed herein contain misrepresentations regarding the amount of purported debts and the reasons for the purported debts.

204. In addition, the $100 administrative fee assessed on each and every purported toll violation is itself a misrepresentation—the $100 amount is far in excess of any reasonable amount the Transurban Defendants pay to "administer" HOT Lanes' users' files.

205. Defendants violated the MCPA by engaging in a fraudulent and deceptive scheme to extort huge fines and penalties from Maryland consumers by threatening dire consequences. Many Maryland consumers are forced to succumb to the aggressive and misleading tactics of the Transurban Defendants and the Collection Defendants.

206. Defendants violated the MCPA by failing to disclose that, the Transurban Defendants had no basis to assess ascending civil penalties in the absence of a lawful finding of guilt on prior toll violations.

207. Defendants violated the MCPA by assessing civil penalties in excess of those authorized by the Maryland E-Z Pass User Agreement.

208. As a direct and proximate result of Defendants' deceptive, fraudulent, and unfair practices, Maryland residents have suffered injury in fact and/or actual damages in an amount to be determined at trial.

209.     Plaintiff Osborne, on behalf of herself and all others similarly situated, demands judgment against Defendants for damages and declaratory relief.

### FIFTH CLAIM FOR RELIEF
### Violation of the Virginia Consumer Protection Act
### Va. Code §§ 59.1-196, *et seq.*
### (On Behalf of Virginia Residents of the Classes)

210.     Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

211.     This cause of action is brought pursuant to Virginia's Consumer Protection Act, Va. Code §§ 59.1-196, *et seq.* ("VCPA").

212.     Under the VCPA, "supplier" means "a seller, lessor or licensor who advertises, solicits or engages in consumer transactions, or a manufacturer, distributor or licensor who advertises and sells, leases or licenses goods or services to be resold, leased or sublicensed by other persons in consumer transactions."

213.     Under the VCPA, "consumer transaction" means "the advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes."

214.     The VCPA declares as "unlawful" practices such "attempting to collect any ... penalties ... that are void or unenforceable under any otherwise applicable laws of the Commonwealth . . . ."

215.     In addition, the VCPA declares as "unlawful" practices such as "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

216.     Transurban Defendants were suppliers under the VCPA by advertising and providing a "service" to consumers in the form of the use of HOT lanes.  The Collection

Defendants were acting as agents of and on behalf of Transurban Defendants in attempting to collect the void and unenforceable penalties described herein.

217. Under the VCPA, Defendants' misleading representations regarding their excessive and unjustified administrative fees and civil penalties, as detailed above, were unfair, deceptive and unconscionable. As such, Defendants violated VCPA in attempting to collect these penalties.

218. Specifically, the summonses and debt collection letters sent to the Plaintiffs and discussed herein contain numerous misrepresentations regarding the amount of purported debts Plaintiffs and the class owed as well as the reasons for the purported debts.

219. In addition, the $100 administrative fee assessed on each and every purported toll violation discussed herein is itself a misrepresentation—the $100 amount is far in excess of any reasonable amount the Transurban Defendants pay to "administer" HOT Lanes' users' files.

220. Defendants violated the VCPA by engaging in a fraudulent and deceptive scheme to extort huge fines and penalties from Virginia consumers by threatening dire consequences. Many Virginia consumers have been forced to succumb to the aggressive and misleading tactics of the Transurban Defendants and the Collection Defendants.

221. Defendants violated the VCPA by failing to disclose that, the Transurban Defendants had no basis to assess ascending civil penalties in the absence of a lawful finding of guilt on prior toll violations.

222. Defendants violated the VCPA by assessing civil penalties in excess of those authorized by the Virginia E-Z Pass User Agreement and Virginia law.

223. As a direct and proximate result of Defendants' deceptive, fraudulent, and unfair practices, Virginia residents have suffered injury in fact and/or actual damages in an amount to

be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**42 U.S.C. Section 1983**
**Violation Of The Eighth Amendment Of The United States Constitution**
**(On Behalf of the Classes)**

224.    Pursuant to statute, the Transurban Defendants are operating under the authority of the Commonwealth of Virginia when they collect administrative fees and civil penalties for themselves. The Transurban Defendants keep such monies for their own use.

225.    The enforcement of the civil penalty assessments discussed above constitutes a violation of the Eighth Amendment's protection against excessive fines. Indeed, Plaintiffs and members of the Classes were assessed enormous fines and penalties that bear no relationship to the harm caused and are therefore unconstitutional.

226.    The Defendants impose these penalties in order to maximize profits for itself.

227.    As a direct and legal result of the acts and omissions of the Defendants, acting under the authority of the Commonwealth of Virginia, Plaintiffs and members of the Classes have suffered damages, and/or are entitled to restitution, in an amount to be proven at trial.

228.    Pursuant to 42 U.S.C. § 1988, Plaintiffs further seeks their costs and attorneys' fees incurred as a result of this lawsuit.

**SEVENTH CLAIM FOR RELIEF**
**42 U.S.C. Section 1983**
**Violation Of The Due Process And Equal Protection Clauses Of The Fourteen Amendment Of The United States Constitution**

229.    Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

230.    Pursuant to statute, the Transurban Defendants are operating under the authority of the Commonwealth of Virginia when they collect administrative fees and civil penalties for themselves. The Transurban Defendants keep such monies for their own use.

231.    The scheme described above violates the Due Process Clause of the Fourteenth Amendment for the following reasons, among others:

(a)    Defendants have 60 days to notify HOT Lanes users of a purported violation. Defendants fail to comply with this notice requirement. Even if they did, by the time notice is delivered HOT Lanes users, users may have passed through the toll road dozens of times, unknowingly racking up thousands of dollars in penalties.

(b)    There is no adequate opportunity to be heard on the amount of the civil penalty or the administrative fees.

(c)    Citizens of Virginia are subject to an extreme penalty that citizens of other states or commonwealths are not subject to. Specifically, Virginia citizens are deprived of their right to operate a motor vehicle and/or register a motor vehicle if they do not pay **judgments comprised of the** exorbitant fines and fees levied by the Transurban Defendants. Citizens of no other state or commonwealth are subject to this *harsh and devastating* penalty.

232.    The above procedures fail to provide adequate procedural protection for the due process rights under the Fourteenth Amendment of the United States Constitution and/or fail to provide equal protection of the laws to citizens of Virginia and other states or commonwealths.

233.    The deprivations of the rights of Plaintiffs and members of the Classes as described above were a proximate result of the policies, procedures, practices, and/or customs maintained by the Transurban Defendants. As a direct and legal result of the acts and omissions

46

of the Transurban Defendants, and each of them, Plaintiffs and members of the Classes have suffered damages, and/or are entitled to restitution, in an amount to be proven at trial.

234.    Plaintiffs and members of the Classes seek injunctive relief to stop the Transurban Defendants' unlawful policies, procedures, practices and/or customs described above.

235.    Pursuant to 42 U.S.C. § 1988, Plaintiffs further seek their costs and attorneys' fees incurred as a result of this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.    Declaring the Defendants' fee and penalty policies and practices and collection methods to be wrongful, unfair, and unconscionable and enjoining any such future collections;

2.    Restitution of fees and penalties paid to the Defendants by Plaintiffs and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.    Disgorgement of the ill-gotten gains derived by the Defendants from their misconduct;

4.    Actual damages in an amount according to proof;

5.    Punitive and exemplary damages;

6.    Pre-judgment interest at the maximum rate permitted by applicable law;

7.    Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.    Such other relief as this Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**

Dated: April 15, 2015

Respectfully submitted,

Bernard J. DiMuro (VSB No. 18784)
Stephen L. Neal Jr. (VSB No. 87064)
Harvey B. Cohen (VSB No. 06440)
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, Virginia 23314
(703) 684-4333
Fax: (703) 548-3181
Email: bdimuro@dimuro.com
Email: sneal@dimuro.com
Email: hcohen@dimuro.com

Walter D. Kelley, Jr. (VSB# 21622)
James J. Pizzirusso (VSB# 47296)
Nathaniel C. Giddings
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200
Fax: (202) 540-7201
Email: wkelley@hausfeld.com
Email: jpizzirusso@hausfeld.com
Email: ngiddings@hausfeld.com

Jeffrey D. Kaliel
TYCKO & ZAVAREEI LLP
2000 L Street, NW, Suite 808
Washington, DC 20036
(202) 973-0900
Fax: (202) 973-0950
Email: jkaliel@tzlegal.com

Matthew T. Sutter, Esq.
VA Bar No. 66741
Wade, Friedman & Sutter P.C.
616 North Washington Street
Alexandria, VA 22314
703-836-9030
Fax: 703-683-1543
Email: sutter@oldtownlawyers.com
Brian C. Gudmundson
Behdad C. Sadeghi

ZIMMERMAN REED, PLLP
1100 IDS Center, 80 South Eighth Street
Minneapolis, MN 55402
(612) 341-0400
Fax: (612) 341-0844
Email: brian.gudmundson@zimmreed.com
Email: behdad.sadeghi@zimmreed.com

(*Pro Hac Vices* to be submitted for non-Virginia attorneys)

*Attorneys for Plaintiffs and the Proposed Class*