IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

JO-ANN BROWN, et al.            )
                                )
                                )
      Plaintiffs,               )
                                )
         v.                     )     1:15cv494(JCC/MSN)
                                )
TRANSURBAN USA, INC., et al.    )
                                )
      Defendants.               )

**M E M O R A N D U M   O P I N I O N**

This case involves Virginia's hotly contested "Public-Private" toll lane scheme.  Plaintiffs in this case seek class action status, and are all users of the High-Occupancy Toll Roads operated by Defendants in Northern Virginia.  This matter is before the Court on three motions to dismiss Plaintiffs' Amended Complaint, filed by (1) Defendants Transurban (USA), Inc., Transurban (USA) Operations, Inc., Capital Beltway Express, LLC, 95 Express Lanes, LLC (the "Transurban" Defendants) [Dkt. 41]; (2) Defendant Faneuil, Inc. ("Faneuil") [Dkt. 44]; and (3) Defendant Law Enforcements Systems, LLC ("LES") [Dkt. 49].  For the following reasons, the Court grants Transurban, Faneuil, and LES's motions with respect to Plaintiffs' substantive due process and unjust enrichment claims; grants Faneuil and LES's motions with respect to

1

Plaintiffs' Maryland Consumer Protection Act and Virginia

Consumer Protection Act claims; and denies Transurban, Faneuil,

and LES's motions with respect to Plaintiffs' Eighth Amendment,

procedural due process, Fair Debt Collection Practices Act, and

tortious interference with contract claims.

## I. Background

At the motion to dismiss stage, the Court must read

the amended complaint as a whole, construe the amended complaint

in a light most favorable to the plaintiff, and accept the facts

alleged in the amended complaint as true. *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).  Thus, the following facts taken from

the amended complaint are only accepted as true for purposes of

the three motions now before the Court.

Pursuant to the Public-Private Transportation Act

("PPTA"),[1] passed by the Virginia General Assembly in 1995,

Transurban contracted with the Commonwealth of Virginia to

maintain and operate high-occupancy toll lanes ("HOT lanes") on

---

[1] "There is a public need for timely development and/or operation
of transportation facilities within the Commonwealth that
address the needs identified by the appropriate state, regional,
or local transportation plan by improving safety, reducing
congestion, increasing capacity, enhancing economic efficiency,
or any combination thereof and that [because] such public need
may not be wholly satisfied by existing methods of procurement
. . . private entities [are authorized] to develop and/or
operate one or more transportation facilities [that] may result
in the development and/or operation of such transportation
facilities to the public in a more timely, more efficient, or
less costly fashion, thereby serving the public safety and
welfare."  Va. Code Ann. §§ 33.2-1801(A)(1), (3).

the Capital Beltway, Interstate 495 ("I-495"), which opened on November 17, 2012, and on Interstate 95 ("I-95") and Interstate 395 ("I-395"), which opened on December 29, 2014.  (Am. Compl. [Dkt. 36] ¶¶ 24-27.)  The HOT lanes on I-495 are colloquially known as the "495 Express Lanes" and the HOT lanes on I-95 and I-395 are colloquially known as the "95 Express Lanes."  (*Id.* at ¶ 25.)  Both the 495 Express Lanes and the 95 Express Lanes collect HOT lane tolls through the use of an E-ZPass transponder mounted on the inside of the vehicle's windshield, which is linked to the driver's bank account or credit card; no cash toll booths are offered and instead, an E-ZPass transponder is required.  (*Id.* at ¶¶ 26-27.)  HOT lane prices on the 495 Express Lanes and the 95 Express Lanes vary dynamically "according to real-time traffic conditions: the more drivers using the HOT Lanes, the more expensive the toll, and vise-versa."  (*Id.* at ¶ 26.)  When an E-ZPass account is out of money to pay tolls, the bank account or credit card is automatically charged to reload the E-ZPass account.  (*Id.* at ¶ 27.)  An E-ZPass account can become inadequately funded if the linked credit card expires or is otherwise cancelled.  (*Id.* at ¶ 59.)

### A. Virginia's HOT Lanes Law

Virginia law governs the creation of HOT lanes (hereinafter collectively referred to as the "HOT lanes law").  (Am. Compl. ¶ 42 (citing Va. Code Ann. §§ 33.2-502, 503).)  The

operator of a motor vehicle "shall make arrangements with the HOT lanes operator for payment of the required toll prior to entering such HOT lanes." Va. Code Ann. § 33.2-503. Failure to make such arrangements, *i.e.*, failure to pay the required toll, violates Virginia law and such a violation is subject to civil penalties, including payment of the unpaid toll, fines, fees, and costs. *Id.* Enforcement of this statutory provision is accomplished by issuance of a summons for a civil violation,[2] which can occur one of two ways.

First, if a law-enforcement officer observes an HOT lane violation, the officer may execute a summons for the violation. Va. Code Ann. § 33.2-503(1). Second, a summons may be executed if a violation is evidenced by information obtained from a photo-enforcement system, which the HOT lane operator is required to install and operate at all toll-collection locations. *Id.* §§ 33.2-503(2)(a)-(b). "A certificate, sworn to or affirmed by a technician employed or authorized by the HOT lanes operator, or a facsimile of such certificate, based on

---

[2] All summonses for civil violations must be executed on a form prescribed by the Supreme Court of Virginia. *See generally* Va. Code Ann. § 33.2-503. A summons issued for a violation may be executed by first-class mailing to the address of the owner of the vehicle as shown by records maintained by the Department of Motor Vehicles. Va. Code Ann. § 33.2-503(2)(c) (citing Va. Code Ann. § 19.2-76.2). "HOT lanes operator personnel or their agents mailing such summons shall be considered conservators of the peace for the sole and limited purpose of mailing such summons." *Id.*

inspection of photographs, microphotographs, videotapes, or other recorded images produced by a photo-enforcement system, shall be prima facie evidence of the facts contained therein." *Id.* § 33.2-503(2)(b).  This second enforcement mechanism, whereby a summons is issued based on evidence obtained from a photo-enforcement system, is the enforcement mechanism primarily at issue in this litigation.

The summons shall provide the registered owner of the vehicle with "reasonable notice" that the vehicle was used in violation of this statute, and provide "notice of the time and place of the hearing and notice of the civil penalty and costs for such offense."  Va. Code Ann. § 33.2-503(2)(d).  The HOT lanes operator may impose an administrative fee in addition to the unpaid toll, "so as to recover the expenses of collecting the unpaid toll, [but the] administrative fee shall be reasonably related to the actual cost of collecting the unpaid toll."  *Id.* § 33.2-503(3)(a).  The summons shall contain an option for the driver or registered owner of the vehicle to prepay the unpaid toll and all penalties, administrative fees, and costs.  *Id.* § 33.2-503(2)(c).  If the operator of the vehicle pays the administrative fee and unpaid tolls within 30 days of notification, the administrative fee shall not exceed $25.  *Id.* § 33.2-503(3)(a).  Otherwise, the administrative fee shall not exceed $100.  *Id.*  If the operator of the vehicle

contests the violation but a court of competent jurisdiction[3]
finds that the operator of the vehicle did violate the statute,
the court shall impose a civil penalty payable to the HOT lanes
operator as follows:  "for a first time offense, $50; for a
second offense, $250; for a third offense within a period of two
years of the second offense, $500; and for a fourth and
subsequent offense within a period of three years of the second
offense, $1,000, together with, in each case, the unpaid toll,
all accrued administrative fees imposed by the HOT lanes
operator . . . and applicable court costs."  *Id.* § 33.2-
503(3)(b).  Failure to pay the required penalties, fees, and
costs can result in suspension of the operator's vehicle
registration and license.  *Id.* § 33.2-503(3)(c).

### B. Defendants' Alleged Enforcement Procedure

As the HOT lanes operator, Transurban enforces civil
violations[4] of the HOT lanes law and attempts to collect payment

---

[3] "Any action under this section shall be brought in the general
district court of the county or city in which the violation
occurred."  Va. Code Ann. § 33.2-503(7).  Any appeal as a matter
of right is heard *de novo* by the circuit court.  Va. Code Ann. §
16.1-106.

[4] Practically speaking, a "violation" of the HOT lanes law could
occur for a variety of reasons.  (*See* Am. Compl. ¶¶ 55-58
(alleging a violation could occur because the electronic toll
reading equipment (hereinafter referred to as a "gantry") simply
fails to register a valid E-ZPass, or because of a tinted
windshield, position of the car in the HOT lane, a dead E-ZPass
battery, or cancelled credit card account).)  A violation could
also occur if the vehicle does not have an E-ZPass transponder,
does not have an active E-ZPass account, or has allowed funding

for unpaid tolls by providing notice to the registered operator of the motor vehicle.  (Am. Compl. ¶¶ 45, 59.)  Once an alleged "violation" occurs, the operator of the motor vehicle does not immediately receive notice of the infraction.  (*Id.* at ¶¶ 57-58.)  Instead, an operator of a motor vehicle in violation of the HOT lanes law "may not find out for months (or even over a year)" until Transurban mails the notice or summons.  (*Id.* at ¶ 58.)  "If a driver somehow 'knows' that she has committed a toll violation, within 5 days of that violation, she can pay the toll and a[n administrative] fee of $1.50 per trip through the 'Missed a Toll' process on Defendant Transurban's website." (*Id.* at ¶ 60.)  Otherwise, the unknowing violator will not become aware of the violation until Transurban issues a notice through the mail.  (*Id.*)

Specifically, Transurban will first mail an "unpaid toll notice" to the registered owner of the motor vehicle requesting payment of the unpaid tolls, plus a $12.50 administrative fee that is assessed for each violation (hereinafter "the first notice").  (Am. Compl. ¶ 60.)  The first notice requests payment or notice that the driver disputes the

---

to the E-ZPass account to expire.  However, "[t]he underlying reason for any particular purported toll violation is irrelevant for the purposes of the claims herein.  Regardless of the reason for the violation, the Transurban Defendants' enforcement procedures for purported toll violations are contrary to law." (*Id.* at ¶ 54.)

violation within 30 days.  (*Id.*)  If the toll remains unpaid
after 30 days, Transurban issues a "final toll invoice" that
requests payment of the unpaid tolls, plus a $25 administrative
fee for each violation (hereinafter "the final notice").  (*Id.*
at ¶ 61; *see also* Transurban's Mem. [Dkt. 42] Ex. C.)  The final
notice requests payment within 30 days and states that
Transurban will refer any failure to pay to its debt collection
agency, LES.  (*Id.*)  Transurban takes "no efforts to ensure or
confirm that the invoices they mail actually reach their
intended recipients . . . even when these invoices are returned
as undeliverable."  (Am. Compl. ¶ 71.)  If Transurban refers the
account for debt collection, LES will issue a collection notice
to the driver that requests payment of the unpaid tolls, plus a
$100 administrative fee for each violation ("the collection
notice").  (*Id.* at ¶¶ 74-84.)  "LES regularly tells consumers in
correspondence that 'this is an attempt to collect a debt and
any information obtained will be used for that purpose' and/or
that the communication is from a debt collector."  (*Id.* at ¶
75.)  LES attempts to make debt validation disclosures in the
collection notice pursuant to the Fair Debt Collection Practices
Act ("FDCPA"), but "does not comply with the FDCPA in several
respects."  (*Id.* at ¶¶ 77-84 (alleging that LES fails to
identify the creditor, Transurban, fails to include any of the

statutory disclosures, and falsely represents the character and amount of the debt).)

If the toll is still unpaid, Transurban engages the services of Faneuil, which initiates collection lawsuits by executing a summons through first-class mail to the registered owner of the motor vehicle. (Am. Compl. ¶¶ 3, 85.) Either Transurban or Faneuil issues "electronically-produced summonses robo-signed by machines. They do not issue summonses sworn to or affirmed by humans, as required by Virginia law." (*Id.* at ¶¶ 86, 88-89, 118.) Moreover, it is alleged that Transurban or Faneuil issues summonses that "include an identical pre-printed signature, placed and proportioned on the forms in the same manner for all summonses." (*Id.* at ¶ 89.) And in some cases, Transurban or Faneuil issues summonses more than one year after the purported toll violation, in violation of Virginia law. (*Id.* at ¶¶ 92-94.) Plaintiffs also allege that Transurban has failed to appear in court, but instead sends a non-lawyer independent contractor for Faneuil to make court appearances. (*Id.* at ¶¶ 95-96 ("Defendant Transurban sent Alexis Brach (a non-lawyer) to appear on its behalf. Because Ms. Brach is an independent contractor for Defendant Faneuil, [the court] ruled she could not and cannot represent the Transurban Defendants in court.").)

On October 27, 2014, approximately two years after the opening of the 495 Express Lanes and prior to the opening of the 95 Express Lanes, Transurban announced the implementation of a "First-Time Forgiveness" program for HOT lane violations. (Am. Compl. ¶ 97.)  This program includes:

> (a) If a consumer contacts Defendant Transurban within 60 days of toll violation, the company will remove automatically-assessed administrative fees, where toll violation arose from insufficient funds in an E-ZPass account, failure to link a license plate to the E-ZPass account or an incorrectly mounted E-ZPass;
>
> (b) In the event that Defendant Transurban sends an E-ZPass customer an invoice and the letter is returned with an unknown address, Defendant Transurban will send the invoice to a debt collection agency but will waive all fees if the customer contacts it and provide[s] evidence the customer has resolved the account issues with E-ZPass and has paid his tolls; and
>
> (c) Defendant Transurban will continue to collect through court action, but "will put a cap on the number of trips sent to court and pursue a maximum of $2,220 (which includes the administrative fee + civil penalties), plus tolls and court fees, regardless of the number of violations.

(*Id.*)  Plaintiffs allege that this new policy nonetheless fails to resolve the problem of "excessive, illegal, and unreasonable fees and fines" for various reasons.  (*Id.* at ¶¶ 98-102.)

### C. Class Representatives

Seven individual Plaintiffs bring this lawsuit against Defendants and claim, generally, that they were assessed massive fees and penalties for minor toll violations on the 495 Express Lanes and 95 Express Lanes that were unreasonable and improper. (Am. Compl. ¶¶ 109-219.)  At all relevant times, each Plaintiff had previously signed up for an E-ZPass account,[5] his or her E-ZPass transponder was mounted on the windshield of the vehicle, and the E-ZPass account was linked to a valid payment method for automatic replenishment.[6]  (Am. Compl. ¶¶ 109, 124, 138, 152, 175, 191, 204.)  Each Plaintiff also alleges that at the time he or she entered the HOT lanes, no indication was given that the E-ZPass was unread or maintained an insufficient balance.  (*Id.* at ¶¶ 111, 126, 140, 154, 177, 193, 206.)  Moreover, each Plaintiff alleges that any eventual summons he or she received was "signed" by an automated computer program, in violation of Virginia law.  (*Id.* at ¶¶ 119, 133, 147, 159, 186, 199, 214.)  Each Plaintiff, and the facts specific to his or her claim, is summarized briefly below.

### 1. Plaintiff Jo-Ann Brown

---

[5] Plaintiffs signed up for an E-ZPass account through various states, including New York, Maryland, or Virginia.  This distinction is irrelevant for purposes of the motions now before the Court.

[6] Plaintiff Jocelyn Chase does not allege that her E-ZPass account was linked to a valid payment method for automatic replenishment.  (Am. Compl. ¶ 204.)

Between October 4 and October 12, 2013, Transurban determined that Plaintiff Jo-Ann Brown ("Brown") violated the HOT lanes law on five separate occasions, totaling $4.15 in toll violations. (Am. Compl. ¶¶ 110-114.) Brown did not receive notice of the toll violations until sixty (60) days later, when she received a letter from "495 Express Lanes" stating that she owed $4.15 in tolls and $100 in administrative fees. (*Id.* at ¶ 115.) Brown protested but nonetheless agreed to pay the amount due, but 495 Express Lanes declined to accept Brown's payment. (*Id.* at ¶¶ 116-117.) In October of 2014, Transurban served Brown with several summonses, which indicated that it was seeking $3,413.75 in total as a result of the $4.15 cumulative toll violation. (*Id.* at ¶ 118 (breaking down the administrative fee, cost amount, and civil penalty sought for each violation).) Transurban assessed a $100 administrative fee and $72 in costs for each of the five toll violations. (*Id.*) The first toll violation was accompanied by a $50 civil penalty; the second toll violation was accompanied by a $250 civil penalty; and the third toll violation was accompanied by a $500 civil penalty; and the fourth and fifth toll violations were each accompanied by a separate $1,000 civil penalty. (*Id.*) Prior to the issuance of the summons, Brown had no meaningful or adequate means to contest the fines and fees, and no judgment has been entered against her to date. (*Id.* at ¶¶ 122-123.)

### 2. Plaintiff Anna Stanfield

Between June 18 and July 3, 2013, Transurban determined that Plaintiff Anna Stanfield ("Stanfield") violated the HOT lanes law on ten separate occasions, totaling $32.70 in toll violations.  (Am. Compl. ¶¶ 126-128.)  In October of 2014, Transurban served Stanfield with several summonses, which indicated that it was seeking $8,380.70 in total as a result the total $32.70 toll violation.  (*Id.* at ¶ 129 (breaking down the administrative fee, cost amount, and civil penalty sought for each violation).)  Transurban assessed a $100 administrative fee and $72 in costs for each of the ten toll violations.  (*Id.*) And as with Brown, Transurban assessed escalating civil penalties, starting at $50 for the first violation, rising to $250 for the second violation, $500 for the third violation, and $1,000 for each of the subsequent violations.  (*Id.*)  Transurban issued all of the summonses more than one year after the date of the purported toll violations.  (*Id.* at ¶ 134.)  Prior to the issuance of the summons, Stanfield had no meaningful or adequate means to contest the fines and fees.  (*Id.* at ¶ 135.)  After receiving the summonses, Stanfield contacted Transurban, and after feeling enormous pressure to resolve the matter, Stanfield was pressured into paying Transurban $2,200.  (*Id.* at ¶¶ 136-137.)

13

### 3. Plaintiff Rachel Amarti

Between June 3 and July 22, 2013, Transurban determined that Plaintiff Rachel Amarti ("Amarti") violated the HOT lanes law on twenty-six separate occasions, with total toll violations in excess of $100. (Am. Compl. ¶¶ 139-142.)  In 2014, Transurban served Amarti with several summonses, which indicated that it was seeking over $25,000 as a result these toll violations. (*Id.* at ¶ 143 (breaking down the administrative fee, cost amount, and civil penalty sought for each violation).)  Transurban assessed a $100 administrative fee and $72 in costs[7] for each of the ten toll violations. (*Id.*) And as with Brown and Stanfield, Transurban assessed escalating civil penalties, starting at $50 for the first violation, rising to $250 for the second violation, $500 for the third violation, and $1,000 for each of the subsequent violations. (*Id.*) Transurban issued all of the summonses more than one year after the date of the purported toll violations. (*Id.* at ¶ 148.) Prior to the issuance of the summons, Amarti had no meaningful or adequate means to contest the fines and fees. (*Id.* at ¶ 149.)  After receiving the summonses, Amarti contacted Transurban, and after feeling enormous pressure to resolve the

---

[7] Amarti claims that Transurban assessed $82 in costs for the first toll violation in the amount of $4.80. (Am. Compl. ¶ 143(a).)  Otherwise, Transurban assessed $72 in costs for each subsequent toll violation. (*Id.* at ¶ 143(b)-(y).)

matter, Amarti was pressured into paying Transurban $3,600. (*Id.* at ¶¶ 150-151.)

### 4. Plaintiff Mary Elise Pizarro

Between May 8 and May 28, 2013, Transurban determined that Plaintiff Mary Elise Pizarro ("Pizarro") violated the HOT lanes law on seven separate occasions, totaling $20.50 in toll violations. (Am. Compl. ¶¶ 153-156.) Pizarro received additional notices of violations in July. (*Id.* at ¶ 156.) Pizarro first received notice of purported toll violations one month after the alleged violation, when she received four "Final Notices" stating that she owed tolls and associated fees. (*Id.* at ¶ 157.) Pizarro regularly used the 495 Express Lanes to commute to and from work, but the invoices indicated violations for only part of a round trip, allegedly a clear indication that some sort of equipment failure was to blame for the violations. (*Id.* at ¶ 158.) Pizarro immediately contacted Transurban to challenge the violations, and the Transurban representative stated that the toll violations may have resulted from how the E-ZPass transponder was mounted on the windshield. (*Id.* at ¶ 159.) Pizarro requested that Transurban debit the toll amounts from her E-ZPass account and understood that the tolls and fees would be assessed in this manner. (*Id.*) After this telephone call, Pizarro received two additional "Final Notices" from Transurban. (*Id.* at ¶ 160.) Pizarro immediately disputed these

15

and all other violations on the Transurban website.  (*Id.* at ¶ 161.)

On July 18, 2013, Transurban e-mailed Pizarro and denied her request due to insufficient funds, even though Pizarro maintained a sufficient balance on her E-ZPass account. (Am. Compl. ¶ 162.)  In January of 2014, Pizarro ceased using the 495 Express Lanes and closed her account.  (*Id.* at ¶ 163.) Shortly thereafter, E-ZPass refunded her approximately $83, which was the positive balance on her account.  (*Id.* at ¶ 164.) In September of 2014, Transurban served Pizarro with ten summonses, which indicated that it was seeking $9,440.90 for ten purported toll violations totaling approximately $20.  (*Id.* at ¶¶ 165-166 (breaking down the administrative fee, cost amount, and civil penalty sought for each violation).)  Transurban assessed a $100 administrative fee and $72 in costs for each of the ten toll violations.  (*Id.*)  And as with the previously mentioned Plaintiffs, Transurban assessed escalating civil penalties, starting at $50 for the first violation, rising to $250 for the second violation, $500 for the third violation, and $1,000 for each of the subsequent violations.  (*Id.*)  Transurban issued all of the summonses more than one year after the date of the purported toll violations.  (*Id.* at ¶ 170.)  Prior to the issuance of the summons, Pizarro had no meaningful or adequate means to contest the fines and fees.  (*Id.* at ¶ 171.)  After

16

receiving the summonses, Pizarro contacted Transurban, and after feeling enormous pressure to resolve the matter, Pizarro was pressured into paying Transurban $1,513.90.[8]  (*Id.* at ¶¶ 172-174.)

### 5. Plaintiff Duane Hale

Between July 6 and November 11, 2013, Transurban determined that Plaintiff Duane Hale ("Hale") violated the HOT lanes law on sixteen separate occasions, totaling $30.65 in toll violations.  (Am. Compl. ¶¶ 176-179.)  Hale received notices demanding payment for unpaid tolls, despite having a positive balance on his E-ZPass account, and promptly disputed these initial notices but Transurban "persisted."  (*Id.* at ¶ 181.)  In October of 2014, Transurban served Hale with sixteen summonses, which indicated that it was seeking over $15,000 for toll violations totaling $30.65.  (*Id.* at ¶¶ 182-183 (breaking down the administrative fee, cost amount, and civil penalty sought for each violation).)  Transurban assessed a $100 administrative fee and $72 in costs for each of the sixteen toll violations.  (*Id.*)  And as with the previously mentioned Plaintiffs, Transurban assessed escalating civil penalties, starting at $50

---

[8] After contacting Transurban, the Transurban employee advised that Pizarro had committed four additional toll violations in July of 2013 that she was not yet aware of, and offered to settle these charges for 413.90 to avoid having them go to court.  (Am. Compl. ¶ 173.)

for the first violation,[9] rising to $250 for the second

violation, $500 for the third violation, and $1,000 for each of

the subsequent violations.  (*Id.*)  Transurban issued all of the

summonses more than one year after the date of the purported

toll violations.  (*Id.* at ¶ 187.)  Prior to the issuance of the

summons, Hale had no meaningful or adequate means to contest the

fines and fees.  (*Id.* at ¶ 171.)  Hale had a court date in

Fairfax County General District Court on March 16, 2014 at which

all of the summonses were "null processed."  (*Id.* at ¶ 189.)  No

judgment has been entered against Hale to date.  (*Id.* at ¶ 190.)

### 6. Plaintiff Michelle Osborne

Between November 13 and November 21, 2013, Transurban

determined that Plaintiff Michelle Osborne ("Osborne") violated

the HOT lanes law on four separate occasions, totaling $16.75 in

toll violations.  (Am. Compl. ¶¶ 192-196.)  Four months later,

Osborne first received notice of the purported violations

through a "Demand for Payment and Credit Bureau Warning Letter"

from LES, stating that she owed $312.20 for three toll

violations.  (*Id.* at ¶ 197.)  In December of 2014, Transurban

served Osborne with summonses, which indicated that it was

seeking $2,293.30 for toll violations totaling $16.75.  (*Id.* at

¶ 198 (breaking down the administrative fee, cost amount, and

---

[9] Transurban allegedly assessed a $50 civil penalty for the
second violation, but escalated from there.  (Am. Compl. ¶
182(b).)

civil penalty sought for each violation).)  Transurban assessed
a $100 administrative fee and $77 in costs for each of the four
toll violations.  (*Id.*)  And as with the prior Plaintiffs,
Transurban also assessed escalating civil penalties, starting at
$50 for the first violation, rising to $250 for the second
violation, $500 for the third violation, and $1,000 for the
fourth violation.  (*Id.*)  Prior to the issuance of the summons,
Osborne had no meaningful or adequate means to contest the fines
and fees.  (*Id.* at ¶ 202.)  No judgment has been entered against
Osborne to date.  (*Id.* at ¶ 203.)

### 7. Plaintiff Jocelyn Chase

Between June 23 and September 4, 2014, Transurban
determined that Plaintiff Jocelyn Chase ("Chase") violated the
HOT lanes law on twenty-nine separate occasions, totaling $30.95
in toll violations.  (Am. Compl. ¶¶ 205-209.)  Chase did not
receive a notice until more than two months after the first
purported toll violation, when she received an "Unpaid Toll
Invoice" letter from Capital Beltways Express, LLC.  (*Id.* at ¶
210.)  Between September and November of 2014, Chase received a
total of six of these "Unpaid Toll Invoice" letters seeking
payment for twenty-three of the twenty-nine toll violations, but
never received this initial notice for six of the violations.
(*Id.*)  The first time Chase received notice of these six
additional violations was on March 3, 2015, when LES sent a

19

credit bureau warning letter for two of the violations, and on December 11, 2014, when LES sent a notice of assignment on the remaining four violations. (*Id.* at ¶ 211.)  By March 3, 2015, LES was seeking a total of $1,817.85 for eighteen alleged toll violations, but by the time LES reported these violations to the credit bureaus, the total had grown to $1,919.10. (*Id.* at ¶ 212.)  On May 25, 2015, Transurban served Chase with summonses, which indicated that it was seeking $2,512.10 for only four toll violations totaling $4.10. (*Id.* at ¶ 213 (breaking down the administrative fee, cost amount, and civil penalty sought for each violation).)  Transurban assessed a $100 administrative fee and $77 in costs for each of the four toll violations. (*Id.*)  And just as with the prior Plaintiffs, Transurban also assessed escalating civil penalties, starting at $50 for the first violation, rising to $100 for the second violation, $250 for the third violation, and $500 for the fourth violation. (*Id.*)  Prior to the issuance of the summons, Chase had no meaningful or adequate means to contest the fines and fees. (*Id.* at ¶ 217.)  Chase had a court date in Fairfax County General District Court on June 24, 2015, but no judgment has been entered against her to date. (*Id.* at ¶¶ 218-219.)

### D. Claims Raised in the Amended Complaint

The seven individual Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant

to Rule 23 of the Federal Rules of Civil Procedure.[10]  (Am.
Compl. ¶ 220.)  Plaintiffs set forth eight claims for relief,
and ultimately ask the Court to (1) declare Defendants' fee
policies and collection methods to be wrongful, unfair, and
unconscionable, and enjoin any such future collections; (2)
order restitution of fees and penalties paid by Plaintiffs to
Defendants; (3) order disgorgement of ill-gotten gains derived
from Defendants' conduct; (4) award actual damages; (5) award
punitive and exemplary damages; and (6) award pre-judgment
interest and costs as applicable.  (*Id.* at ¶¶ 235-312.)
Specifically, Plaintiffs, by their applicable classes, bring the

---

[10] Plaintiffs propose three "classes." (Am. Compl. ¶ 221.)  Class
One, the "Outstanding Fee or Civil Penalties Class," constitutes
all users of HOT lanes in Virginia who held an E-ZPass account
at the time of the purported violation and who have been
assessed fees or penalties by Transurban but who have not
executed a release or had judgments entered against them.  (*Id.*)
Class Two, the "Settlement/Judgment Class," constitutes all
users of HOT lanes in Virginia who held an E-ZPass account at
the time of the purported violation and who have been assessed
fees or penalties by Transurban, have been issued a summons by
Transurban, and who have resolved the summons by settlement or
judgment.  (*Id.*)  And Class Three, the "LES Fair Debt Collection
Practices Class," constitutes all natural persons who received
correspondence from LES (1) in an attempt to collect a debt on
behalf of Transurban; (2) that was incurred primarily for
personal, household, or family purposes; and (3) during the one
year period prior to the filing of this Complaint, and all
natural person who received correspondence from LES stating, "If
you wish to dispute the validity of this debt or any portion
thereof, you must notify this office, in writing, using the
affidavit on the reverse side of this notice.  Otherwise, we
will assume the debt is valid and will pursue all means
available for its collection." (*Id.*)

following claims against the following Defendants, which have
been grouped into three categories for ease.

### 1. Constitutional Claims against only Transurban

Claims One, Two, and Three, brought only against the
Transurban Defendants, allege that Transurban has violated 42
U.S.C. § 1983, the United States Constitution, and the Virginia
Constitution.  Specifically, in Claim One, Plaintiffs allege
that Transurban violated 42 U.S.C. § 1983 by levying excessive
fines in violation of the Eighth Amendment to the United States
Constitution.  (Am. Compl. ¶¶ 235-241.)  Separately, Claim One
also sets forth a violation of Article I, Section 9 of the
Virginia Constitution,[11] which also prohibits excessive bail and
excessive fines.  (*Id.*)  In Claim Two, Plaintiffs again allege a
violation of 42 U.S.C. § 1983, but based upon alleged
infringements of their procedural due process rights under the
Fifth and Fourteenth Amendments to the United States
Constitution.  And again, separately, Plaintiffs also allege a
violation of Article I, Section 11 of the Virginia Constitution.
(*Id.* at ¶¶ 242-248.)  In Claim Three, also brought pursuant to
42 U.S.C. § 1983, Plaintiffs allege that Transurban violated
their substantive due process rights by collecting excessive and
unreasonable fees and penalties, contrary to Virginia law and to

---

[11] Plaintiffs erroneously refer to Article I, Section 11 of the
Virginia Constitution, which discusses, *inter alia*, due process
of law, and is cited in Claim Two.  (*See* Am. Compl. at 53, 54.)

Plaintiffs' contract with the non-party E-ZPass entities. (*Id.* at ¶¶ 249-257.)

### 2. State Law Claims against All Defendants

Plaintiffs assert four claims under state law against all named Defendants.  In Claim Four, entitled "Unjust Enrichment," Plaintiffs allege that all Defendants knowingly received and retained wrongful benefits as a result of their wrongful conduct in conscious disregard of Plaintiffs' rights. (*Id.* at ¶¶ 258-267.)  In Claim Six, Maryland Plaintiffs allege that all Defendants violated the Maryland Consumer Protection Act, Md. Code, Com. Law §§ 13-101, *et seq.*, by engaging in unlawful, unfair, and deceptive trade practices.  (*Id.* at ¶¶ 272-282.)  Similarly, in Claim Seven, Virginia Plaintiffs allege that all Defendants violated the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq.*, by engaging in unlawful, unfair, and deceptive trade practices.  (*Id.* at ¶¶ 283-296.)  And in Claim Eight, entitled "Tortious Interference with Contract," Plaintiffs allege that all Defendants knowingly interfered with Plaintiffs' contractual relationship with the E-ZPass entities under the E-ZPass contracts.  (*Id.* at ¶¶ 297-312.)

### 3. FDCPA Claim against only Collection Defendants

Lastly, in Claim Five, Plaintiffs allege that Faneuil and LES, the Collection Defendants, violated the Fair Debt

23

Collection Practices Act ("FDCPA") by making false and misleading representations, and by engaging in unfair and abusive debt collection practices in violation of 15 U.S.C. § 1692g.  (Am. Compl. ¶ 269.)  Plaintiffs also allege that the Collection Defendants attempted to collect knowingly excessive and inflated fines and fees in violation of 15 U.S.C. §§ 1692e(2), 1692f(1).  (*Id.* at ¶ 270.)

### E. Motions Now Before the Court

Transurban, Faneuil, and LES each filed a motion to dismiss with a memorandum in support.  (Transurban's Mot. [Dkt. 41]; Transurban's Mem. in Supp. [Dkt. 42]; Faneuil's Mot. [Dkt. 44]; Faneuil's Mem. in Supp. [Dkt. 45]; LES's Mot. [Dkt. 49]; LES's Mem. in Supp. [Dkt. 50] (collectively "the motions").)  The motions raise four general issues that the Court must address.  First, whether the Plaintiffs' claims are justiciable and properly before this Court of limited jurisdiction.  (*See* Transurban's Mem. at 4-6.)  Second, whether Plaintiffs sufficiently stated a claim for relief for their constitutional claims against Transurban.  (*See* Transurban's Mem. at 8-21.)  Third, whether Plaintiffs adequately state a claim for relief against the Collection Defendants under the FDCPA (*See* Faneuil's Mem. at 9-19; LES's Mem. at 6-16.)  Fourth, whether Plaintiffs state proper claims for relief under Virginia and Maryland law against all named Defendants.  (*See* Transurban's Mem. at 21-30;

Faneuil's Mem. at 8-9, 20-28; LES's Mem. at 18-27.)  Fully briefed and argued, these issues are now properly before the Court for disposition.

## II. Legal Standard

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  A motion pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the Court's subject matter jurisdiction over the pending action.  Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction, and we presume that a cause lies outside this limited jurisdiction.  The burden of establishing the contrary rests upon the party asserting jurisdiction." *Wheeling Hosp., Inc. v. Health Plan of the Upper Ohio Valley, Inc.*, 683 F.3d 577, 583-84 (4th Cir. 2012) (citation omitted).  Relevant here, "[a] Court is deprived of jurisdiction over a case when the case becomes moot." *Williams v. Ozmint*, 716 F.3d 801, 809 (4th Cir. 2013) (citing *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983)) (additional citation omitted).

And while the court must accept well-pleaded allegations as true when ruling on a Rule 12(b)(6) motion, the court need not accept as true legal conclusions disguised as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 679-81 (2009). Therefore, a pleading that offers only a "formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Nor will a complaint that tenders mere "naked assertion[s]" devoid of "further factual enhancement." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (citation omitted) (internal quotation marks omitted). In the instance where sufficient facts are alleged in the complaint to rule on an affirmative defense, such as the statute of limitations, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6). This principle only applies, however, if all facts necessary to the affirmative defense "clearly appear[ ] *on the face of the complaint*." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (emphasis in original); *see also* 5B Wright & Miller, Federal Practice &

Procedure § 1357 ("A complaint showing that the governing statute of limitations has run on the plaintiff's claim for relief is the most common situation in which the affirmative defense appears on the face of the pleading and provides a basis for a motion to dismiss under Rule 12(b)(6).").

## III. Analysis

### A. Justiciability

Defendants assert a potpourri of challenges to Plaintiffs' Article III standing in this case.   Collection Defendants argue that none of the named plaintiffs have standing to sue for violations of the FDCPA. (LES's Mem. at 11; Faneuil's Mem. at 10.)   Transurban argues that Plaintiffs Browne, Osborne, Chase, and Hale's claims are moot, and therefore they have no standing to sue for either damages or injunctive relief. (Transurban's Mem. at 6.)   Additionally, Transurban urges the Court to find that none of the named plaintiffs has standing to seek injunctive relief against Transurban.   (*Id.* at 7.)   The Court addresses each of these issues in turn, ultimately finding that each named plaintiff has standing to assert each of their claims, before turning to the sufficiency of the facts alleged with regards to those claims.   The Court begins with an analysis of the Plaintiffs' standing to bring an action against the Collection Defendants under the FDCPA.

### 1. Justiciability of FDCPA Claims

Article III standing requires, at a bare minimum, that a plaintiff allege "(1) an injury in fact (i.e., a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (i.e., a 'fairly ... trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is 'likely' and not merely 'speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013) (citing *Sprint Commc'ns Co., L.P. v. APCC Serv., Inc.*, 554 U.S. 269, 273-74 (2008)). The Collection Defendants assert that Plaintiffs here "have not suffered actual harm" as a result of Faneuil and LES's alleged FDCPA violations. (LES's Mem. at 11.) They argue that Plaintiffs "are seeking remedies for mere *statutory* violations of the FDCPA", and they therefore fall at the first prong of the standing inquiry, lacking any "injury in fact". (Faneuil's mem. at 9). Plaintiffs respond that due to the FDCPA's provision for statutory damages even in the absence of an actual economic injury, Plaintiffs do not need to suffer an economic injury in order to bring suit under the FDCPA. (Pls.' Opp'n. at 17.)

The Fourth Circuit has yet to address the issue of whether a plaintiff must suffer an actual economic loss to bring suit under the FDCPA, but several circuits which have considered the issue have found that no actual economic loss is required in

28

order to have standing under the FDCPA.  *See Keele v. Wexler*, 149 F.3d 589, 593-94 (7th Cir. 1998)("The FDCPA does not require proof of actual damages as a precursor to the recovery of statutory damages"); *Tourgeman v. Collins Fin. Servs., Inc.*, 755 F.3d 1109, 1116 (9th Cir. 2014); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 307 (2d Cir. 2003); *Robey v. Shapiro, Marianos & Cejda, L.L.C.*, 434 F.3d 1208, 1212 (10th Cir. 2006); *Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 781 (9th Cir. 1982). The Court agrees that it would be impractical to require that Plaintiffs suffer an actual economic injury before they have standing to sue under the FDCPA, particularly as the FDCPA "is designed to protect consumers from the unscrupulous antics of debt collectors, irrespective of whether a valid debt actually exists." *Keele*, 149 F.3d at 594.  The "injury in fact" suffered by Plaintiffs under the FDCPA is not any actual economic loss, but rather being subjected to the allegedly "unfair and abusive practices" of the Collection Defendants.  (Am. Compl. ¶ 269.) The Court therefore finds that Plaintiffs have standing to pursue their FDCPA claims against the Collection Defendants.

## 2. Justiciability of Claims Against Transurban

Transurban also challenges the justiciability of this case under Article III, arguing that all of Plaintiffs Browne, Osborne, Chase, and Hale's claims are moot, and that none of the named Plaintiffs has standing to seek prospective relief.  The

two questions of mootness and standing to seek prospective relief are closely intertwined in this case, but the Court addresses Transurban's mootness argument first.

An actual controversy must exist at all stages of federal court proceedings. *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974). "The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *Id.* (citations and internal quotation marks omitted). Essentially, a case can become moot if there is a change in the facts that ends the controversy between the parties to the extent that one or both parties no longer have a material incentive to pursue or defend the action.

A case only truly becomes moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (omitting internal quotations and citations). A case is not mooted if the Court can offer effective prospective, injunctive relief. *McLean v. City of Alexandria*, No. 1:14CV1398 JCC/IDD, 2015 WL 427166, at *3 (E.D. Va. Feb. 2, 2015). Nor is a case mooted if compensatory or even nominal damages are still available. *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 550 (4th Cir. 2010). Courts are

especially wary of attempts to force mootness on an unwilling
plaintiff by the defendant taking unilateral, voluntary action.
*See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),
Inc.*, 528 U.S. 167, 170-71, (2000) ("A defendant's voluntary
cessation of a challenged practice ordinarily does not deprive a
federal court of its power to determine the legality of the
practice."). When the defendant voluntarily has voluntarily
ceased the conduct which has created the controversy, "the heavy
burden of persuading the court that the challenged conduct
cannot reasonably be expected to recur lies with the party
asserting mootness." *Id*. This is especially true when, as
here, the defendant maintains the legality of the challenged
practice despite their voluntary abandonment of a course of
conduct. *Knox* 132 S. Ct. at 2287.

Transurban argues that Plaintiffs Brown, Osborne and
Hale's claims are moot as a result of Transurban's dismissals of
its state court actions against these Plaintiffs. (Transurban's
Mem. at 6.) Plaintiffs point out that "these 'dismissals' were
all 'voluntary' and occurred ***after*** Plaintiffs filed the instant
action." (Pls.' Opp'n. at 11.) In light of the voluntary
nature of Transurban's dismissals, the "heavy burden of
persuading the Court that the challenged conduct cannot
reasonably be expected to recur" lies on Transurban. *Friends of*

*the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170-71 (2000).

Transurban does not carry its heavy burden in attempting to persuade the court that it will not resume the challenged toll violation enforcement scheme with regards to either its specific claims against Plaintiffs Osborne, Chase, and Hale, let alone with regards to its general toll enforcement practices. While Transurban has voluntarily dismissed its state-court enforcement actions against Plaintiffs Osborne, Chase, and Hale, Transurban's claim against Chase was clearly dismissed without prejudice, and it is unclear if Transurban's claim against Hale has been dismissed with or without prejudice. (Transurban's Mem. at Ex. H & G.) The Court is therefore not satisfied that Transurban is precluded from bringing these claims again. Absent an order to the contrary in this case, Transurban could simply renew its actions for penalties against Chase and Hale at any time.

The dismissal with prejudice of Transurban's state court claims against Brown and Osborne does preclude Transurban from resurrecting that particular claim for damages, but for the reasons laid down below, Brown and Osborne still have standing to sue for injunctive relief from Transurban's enforcement policies. This potential prospective relief, in addition to the possibility that Brown and Osborne could receive at least

nominal damages from Transurban on a section 1983 suit for alleged violations of their due process rights, is enough to establish that the Court can still grant "effective relief" to Brown and Osborne despite the fact that they no longer face prosecution by Transurban for the previously alleged toll violations which have been dismissed in state court.

Finally, Transurban contends that Plaintiffs lack standing to seek prospective, injunctive relief against future collections by Transurban. (Transurban's Mem. at 7.) Standing to sue for past damages does not necessarily grant standing to sue for prospective relief, rather "plaintiff[s] must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). When seeking prospective future relief, such as an injunction, it is insufficient to merely allege past harm. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995). However, Plaintiffs here need not meet the general "actual and imminent harm" standard first articulated by the Supreme Court in *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009), later developed in *Clapper v. Amnesty International USA*, 133 S. Ct. 1138, 1147 (2013) and suggested here by Transurban. Instead, Plaintiffs fall neatly within the "capable of repetition yet evading review" exception to the general "actual and imminent harm" rule. Two criteria must be met for a plaintiff to have

standing under the "capable of repetition yet evading review"
exception.  First, the injury must be likely to happen to
Plaintiffs again.  *Weinstein v. Bradford*, 423 U.S. 147, 149
(1975).  Specifically, there must be a "reasonable expectation
that the same complaining party would be subjected to the same
action again."  *Id.*  The Court will refer to this as the
"reasonable expectation" requirement.  Second, the injury must
be of inherently limited duration so that it is likely to always
become moot before any litigation can be completed.  *Fed.*
*Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449,
462 (2007) (citations omitted).  The Court shall refer to this
second requirement as the "limited duration" requirement.
Plaintiffs allege facts in the amended complaint that, if true,
squarely place this case in the "capable of repetition yet
capable of evading review" exception to the general rule on
standing to seek prospective relief.

On the first requirement of the capable of repetition
yet evading review doctrine, the "reasonable expectation"
requirement, Transurban contends that a "highly attenuated chain
of possibilities" must occur before Plaintiffs would be likely
to suffer the same harm.  (Transurban's Mem. at 7-8 (quoting
*Clapper* 133 S. Ct. at 1147-48).)  But construing all alleged
facts in the light most favorable to the Plaintiffs, as the
Court must at this stage, it is not unreasonable to conclude

that Plaintiffs and the other unidentified members of the proposed classes will be subject to Transurban's toll collection practices if left unabated.  Only one Plaintiff, Pizarro, has allegedly stopped using the HOT lanes.  (Am. Compl. ¶ 163.) Otherwise, Plaintiffs generally allege that "[t]housands of Virginia, Maryland, and DC residents have been subject to the Transurban Defendants' excessive fines and fees."  (*Id.* at ¶¶ 4, 102 ("An average of 23,308 vehicles took the [HOT] lanes every day in the first six weeks [they were in operation].").)  They further allege that in the course of one calendar year Transurban files roughly 26,000 toll violation lawsuits, or just over 71 per day on average.  (*Id.* at ¶ 225.)  Each of the named Plaintiffs also alleges that Transurban has accused him or her of multiple toll violations spanning periods of at least several days and in some cases several months, further suggesting that the alleged issues are not isolated incidents but rather a pattern of alleged illegality.  (*Id.* at ¶¶ 112-219.)  At this stage, Plaintiffs need only allege facts sufficient to demonstrate a "reasonable expectation that [they] will again be subjected to the alleged illegality, or will be subject to the threat of prosecution under the challenged law." *Wisconsin Right to Life, Inc.*, 551 U.S. at 463 (citations and internal punctuation omitted).  Based on the allegations contained in Plaintiffs' amended complaint, it is not unreasonable for them

35

to expect to be submitted to Transurban's toll enforcement policies again, so they easily clear this standard.

Turning to the second requirement of capable of repetition yet evading review, the "limited duration" requirement, Plaintiffs again allege facts that easily satisfy this requirement. The Fourth Circuit has held that the protracted proceeding of garnishing a bank account, *Harris v. Bailey*, 675 F.2d 614, 616 (4th Cir. 1982), and the presumably longer negotiations involved in a labor contract dispute, *Sinai Hospital of Baltimore, Inc. v. Horvitz*, 621 F.2d 1267, 1269 n.3 (4th Cir. 1980), both satisfy this "limited duration" requirement. The factual circumstances underlying this proceeding illustrate just how short-lived Transurban's collection process can be. The huge economic pressure and potential legal ramifications of non-payment of the fines sought by Transurban were sufficient to induce Plaintiffs Pizarro, Stanfield, and Amarti to pay a portion of the fines claimed by Transurban despite the fact that those Plaintiffs still strenuously contest the legality of those penalties. (Am. Compl. ¶¶ 137, 151, 174.) This kind of economic pressure is directly analogous to the kind of economic pressure which motivates quick resolution of labor contract disputes, which the Fourth Circuit held satisfied the "limited duration" requirement in *Sinai Hospital*. Additionally, Transurban has dismissed toll

36

collection actions against the named Plaintiffs who resisted its demands for payment only after this complaint was filed.  (Pls.' Opp. at 11-12.)

If the Court accepted Transurban's argument in this regard, the toll collection process could theoretically evade judicial review for perpetuity, assuming Transurban simply pressured prospective plaintiffs into quickly settling and then voluntarily dismissed its suits against prospective plaintiffs with the resolve or financial means to resist settlement.  This is precisely the kind of jurisprudential catch-22 the capable of repetition yet evading review and voluntary cessation of illegal activities doctrines were created to address.  Accordingly, the Court finds that this case properly fits within the capable of repetition yet evading review exception to the general rule on standing to pursue prospective relief and Plaintiffs have standing to assert the claims in the amended complaint on behalf of themselves and those similarly situated.  The Court will now address one final set of initial inquiries regarding Transurban's claims that certain named Plaintiffs are barred from pursuing their instant claims against Transurban by either settlement or res judicata before turning to the sufficiency of Plaintiffs' claims under Rule 12(b)(6).

### 3. Res Judicata and Alleged Settlement

The Court begins by noting that both res judicata and the existence and scope of a settlement or release agreement, are affirmative defenses.  *See Arizona v. California*, 530 U.S. 392, 410 *supplemented* 531 U.S. 1 (2000) (classifying res judicata as an affirmative defense); *Millner v. Norfolk & W.R. Co.*, 643 F.2d 1005, 1007 (4th Cir. 1981) (characterizing alleged existence of a settlement agreement as an affirmative defense); *Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772, 776 (4th Cir. 1990) ("Accord and satisfaction is an affirmative defense. . . ."). Accordingly, in order for the court to dismiss on any of these bases at this stage, all facts necessary to the affirmative defense must "clearly appear[ ] *on the face of the complaint*." *Goodman*, 494 F.3d 458, 464 (4th Cir. 2007) (emphasis in original).

In support of their motion to dismiss, Transurban alleges that Plaintiffs Stanfield, Amarti, and Pizarro are precluded from pursuing their claims against Transurban here because they have "resolved the summons by settlement". (Transurban's Mem. at 5 (citing Am. Comp. ¶¶ 137, 151, 221).) Plaintiffs respond that any "settlements" are in fact a unilateral release of Transurban's claims for fines against Plaintiffs, but absent any "evidence of any settlement agreement or any release executed by any Plaintiff" the proposed settlements do not release Plaintiffs' claims against

Transurban. (Pls.' Opp'n. at 8.) Generally, "once a competent party makes a settlement and acts affirmatively to enter such a settlement, her second thoughts at a later time upon the wisdom of the settlement do not constitute good cause for setting it aside". *Snyder-Falkinham v. Stockburger*, 457 S.E.2d 36, 39 (Va. 1995). However, "the scope of a release agreement, like the terms of any contract, is generally governed by the expressed intention of the parties." *Richfood, Inc. v. Jennings*, 499 S.E.2d 272, 275 (Va. 1998) (quoting *First Security Federal Savings Bank, Inc. v. McQuilken*, 480 S.E.2d 485, 487 (Va. 1997)). While there does not need to be a signed and executed written release for a settlement agreement to be valid, the parties must be "fully agreed upon the terms of the settlement and intend to be bound thereby." *Snyder-Falkinham*, 457 S.E.2d at 39. Where, as here, there is no evidence that Plaintiffs or Transurban contemplated a release of *Plaintiffs'* claims as consideration for Transurban's acceptance of a payment less than what they claimed was owed, the Court will not imply a release of those claims. It would certainly be improper to do so at the 12(b)(6) stage, where the Court must interpret all alleged facts in the light most favorable to the plaintiff.

Without evidence demonstrating that Plaintiffs and Transurban agreed that Plaintiffs would release any potential claims against Transurban in return for Transurban's acceptance

of less than it claimed was owed, the "settlement" alleged by
Transurban is better understood as an accord and satisfaction on
the fines originally claimed by Transurban.  Accord and
satisfaction can serve to discharge a contract or a cause of
action where a partial payment is offered and accepted as
satisfaction for the full amount initially demanded.  *See
Virginia-Carolina Elec. Works v. Cooper*, 63 S.E.2d 717, 718 (Va.
1951).  Accord and satisfaction, like any other written or
implied release agreement, requires an agreement as to the
specific terms and scope of the release.  *Id.* at 719.  This
Court can find no case where accord and satisfaction of a debt
alone, without some further agreement by the parties, has been
held to moot or release other claims by the debtor or paying
party against the creditor or receiving party.  In fact, an
accord and satisfaction on one debt is generally not even held
to release the *creditor's* other claims against the debtor,
unless there is some indication that the parties intended to
settle those claims.  *See Brucato v. Ezenia! Inc.*, 351 F. Supp.
2d 464, 470 (E.D. Va. 2004).  The payments offered by Plaintiffs
Stanfield, Amarti, and Pizarro and accepted by Transurban
therefore at most constitute an accord and satisfaction on
Transurban's original claim for fines against Plaintiffs.  They
do not preclude Plaintiffs from bringing the present action

40

challenging the legality of both the fines themselves and the means by which Defendants have pursued the fines.

Finally, Transurban argues that because Plaintiff Amarti has already been found liable in state court for her first five alleged toll violations, her present claims against Transurban ought to be barred by res judicata. (Transurban's Mem. at 5) However, this argument profoundly overstates the breadth and effect of res judicata in Virginia. This Court gives the same preclusive effect to prior state-court judgements as they would receive under the law of the state in which the judgment was rendered. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 896, 79 L. Ed. 2d 56 (1984).

In Virginia, the claim preclusive, res judicata effect of judgments on actions commenced after July 1, 2006 is governed by Virginia Supreme Court Rule 1:6, which reads, in relevant part:

> A party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, shall be forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction or occurrence, whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the prior proceeding depended, or the particular remedies sought. A claim for relief pursuant to this rule includes those set

> forth in a complaint, counterclaim, cross-claim or
> third-party pleading.

Va. Sup. Ct. R. 1:6.  The Supreme Court of Virginia has been

reluctant to interpret the finer points of Rule 1:6,

particularly its interplay with Virginia's longstanding rule

that all counterclaims are permissive rather than compulsory.

*See* Va. Code Ann. § 16.1-88.01; Va. Sup. Ct. R. 3:9; *Tyler v.*

*Berger,* No. Civ.A. 605cv00030 2005 WL 2596164, at *3 n. 7 (W.D.

Va. Oct. 13, 2005).  Taken to the extreme interpretation

proposed by Defendants in this case, Rule 1:6 would rip the

heart out of Virginia's permissive counterclaim rule by barring

any later claims by any party to the first case, including

claims that the defendant in the first case elected not to raise

as counterclaims.  Such a result would run afoul of the general

rule that "where a party 'may interpose a claim as a

counterclaim,' but fails to do so, that party ordinarily will

not be 'precluded from subsequently maintaining an action on

that claim.'"  *Marbury Law Grp., PLLC v. Carl*, 799 F. Supp. 2d

66, 74 (D.D.C. 2011) (quoting Restatement (Second) of Judgments

§ 22(1))(Holding Rule 1:6 did not prevent a party from raising

later claims where the party could have, but did not, raise

counterclaims in a prior proceeding stemming from the same

transaction or occurrence).

The plain language of Rule 1:6 is readily compatible with the voluntary counterclaim rule, as it limits the application of res judicata to bar future claims only by a "party whose claim for relief. . . is decided on the merits". Va. Sup. Ct. R. 1:6.  If, in the prior case, no counterclaim was raised by the prior defendant, she cannot fairly be said to have been a "party whose claim for relief… [was] decided on the merits," as she has made no claim for relief in the previous case.  *Id.*  Defendants' reliance on *Winchester Neurological Consultants, Inc. v. Landrio,* 74 Va. Cir 480 (2008) is misplaced, as in *Landrio* the prior defendant *had* "asserted a counterclaim against WNC [the current defendant] in the First Arbitration."  The present case is more analogous to the situation addressed in *Marbury Law Grp., PLLC v. Carl*, where the party raising the claims being evaluated in a later federal court action "never filed a counterclaim in the [prior] Virginia action."  *Marbury Law Grp., PLLC* 799 F. Supp. 2d at 74.

In jurisdictions like Virginia where there is no compulsory counterclaim rule, there is one widely recognized exception to the general rule that res judicata will not preclude a subsequent claim by a defendant who did not file a counterclaim in the original action.  These are cases where "[t]he relationship between the counterclaim and the plaintiff's claim [in the prior action] is such that [the] successful

43

prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action." Restatement (Second) of Judgments § 22(2)(b). This exception extends to cover both cases where one party seeks an injunction against enforcement of a judgement against him in a prior case. See *Valley View Angus Ranch, Inc. v. Duke Energy Field Servs., Inc.*, 497 F.3d 1096, 1102 (10th Cir. 2007) (applying Oklahoma's permissive counterclaim law). It has also been applied to cases where one party simply seeks the return of a monetary award already granted by the prior decision. See *A.B.C.G. Enterprises, Inc. v. First Bank Se., N.A.*, 515 N.W.2d 904, 911 (Wis. 1994). Thus, Amarti and any other prospective class members who have had judgments entered against them in state court proceedings may be precluded from pursuing the recovery of any money awarded to Transurban in a state-court proceeding, but they are certainly not precluded from raising any of the distinct constitutional, federal, or state law claims presented in the amended complaint. As all named plaintiffs have standing to pursue each of their claims, the Court will now address the sufficiency of Plaintiffs' claims under Rule 12(b)(6).

### B. Constitutional Claims

The first three claims in the amended complaint allege violations of the state and federal constitution against only

Transurban.[12]  (Am. Compl. ¶¶ 235-257.)  Transurban argues that

Plaintiffs have failed to state, and indeed cannot state, claims

of federal constitutional violations because Transurban is not a

state actor.  (Transurban's Mem. at 8-11.)  Alternatively,

Transurban argues that even if the Court finds it is a state

actor, Plaintiffs' state and federal constitutional claims are

insufficient for a variety of reasons.  (*Id.* at 12-21.)  Each

argument is addressed in turn.

### 1. State Action

Plaintiffs bring Claims One, Two, and Three pursuant

to 42 U.S.C. § 1983,[13] and in part allege violations of rights

under the United States Constitution.  "Title 42 U.S.C. § 1983

is a federal statutory remedy available to those deprived of

rights secured to them by the Constitution . . . ."  *Philips v.*

*Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  To

state a claim for relief under section 1983, a plaintiff must

allege that the defendant "(1) deprived plaintiff of a right

---

[12] Plaintiffs do not bring these claims against Faneuil and LES.
(*See* Pls.'s Opp'n at 19 n.19 (citing Am. Compl. ¶¶ 236, 243,
253).)

[13] "Every person who, under color of any statute, ordinance,
regulation, custom, or usage, of any State or Territory or the
District of Columbia, subjects, or causes to be subjected, any
citizen of the United States or other person within the
jurisdiction thereof to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws,
shall be liable to the party injured in an action at law, suit
in equity, or other proper proceeding for redress . . . ."  42
U.S.C. § 1983.

secured by the Constitution and laws of the United States, and (2) that the deprivation was performed under color of the referenced sources of state law found in the statute." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970). The Constitution only applies to government action, not private conduct. *See, e.g.*, *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982). Thus, the prerequisite to a prima facie case under section 1983 is that the defendant was a "state actor," or acted "under color of state law." *Philips*, 572 F.3d at 180-81 (citations omitted).[14]

"[T]here is 'no specific formula' for determining whether state action is present . . . . 'What is fairly attributable [to the state] is a matter of normative judgment, and the criteria lack rigid simplicity.'" *Id.* at 182 (quoting *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006) (quoting, in part, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001))).  In *Lugar v. Edmonson Oil Co.*, the Supreme Court set forth the standard for determining whether a party acts under color of state law, thus exposing itself to liability under section 1983:

> First, the deprivation must be caused by the
> exercise of some right or privilege created

---

[14] "The same analysis applies to whether an action was taken 'under color of state law' as required by § 1983 and whether the action was state action." *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 178 (4th Cir. 2009).

> by the State or by a rule of conduct imposed
> by the State or by a person for whom the
> State is responsible . . . . Second, the
> party charged with the deprivation must be a
> person who may fairly be said to be a state
> actor.   This may be because he is a state
> official, because he has acted together with
> or has obtained significant aid from state
> officials,  or  because  his  conduct  is
> otherwise chargeable to the State.

457 U.S. 922, 937 (1982).  Determining whether the defendant

"has acted together with or obtained significant aid from state

officials," or whether "his conduct is otherwise chargeable to

the State," is the key issue that this Court must now address.

In other words, because there is no question that the Transurban

Defendants are private entities, and not state or public

officials in the traditional sense, the Court must determine if

Transurban's "conduct is fairly attributable to the state."

*Arlosoroff v. Nat'l Collegiate Athletic Ass'n*, 746 F.2d 1019,

1021 (4th Cir. 1984).

While merely private conduct will not qualify as state

action, the Fourth Circuit has recognized four contexts in which

a private party can be deemed a state actor.  *Andrews v. Fed.*

*Home Loan Bank of Atlanta*, 998 F.2d 214, 217 (4th Cir. 1993).

Relevant here is the "public function" theory of state action.

*Id.* at 218.  Specifically, a private party can act under color

of state law "when the state has delegated a traditionally and

exclusively public function to a private actor."  *Id.* at 217.

This narrow context "encompasses the 'exercise by a private entity of powers traditionally exclusively reserved to the State.'"  *Id.* at 218 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)).  Thus, a state cannot simply evade its constitutional obligations through delegation to a private party.  *Andrews*, 998 F.2d at 218.  This context is narrowly confined, however, to apply only to those functions that are "traditionally exclusively reserved to the state."  *Id.*

Here, as support for the proposition that it is not a state actor, Transurban relies heavily on *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40 (1999). (Transurban's Mem. at 9-11.)  There, the Supreme Court stated that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State . . . ."  *Am. Mfrs. Mutual Ins. Co.*  526 U.S. at 52 (quoting *Jackson*, 419 U.S. at 350).  Instead, the Supreme Court requires a "sufficiently close nexus between the State and the challenged action," so that the State is said to have "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  *Id.* at 52 (citations omitted). Transurban argues that because the Commonwealth has not coerced Transurban or dominated its actions, it cannot be considered a state actor.  (Transurban's Mem. at 9.)  Transurban's reliance

48

on "coercion" and "domination" is misplaced and obviates the proper focus of the Court's analysis.

    As Transurban correctly notes, the Court must identify "the specific conduct of which the plaintiff complains" and determine whether it is fairly attributable to the State. (Transurban's Mem. at 9-10 (quoting *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001)). In this regard, it is clear that the "specific conduct" at issue, *i.e.*, enforcement of toll collections for HOT lane violations, is fairly attributable to the Commonwealth because the Commonwealth expressly delegated that power to Transurban through state law. *See* Va. Code §§ 33.2-503(2)-(3) ("HOT Lanes operator shall install and operate . . . a photo-enforcement system at locations where tolls are collection for the use of such HOT lanes . . . . The HOT Lanes operator may impose and collect an administrative fee in addition to the unpaid toll so as to recover the expenses of collected the unpaid toll . . . ."); *see also* Va. Code § 33.2-503(2)(c) ("HOT lanes operator personnel or their agents mailing such summons shall be considered conservators of the peace for the sole purpose of mailing such summons."). And Virginia state courts have found that Transurban acts in the place of the Commonwealth when it seeks to collect unpaid tolls and administrative fees. *See Commonwealth v. Cooley*, MI-2014-2473, 2474, 2475, 2476, 2015 Va. Cir. LEXIS 65, at *5 (Va. Cir. Ct.

49

Apr. 7, 2015) ("While this may be an action with only civil penalties, Transurban is prosecuting violators of the HOT lanes statute in the shoes of the Commonwealth.  Government actors, such as the Commonwealth, frequently bring prosecutions for civil fines and penalties."); *Dulles Toll Road v. Diggs*, MI-2014-2511, 2517 at *4, *6 (Va. Cir. Ct. June 29, 2015) ("[W]hile the statute does say it is to be tried 'as a civil case,' it also says in the same section that '[s]uch action shall be considered a traffic infraction . . . .'  A 'traffic infraction has far more in common with a misdemeanor than it does with a tort lawsuit . . . [and] is brought by governmental authorities . . . . The Court finds that the instant cases constitute a 'prosecution' involving a 'pecuniary fine' or 'penalty.'").  It is also telling that the Fairfax County General District Court has filed Transurban's actions against Plaintiff Amarti as a "Traffic/Criminal Case" rather than as a civil case. (Transurban's Mem. at Ex. D.)  For these reasons, the specific conduct at issue, enforcement of toll collection for HOT lane violations, can be accurately described as state action. *Mentavlos*, 249 F.3d at 310.

The only question that remains is whether the Commonwealth has delegated a function "traditionally exclusively reserved to the state." *Andrews*, 998 F.2d at 218.  The Court finds that Virginia has delegated such a function, because the

operation of, and enforcement of laws on, roads and public highways, including toll roads, is a function traditionally reserved to the state. *See Almond v. Day*, 97 S.E.2d 824, 830 (Va. 1957) ("The authorities agree that in the construction, maintenance and operation of a highway system the State is performing a governmental function.") (citations omitted); *see also Ferguson v. Bd. of Supervisors of Roanoke Cnty.*, 113 S.E. 860, 861 (Va. 1922) ("Voluntary contributions made by citizens for the improvement of the public highways do not change their character or in any way diminish the control thereof which is by law vested in the public authorities."); *Gordon v. Nash*, No. 4372, 1940 WL 958, at *3 (D. Alaska July 26, 1940) ("A toll road is a public highway, established by public authority for public use and is to be regarded as a public easement and not as private property."); *Bester v. Chicago Transit Auth.*, 676 F. Supp. 833, 838 (N.D. Ill. 1987) ("The toll road case is relatively easy because building and maintaining the roads, and indeed the toll road, has been a government function since ancient ages."), *aff'd*, 887 F.2d 118 (7th Cir. 1989).  This conclusion is further bolstered by a close review of the statutory scheme that gives Transurban this enforcement power, traditionally reserved for the State.  A HOT lane violator is also subject to receipt of a summons issued by a law enforcement officer who witnesses the violation. *See* Va. Code Ann. § 33.2-

503(1).  Undeniably, a police officer acting within the scope of her official duties is a state actor.  *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 49-50 (1988)("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.").  The same must be true then for Transurban, who effectively possesses that very same power, at least with regard to HOT lane violations.  *See Payton v. Rush Presbyterian St. Luke's Med. Ctr.*, 184 F.3d 623, 629 (7th Cir. 1999) ("[I]f the state cloaks private individuals with virtually the same power as public police officers, and the private actors allegedly abuse that power to violate a plaintiff's civil rights, that plaintiff's ability to claim relief under § 1983 should be unaffected.").

For these reasons, the Court finds that Transurban acts under color of state law when collecting unpaid tolls and associated administrative fees, penalties, and costs, and therefore, it is subject to suit under section 1983.[15]

---

[15] In a footnote, Transurban also tersely asserts that if it was a state actor, it would be entitled to sovereign immunity under the Eleventh Amendment.  (*See* Transurban's Mem. at 11 n.7.)  It elaborates, albeit briefly, in its reply brief.  (*See* Transurban's Reply [Dkt. 56] at 9.)  Without the benefit of full briefing and a more complete record, the Court declines to consider whether Transurban is entitled to sovereign immunity.  Indeed, at this early stage in the proceeding, it cannot make such a finding without more in the record.  *See Pele v. Penn. Higher Educ. Assistance Agency*, 13 F. Supp. 3d 518, 528 (E.D.

## 2. Excessive Fines Claim

In Claim One, Plaintiffs allege that Transurban's "enforcement of the civil penalty assessments discussed above constitutes a violation of the United States Constitution's Eighth Amendment's . . . protection against excessive fines." (Am. Compl. ¶ 237.) In support of its motion to dismiss for failure to state a claim, Transurban raises two arguments: (1) the excessive fines clause is not implicated where a private entity seeks or retains the penalty, and (2) Plaintiffs have not adequately alleged that the civil penalties are excessive. (Transurban's Mem. at 12-16.)

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "The Excessive Fines Clause of the Eighth Amendment prohibits the government from imposing excessive fines as punishment." *U.S. ex rel. Drakeford v. Tuomey*, No. 13-2219, 2015 WL 4036166, at *17 (4th Cir. July 2, 2015) (quoting *Korangy v. FDA*, 498 F.3d 272, 277 (4th Cir. 2007)). Civil fines typically do not fall within the scope of the Eighth Amendment prohibition, "[b]ut where a civil sanction

---

Va. 2014). Accordingly, the Court defers ruling on the sovereign immunity defense at this time. *See Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 607 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency,* 745 F.3d 131 (4th Cir. 2014) (discussing the arm-of-the-state test for purposes of determining sovereign immunity).

can only be explained as serving in part to punish, then the fine is subject to the Eighth Amendment." *Tuomey*, 2015 WL 4036166, at *17 (citations and internal quotation marks omitted).  Excessive fines are infrequent and must be "grossly disproportional to the gravity of the offense.  *Id.* (citations omitted).  The Eighth Amendment prohibits the government from imposing excessive fines.  *Korangy*, 498 F.3d at 277.  However, "it does not constrain an award of money damages in a civil suit when the government has neither prosecuted the action nor has any right to receive a share of the damages awarded." *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 264 (1989).

Transurban first argues that because the civil penalties[16] are sought by, and subsequently paid to, a private

---

[16] Transurban argues that Plaintiffs do not assert that the administrative fees violate the Eighth Amendment, only the civil penalties.  (Transurban's Mem. at 13.)  But Plaintiffs are challenging the toll collection process in its entirety, which necessarily includes all associated fees, penalties, and costs. (Am. Compl. ¶¶ 10-16, 237.)  At this stage, the Court accepts this allegation as true.  Whether Plaintiffs can ultimately prove this claim and prevail after a period of discovery is another question left for another time.  *See Austin v. United States*, 509 U.S. 602, 610 (1993) (holding the Eighth Amendment prohibits excessive punishment and not excessive remedial goals).  Moreover, the remedial amount sought here, *i.e.*, the unpaid toll, is a fraction of the total amount sought, which gets exponentially larger with each violation due to the combined fees and penalties.  Thus, any suggestion that the toll collection process is purely remedial also fails at this stage. *See United States v. Bajakajian*, 524 U.S. 321, 329 (1998)

entity, the Eighth Amendment prohibition does not apply. (Transurban's Mem. at 12-13.)  The Court does not agree with Transurban's argument primarily for two reasons.  First, the Court has already found that Transurban is a state actor for purposes of section 1983 when collecting unpaid tolls and associated fees, thus, it is not a "private entity" as Transurban contends.  *See supra*, sec. III.B.1.  Second, under the statutory scheme at issue, upon a finding of a violation by a state court of competent jurisdiction, the state locality initially receives any unpaid tolls or associated penalties and fees before those payments are transferred to the statutory HOT lanes operator, Transurban.[17]  *See* Va. Code Ann. § 33.2-503(3)(b) ("The court shall remand penalties, the unpaid toll, and administrative fees assessed for violation of this section to the treasurer or director of finance of the county or city in which the violation occurred for payment to the HOT lanes operator for expenses associated with operation of the HOT lanes and payments against any bonds or other liens issued as a result of the construction of the HOT lanes.").  Thus, it cannot be

---

(suggesting that remedial actions are brought to obtain compensation or indemnification for lost revenues).
[17] In oral argument on this motion, Mr. Kidney, attorney for Transurban, admitted that "if you go to trial [challenging the alleged toll violation], you would pay the court.  The statute says that the court should then direct that money to the county where the violation has occurred, and then the county directs that money to Transurban." Transcript of Motions Hearing at 24.

said that under the facts alleged in the amended complaint that "the government neither has prosecuted the action nor has any right to receive a share of the damages awarded." *Kelco Disposal, Inc.*, 492 U.S. at 264.  Instead, when viewing the facts in a light most favorable to Plaintiffs at this stage, Plaintiffs have sufficiently stated a claim for relief under the Excessive Fines Clause of the Eighth Amendment for the collection of unpaid tolls, penalties, fees, and costs by Transurban, a state actor executing a traditionally exclusive state function. *See Lewis v. Village of Hanover Park*, No. 12C7904, 2012 WL 6755094, at *2 (N.D. Ill. Dec. 31, 2012) ("The Court will permit the case to proceed on these [Eighth Amendment] claims and these claims alone.  This does not constitute approval of these claims on their merits, but rather simply a determination that the lawsuit may proceed to the next step with regard to these claims.").  Accordingly, the Court also denies Transurban's motion on this basis.

Transurban's second argument for dismissal of Claim One is that Plaintiffs have not adequately alleged that the civil penalties are "excessive."  (Transurban's Mem. at 13-16.) "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United*

*States v. Bajakajian*, 524 U.S. 321, 329 (1998) (citations omitted).  In making such a determination, the Supreme Court has cautioned that deference is owed to the legislature that determines the appropriateness of a given punishment.  *Id.* at 336. Courts addressing this issue have not fixed a bright-line ratio of unconstitutionality, however.  *See, e.g., Tuomey*, 2015 WL 4036166, at *19.

        Here, Plaintiffs have alleged that Transurban seeks penalties and fees that are several hundred times the underlying dollar value of the unpaid toll violation.  (Pl.s' Opp'n at 29.) Transurban sought $3,413.75 from Brown based on a cumulative unpaid toll in the amount of $4.95, which is approximately 821 times the unpaid toll.  (Am. Compl. ¶ 10.)  Transurban argues that the repeated nature of Plaintiffs' wrongful conduct justifies this facially disproportionate penalty.  (*See* Transurban's Mem. at 14 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996) ("[R]epeated misconduct is more reprehensible than an individual instance of malfeasance.").  But in *Gore*, a national BMW distributor *knowingly* failed to advise its dealers, and as a result, its customers, of pre-delivery damage to new cars when the cost of repair was less than 3% of the suggested retail price of the car.  *Id.* at 562. Thus, the question presented in *Gore* was whether a $2 million punitive damages award exceeded the constitutional limits of the

Due Process Clause of the Fourteenth Amendment.  *Id.* at 562–63. Here, Plaintiffs allege that they had *no* knowledge or immediate notice of the underlying toll violation.  (Am. Compl. ¶ 58.) Stated differently, unlike the car distributor in *Gore*, Plaintiffs claim that they did not knowingly violate or intentionally fail to pay the toll.  And in the most egregious set of allegations, Plaintiffs did not receive notice of the underlying toll violation until over one year after the initial violation.  Therefore, Plaintiffs' allegations and factual circumstances are different from those of the individual who knowingly and repeatedly engages in prohibited conduct subject to penalty.[18]

Accepting Plaintiffs' allegations as true, their claim bears a striking resemblance to the successful claim in *Bajakajian*.  An unwitting toll road violation is, if anything, a less culpable act than a willful failure to report otherwise legally possessed currency.  *Bajakajian*, 524 U.S. at 337-338. Under the facts alleged, Plaintiffs are not habitual, scofflaw toll violators, but rather bona fide victims of a mechanical glitch, and thus, like the plaintiff in *Bajakajian*, they "[do] not fit into the class of persons for whom the statute was principally designed."  *Id.*  The Supreme Court in *Bajakajian* was

---

[18] Similarly, Plaintiffs are also easily distinguishable from the violating homeowners in *Moustakis v. City of Fort Lauderdale*, 338 F. App'x 820 (11th Cir. 2009).

primarily concerned with *proportionality* between the alleged harm and the financial penalty.  *Id.* at 334.  Here, Plaintiffs have sufficiently alleged that Transurban sought penalties and fees that were *grossly* disproportionate to the miniscule underlying toll violation.  (*See* Am. Compl. ¶¶ 10-16.) Therefore, the Court denies Transurban's motion to dismiss Claim One on this basis.

### 3. Due Process Claims

Transurban next challenges Plaintiffs' procedural due process claim (Claim Two) and Plaintiffs' substantive due process Claim (Claim Three).  (Transurban's Mem. at 16-21.)  The sufficiency of each claim is addressed in turn.

### a. Procedural Due Process (Claim Two)

Transurban argues that Plaintiffs fail to state a proper procedural due process claim because Plaintiffs fail to plead a lack of adequate notice and a lack of an opportunity to be heard.  "At bottom, procedural due process requires fair notice of impending state action and an opportunity to be heard."  *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir. 2014) (citations omitted), *cert. denied*, 134 S. Ct. 2667 (2014).  "Proper notice is 'an elementary and fundamental requirement of due process,' and must be reasonably calculated to convey information concerning a deprivation."  *Id.* (citations omitted).  And to determine whether there is an

adequate opportunity to be heard, the Court balances "the
private interest and the public interest, along with 'the risk
of erroneous deprivation of such interest through the procedures
used, and the probable value, if any, of additional or
substitute procedural safeguards.'"  *Id.* (quoting *Mathews v.
Eldridge*, 424 U.S. 319, 335 (1976)).

　　　　Here, Plaintiffs have sufficiently alleged both a lack
of proper notice and an inadequate opportunity to be heard.
Even though the Fourth Circuit upheld a similar statutory scheme
in *Snider* regarding photo-enforced speed cameras, here,
Plaintiffs are not challenging the constitutionality of the
statutory scheme.  Instead, Plaintiffs take issue with
Transurban's implementation and enforcement, and argue that
Transurban's procedures violate Plaintiffs' constitutional
rights.  At this stage, Plaintiffs' allegations in this regard
are sufficient.  Quite simply, Plaintiffs challenge the adequacy
of Transurban's notice because there is no immediate
notification that a toll violation has occurred.  (*See* Am.
Compl. ¶¶ 111-13, 126-27, 154-55, 177-78, 193-95.)
Additionally, aside from lacking immediate notice, Plaintiffs
have alleged that at times, Transurban provides *no* subsequent
notice of unpaid toll amounts before assessing excessive
penalties and fees.  (*See* Am. Compl. ¶ 173 ("During this
conversation [in or around September of 2014], Ms. Pizarro was

informed by a Transurban employee that she allegedly committed
four additional toll violations in July 2013 that she was not
yet aware of."); ¶ 210 ("Ms. Chase never received this initial
notice from the Transurban Defendants for 6 of the tolls.").)
Otherwise, Plaintiffs allege that even when they have received
notice of an alleged toll violation, the notice is still
inadequate because it fails to properly advise Plaintiffs of the
escalating penalties and fees under the statutory scheme.
(Pls.' Opp'n at 33-34 (citing Ex. B).)  These allegations,
assumed to be true at this stage, are sufficient because
Transurban's notice is not "reasonably certain to inform those
affected."  *See Jones v. Flowers*, 547 U.S. 220 (2006); *see also
Snider*, 739 F.3d at 146 (quoting *Mullane v. Cent. Hanover Bank &
Trust Co.*, 339 U.S. 306, 314-15 (1950)).  Accordingly, the Court
denies Transurban's motion on this basis.

> The Court need not address the sufficiency of
Plaintiffs' allegations regarding an opportunity to be heard,
having already determined that Plaintiffs have sufficiently
alleged inadequate notice.  However, under the statute, toll
violators who have received a summons are given an opportunity
to be heard to challenge the violation through a hearing in
state court, instead of just paying the fees and penalties.  *See*
Va. Code Ann. §§ 33.2-503(2)(c)-(d), (3)(b).  This opportunity
to be heard is sufficient to comport with procedural due process

regardless of the increasing amount of civil penalties and fees that attach to such a right. *See United States v. Bolding*, 876 F.2d 21, 22-23 (4th Cir. 1989) (holding that mandatory penalty schemes do not violate the Due Process Clause). Of course, this opportunity to be heard is presumably infringed upon if Plaintiffs are not provided adequate notice. Thus, for the reasons stated above, the Court denies Transurban's motion to dismiss Claim Two.

### b. Substantive Due Process (Claim Three)

Plaintiffs allege that Transurban has violated their substantive due process rights by acting unreasonably, arbitrarily, and irrationally in seeking excessive penalties and administrative fees that are contrary to the authority granted under Virginia law. (Am. Compl. ¶¶ 249-257.) Because Plaintiffs claim a substantive due process violation under a legislative enactment, the Court employs a two-step inquiry. *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999). "The first step in this process is to determine whether the claimed violation involves one of those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* (citations and internal quotation marks omitted). The second step is dependent on the outcome of the

first step.  If the interest at issue is "fundamental," it is
entitled to strict scrutiny review.  *Id.*  If it is not
"fundamental," it is only entitled to rational basis review.
*Id.*

> [C]ourts must be reluctant to expand the
> concept of substantive due process because
> guideposts for responsible decision-making
> in this uncharted area are scarce and open-
> ended, which means that the courts must
> exercise the utmost care whenever we are
> asked to break new ground in this field,
> less the liberty protected by the Due
> Process Clause be subtly transformed into
> the policy preferences of judges.

*Id.* at 738 (citations and international quotation marks and
punctuation omitted).

Here, the parties have not suggested, and the Court
indeed cannot find, that any fundamental right or liberty
interest is at issue.  Instead, at issue is Plaintiffs' use of
toll roads and the Commonwealth's interest in recouping unpaid
tolls and penalizing those violators to deter future misuse.
(Am. Compl. ¶ 250 ("Plaintiffs and the class members are
entitled to, *inter alia*, use toll roads and may be assessed
tolls and reasonable administrative fees and civil penalties
where appropriate.").)  Thus, Transurban's action has a strong
presumption of validity and is constitutional so long as it is
"rationally related to a legitimate government purpose."  *Tri
Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 440 (4th Cir.

2002).   Even though Plaintiffs have made the conclusory

allegation that Transurban acts "arbitrarily" and "irrationally"

when seeking unpaid tolls and associated penalties, the amended

complaint is devoid of any additional factual support that would

overcome the strong presumption of validity to which Transurban,

as a state actor, is entitled.   (*See* Am. Compl. ¶¶ 254-55.)

Plaintiffs take issue with Transurban's toll and penalty

collection process, and indeed, the Court has found that

Plaintiffs properly state a claim for relief under a procedural

due process violation.   "Substantive due process violations run

only to state action so arbitrary and irrational, so unjustified

by any circumstance or governmental interest, as to be literally

incapable of avoidance by any pre-deprivation procedural

protections or of adequate rectification by any post-deprivation

remedies."   *Snider Int'l Corp. v. Town of Forest Heights*, 906 F.

Supp. 2d 413, 432-33 (D. Md. 2012) (citation and internal

quotation marks omitted), *aff'd*, 739 F.3d 140 (4th Cir. 2014).

With proper procedural protections in place, it cannot be said

that Transurban's actions are alleged to be so arbitrary and

irrational to support a substantive due process violation.

Moreover, "the fact that state courts are available to redress

and correct violations of state law belies the existence of a

substantive due process claim."   *Tri Cnty. Paving, Inc.*, 281

F.3d at 441.   Accordingly, the Court will grant Transurban's

motion in this regard and dismiss Count Three of the amended complaint in its entirety.[19]

### C. FDCPA Claims

In Claim Five, Plaintiffs allege that Faneuil and LES, the Collection Defendants, violated the FDCPA by making false and misleading representations, and by engaging in unfair and abusive practices in violation of 15 U.S.C § 1692g. (Am. Compl. ¶ 269.) Plaintiffs also allege that the Collection Defendants attempted to collect knowingly excessive and inflated fines and fees in violation of sections 1692e(2) and/or 1692f(1). (*Id.* at ¶ 270.) The Court will deny Defendants' motions with regard to Claim Five because under the facts alleged, the payments sought by Defendants are properly considered "debts", these debts are subject to the FDCPA, and Plaintiffs allege facts which if true would constitute a violation of the FDCPA.

To state a claim for relief under the FDCPA, Plaintiffs must allege facts that, if true, would show: "(1) the plaintiff has been the object of collection activity arising from consumer debt, (2) the defendant is a debt[] collector as

---

[19] The Due Process clauses of the United States Constitution are co-extensive with those in the Virginia Constitution. *See Solem v. Helm*, 463 U.S. 277, 285 n.10 (1983); *see also Shivaee v. Commonwealth*, 613 S.E.2d 570, 574 (Va. 2005) ("Because the due process protections afforded under the Constitution of Virginia are co-extensive with those of the federal constitution, the same analysis will apply to both."). Accordingly, claims brought under the Virginia Constitution in Claim Two will remain, while those in Claim Three will be dismissed.

defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA." *Dikun v. Streich*, 369 F. Supp. 2d 781, 784-85 (E.D. Va. 2005) (citation omitted).

> The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5). Congress did not expressly define "transaction." However, the majority of federal courts that have interpreted this provision have required the "transaction" to be consensual, where the parties negotiate or contract for consumer-related goods or services. *See, e.g., Franklin v. Parking Revenue Recovery Servs., Inc.*, No. 13 C 02578, 2014 WL 6685472, at *3 (N.D. Ill. Nov. 25, 2014) (defining "transaction" as "those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services") (quoting *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1324 (7th Cir. 1997); *see also Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1371 (11th Cir. 1998)); *Yazo v. Law Enforcement Sys., Inc.*, No. CV 08-03512 DDP (AGRx), 2008 WL 4852965, at *2 (C.D. Cal. Nov. 7, 2008). Plaintiffs do not suggest an alternate definition, and indeed, the Court cannot find one that is more

widely accepted than the definition from *Franklin*.

Plaintiffs allege that all named plaintiffs were, at all relevant times, validly enrolled in a state E-ZPass program. (Am. Compl. ¶¶ 10-16.)  Furthermore, Plaintiffs allege that they have acted pursuant to the requirements of the program in properly mounting the E-ZPass device on their windshields and linking their E-ZPass accounts to a valid credit card. (*Id.*) Finally, Plaintiffs allege that "in many cases, the Transurban Defendants' equipment registers a "violation" even where a valid, fully funded E-ZPass account is in existence." (*Id.* ¶ 55.)  Therefore, the Court, accepting the facts alleged as true for the purposes of this Motion to Dismiss, concludes that the alleged toll violations at issue here are properly understood as "consensual transactions."

Plaintiffs have contracted with E-ZPass for a transponder that communicates with toll collection booths across the country.  In most regions of the country, this allows for more efficient travel.  Indeed, motorists with an E-ZPass transponder need not wait in the "cash only" lines at toll booths, but instead, can continue driving through the "E-ZPass" lane, typically without delay.  Under the facts of this case, Transurban, as the HOT operator, has installed E-ZPass gantries as the only toll collection method for the HOT lanes.  At this stage, assuming that the allegations of the Amended Complaint

are true, Plaintiffs have not in fact committed a toll infraction, but rather Transurban has simply neglected to collect the toll at the moment of entry.  Their later actions in assigning fees and fines do not change this fact, nor do they alter the nature of the underlying debt.

The Collection Defendants also argue that Plaintiffs have failed to allege facts which, if true, would constitute behavior prohibited by the FDCPA.  (Faneuil's Mem. at 9; LES's Mem. at 6.)  However, Plaintiffs allege facts which, if true, could constitute a violation of the FDCPA.  For purposes of assessing the validity of an FDCPA claim, the Court examines the representations made by the debt collector "from the vantage of the least sophisticated consumer."  *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 394 (4th Cir. 2014).  With respect to Defendant Faneuil, Plaintiffs allege that Transurban has sent a contractor employed by Faneuil, "Alexis Brach (a non-lawyer) to appear on its [Transurban's] behalf." (Am. Compl. ¶ 95.)  Plaintiffs further allege that "Ms. Brach still regularly negotiates with driver. . . in the Virginia courthouses," and "regularly appears for Defendant Transurban in such proceedings." (*Id.* ¶ 96.)  A legally un-sophisticated consumer could very reasonably imply from Ms. Brach's representation of Transurban in negotiations over legal actions that allegedly took place *in courthouses* that Ms. Brach was in

fact an attorney employed by Faneuil, representing Transurban. This conclusion is even more understandable as, on at least one occasion, Ms. Brach is alleged to have attempted to "appear on [Transurban's] behalf" in court. (*Id.* ¶ 95.)  A jury could find this to be a violation of 15 U.S.C.A. § 1692e, prohibiting "[t]he false representation or *implication* that any individual is an attorney." (emphasis added).  This behavior would satisfy the requirement that "defendant has engaged in an act or omission prohibited by the FDCPA." *Dikun v. Streich*, 369 F. Supp. 2d 781, 784-85 (E.D. Va. 2005). Defendant Faneuil's Motion to Dismiss Claim Five therefore fails, and the Court need not address the sufficiency of Plaintiffs' alternative allegations of § 1692e or  § 1692f violations at this stage.

Defendant LES admits that the Fourth Circuit has held in *Clark v. Absolute Collection Serv., Inc.*, 741 F.3d 487 (4th Cir. 2014). that a notice requiring the recipient to submit her dispute in writing was a violation of § 1692g(3) of the FDCPA. Plaintiffs allege that the notice mailed by LES regularly contains language purporting to require disputes to be submitted to LES in writing. (Am. Compl. ¶ 77.) In light of the *Clark* decision, any such language would certainly satisfy the requirement that "defendant has engaged in an act or omission prohibited by the FDCPA." *Dikun v. Streich*, 369 F. Supp. 2d 781, 784-85 (E.D. Va. 2005).  Therefore Defendant LES's Motion to

Dismiss also fails with regard to Claim Five.

Accordingly, because the object of the alleged collection activity is a debt for purposes of the FDCPA and Plaintiffs allege facts which, if true, would constitute acts or omissions prohibited by the FDCPA, Plaintiffs state a proper claim for relief and the Court denies the Collection Defendants Motions to Dismiss with respect to Claim Five.

## D. State Law Claims[20]

Plaintiffs bring four causes of action under state law against all Defendants: unjust enrichment (Claim Four), violation of the Maryland Consumer Protection Act ("MCPA") (Claim Six), violation of the Virginia Consumer Protect Action ("VCPA") (Claim Seven), and tortious interference with contract (Claim Eight).  (Am. Compl. ¶¶ 258-267, 272-312.)  Each claim and each Defendant is addressed in turn.

### 1. Unjust Enrichment

In Claim Four, Plaintiffs claim that "Defendants

---

[20] All parties seem to agree that Virginia law applies to Claims Four, Seven, and Eight, while Maryland law applies to Claim Six. Therefore, the Court applies Virginia law to Claims Four, Seven, and Eight, and Maryland law to Claim Six for purposes of resolving these motions and without completing a choice of law analysis.  *Cf. G4I Consulting, Inc. v. Nana Servs., LLC*, No. 1:11cv810 (LMB/TCB), 2012 WL 1677985, at *4 (E.D. Va. May 14, 2012) ("Because the rule of *lex loci delicti*, or the law of the place of the wrong, applies to choice-of-law decision in tort actions, and the site of the alleged wrong in this instance was the Commonwealth, Virginia law governs the unjust enrichment claim . . . .").

knowingly received and retained wrongful benefits and funds from Plaintiffs . . . with conscious disregard for the rights of Plaintiffs." (Am. Compl. ¶ 261.) To recover under a theory of unjust enrichment, Plaintiffs must demonstrate that: (1) Plaintiffs conferred a benefit on Defendants; (2) Defendants knew of the benefit and should reasonably have expected to repay Plaintiffs; and (3) Defendants accepted or retained the benefit without paying for its value. *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008). "Generally, an action for unjust enrichment lies when one has money of another that he has no right to retain." *Butts v. Weltman, Weinberg & Reis Co., LPA*, No. 1:13cv1026 (JCC/IDD), 2013 WL 6039040, at *2 (E.D. Va. Nov. 14, 2013) (citing *Robertson v. Robertson*, 119 S.E. 140 (1923)). Under a theory of unjust enrichment, the Court will recognize an implied contract, or a quasi-contract, which requires the party accepting the benefit to make reasonable compensation for it. *Id*. Therefore, "[a] condition precedent to the assertion of such a claim is that no express contract exists between the parties." *Id*. This is not a "blanket rule," however, and under Virginia law, the fact that an express contract does exist between at least one of the parties and a non-party does not bar all subsequent implied contracts regarding the same subject matter. *Id*.

Here, the Court must dismiss Claim Four against the

71

Collection Defendants.  Aside from conclusory and boilerplate allegations (*see* Am. Compl. ¶¶ 258-267), there is no specific allegation that any of the named Plaintiffs conferred a benefit upon Faneuil or LES.  *Butts* is distinguishable from the facts as alleged here, and does not alter this outcome.  In *Butts*, Plaintiff specifically alleged "that she paid $2,691.03 to Defendant despite the absence of any valid obligation."  2013 WL 6039040, at * 5.  Here, such a specific, but necessary, allegation is lacking as to Faneuil and LES.  Accordingly, the Court dismisses Claim Four against the Collection Defendants.

Whether Plaintiffs have sufficiently stated a claim for unjust enrichment against Transurban is a closer call. Transurban first argues that the "settlement agreements" between various Plaintiffs and Transurban foreclose any implied contract under a theory of unjust enrichment.  (*See* Am. Compl. ¶ 266 ("Certain Defendants may be protected by settlement or judgments with class members, but all Defendants are not party to such settlements or judgments.").)  Specifically, Plaintiffs Stanfield, Amarti, and Pizarro made payments to Transurban. (*See* Am. Compl. ¶¶ 137, 151, 174.)  Otherwise, Plaintiffs Brown, Hale, Osborne, and Chase made no payments to Transurban.  All Plaintiffs, however, fail to sufficiently allege facts that would support a claim for the following reasons.

Plaintiffs Stanfield, Amarti, and Pizarro's unjust

enrichment claim fails because even though they conferred a benefit on Transurban, at the time, there is no allegation that Transurban should have reasonably been expected to repay Plaintiffs.  Stated differently, there is no allegation that "retention of the benefit by the defendant . . . render[s] it inequitable for the defendant to retain the benefit without paying for its value." *Nossen v. Hoy*, 750 F. Supp. 740, 744-45 (E.D. Va. 1990).  Instead, as discussed above, it appears these payments were made to settle an outstanding claim by Transurban for an amount substantially smaller than the amount Transurban originally sought.  Transurban's practices in this regard are not at issue in Claim Four.

It is apparent as a matter of law, from a fair reading of the amended complaint that an unjust enrichment claim cannot move forward as to these three Plaintiffs.  Moreover, the same is true for the remaining four Plaintiffs, Brown, Hale, Osborne, and Chase, who are *never* alleged to have conferred a benefit on Transurban.  *Butts*, 2013 WL 6039040, at *5.  Therefore, this claim fails against Transurban as a matter of law, for the same reasons it did against the Collection Defendants.  Ultimately, the allegations in the amended complaint fail to satisfy the requirements to state a claim for unjust enrichment, an equitable remedy that the Court imposes when no other remedy at law will do.  *See Nossen*, 750 F. Supp. at 745.  Accordingly, the

73

Court will dismiss Claim Four in its entirety against all Defendants.

### 2. Maryland and Virginia Consumer Protection Acts

Plaintiffs bring a claim under the Maryland Consumer Protection Act ("MCPA") in Claim Six, and a claim under the Virginia Consumer Protection Act ("VCPA") in Claim Seven. "To properly state a cause of action under the VCPA, Plaintiff must allege (1) fraud, (2) by a supplier, (3) in a consumer transaction." *Nahigian v. Juno Loudon, LLC*, 684 F. Supp. 2d 731, 741 (E.D. Va. 2010). Similarly, to state a claim under the MCPA, Plaintiffs "must show that they reasonably relied to their detriment on some promise or misrepresentation made by [Defendants]." *Green v. Wells Fargo Bank, N.A.*, 927 F. Supp. 2d 244, 253-54 (D. Md. 2013) (citing *Goss v. Bank of Am., N.A.*, 917 F. Supp. 2d 445, 451 (D. Md. 2013) ("To state a claim under the MCPA, 'the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation.'") (quotation omitted)). Because claims under the VCPA and MCPA involve allegations of fraud, such claims must be pled with heightened particularity. *See, e.g., Fravel v. Ford Motor, Co.*, 973 F. Supp. 2d 651, 656 (W.D. Va. 2013); *Myers v. Lee*, No. 1:10cv131 (AJT/JFA), 2010 WL 2757115, at *6 (E.D. Va. July 12, 2010) (citing *Nahigian*, 684 F. Supp. 2d at 741); *see also Green*,

74

927 F. Supp. 2d at 249.  Rule 9(b) governs the heightened particularly pleading standard regarding claims of fraud.  *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularly the circumstances constituting fraud or mistake.  Specifically, there must be allegations of fraudulent misrepresentations of fact, which must include: "a false representation, or material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage."  *Hamilton v. Boddie-Noell Enter., Inc.*, No. 2:14CV00051, 2015 WL 751492, at *2 (W.D. Va. Feb. 23, 2015) (citations omitted).  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *see also United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.,* 707 F.3d 451, 455-56 (4th Cir. 2013) (stating that in a False Claims Act case, to assert a fraudulent allegation, plaintiff "must, at a minimum describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.").

Defendants argue that Plaintiffs have failed to state a claim for relief under the VCPA and MCPA with the requisite particularity, that the nature of the transaction at issue falls outside the scope of the VCPA and MCPA, Plaintiffs' have failed to allege reliance on the alleged misrepresentations, and that

Plaintiffs have failed to allege a loss in reliance on the alleged misrepresentations. (Transurban's Mem. at 27-28; LES's Mem. at 21, 23; Faneuil's Mem. at 26-28.)  The Court will address these arguments as they apply to each Defendant in turn.

Plaintiffs have generally met the requirements of heightened particularity in pleading their VCPA and MCPA claims against Transurban.  Plaintiffs describe several discrete, specific instances where each named Plaintiff has allegedly received a representation from Transurban claiming that it has incurred administrative fees which are "unreasonable and are not related to the true costs the Transurban Defendants incurred to 'administer' [named Plaintiff's] file."  (Am. Compl. ¶ 120, 131, 145, 167, 184, 200, 215.)  Plaintiffs have likewise alleged that Plaintiffs Stanfield, Amarti, and Pizarro have made payments to Defendant Transurban the amount of which was directly related to the amount demanded in these letters.  (Am. Compl. ¶¶ 137,151, 174.)  Plaintiffs have therefore alleged both a misrepresentation and a reliance on that misrepresentation to the detriment of Plaintiffs Stanfield, Amarti, and Pizarro. These allegations then suffice to show that Plaintiff Stanfield has "reasonably relied to [her] detriment on some promise or misrepresentation made by [Defendants]." *Green*, 27 F. Supp. 2d at 253-254.  Accordingly, her MCPA claim against Plaintiff Transurban will survive the Motion to Dismiss.

Plaintiffs Amarti and Pizarro, under the VCPA, must also demonstrate that Transurban is a "supplier" with whom they have engaged in a "consumer transaction". *Nahigian*, 684 F. Supp. 2d at 741.  For the same reasons discussed above in determining that the debts sought by Defendants are the result of a "consensual transaction" for purposes of the FDCPA, the Court finds that Plaintiffs and Defendant Transurban have engaged in a "consumer transaction" as required by the VCPA. *supra* at III.C.  Transurban's role as the operator of the HOT Lanes and 495 Express Lanes makes it a "supplier" of toll road services with respect to the transactions at issue.[21] (Am. Compl. ¶ 289.)  Therefore, Plaintiffs Amarti and Pizarro's VCPA claim against Transurban will also survive the Motion to Dismiss.

With respect to the Collection Defendants, Plaintiffs' MCPA and VCPA claims fail due to pleading deficiencies.  As discussed in the above case law, there are at least two important requirements under both the VCPA and MCPA: sufficient allegations of fraudulent conduct, and reliance by plaintiffs thereon.  *Hamilton*, 2015 WL 751492, at *2; *Goss*, 917 F. Supp. at 451.  Plaintiffs allege only that Faneuil has taken actions from which Plaintiffs could imply that Ms. Brach is an attorney. (Am. Compl. ¶¶ 95-96.)  Plaintiffs have not alleged that they have

---

[21] Transurban has not challenged its status as a "supplier" in any of its briefs or at oral argument on this motion.

relied on the implication that Ms. Brach is an attorney to their detriment.  Indeed, Plaintiffs do not allege that they have relied on any material representations by Faneuil in a way which has caused them any material damage.

Likewise, Plaintiffs fail to allege that they have suffered any loss from reliance on a misrepresentation of fact by Defendant LES.  It is not clear that the language in LES's notices purporting to require Plaintiffs to file any dispute with LES in writing would satisfy the requirement of a misrepresentation of fact, but even assuming that it does, Plaintiffs fail to allege that they have relied on that purported requirement in any way, let alone in a way that caused Plaintiffs harm.  As Plaintiffs fail to allege a misrepresentation by these defendants on which they have relied to their material detriment, the Court will dismiss Claims Six and Seven with respect to the Collection Defendants.

Plaintiffs claim that the summonses and debt collection letters "contain misrepresentations regarding the amount of purported debts and the reasons for the purported debts." (Am. Compl. ¶¶ 276, 291.)  It is clear that Plaintiffs do not agree with Defendants' procedure for collecting unpaid tolls and any associated penalties.  It is also clear that Plaintiffs believe that Defendants assess illegal and unreasonable fines.  What remains unclear, however, is the exact

nature of the "misrepresentation" that Collection Defendants have made by issuing summonses and collection notices regarding underlying alleged toll violations as reported to them by Transurban. *See Graham v. RRR, LLC*, 202 F. Supp. 2d 483, 490-91 (E.D. Va. 2002) ("To recover under the VCPA, [Plaintiff] must 'prove a false misrepresentation.'") (quoting *Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F. Supp. 2d 535, 553 (E.D. Va. 2001)). However, Plaintiffs do not allege that the *Collection Defendants* have made any misrepresentations regarding the amount Transurban claims it was owed. In light of Rule 9(b), it is not enough, even at this stage of the proceeding, to simply allege conclusory buzz words associated with fraud without sufficient factual support and specificity. The Court is left to ask *how* the summonses and debt collection letters "contain misrepresentations," because Plaintiffs fail to offer any additional allegations of fact as to the true, or otherwise correct, representation that should have been listed on those notices. Plaintiffs fail to allege *how* the documents at issue are false. *See Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502, 533 (E.D. Va. 2011) ("In order to state a cause of action for a violation of this statute, plaintiff must allege a fraudulent misrepresentation of fact.").

Again, the Court understands that Plaintiffs disagree with the exorbitant nature of the fine amount and with

Defendants' collection practices generally.  These harms, however, are more appropriately addressed and remedied by the constitutional claims regarding excessive fines and procedural due process.  Here, Plaintiffs allegations under Claims Six and Seven fall short against Defendants Faneuil and LES because they fail to sufficiently plead facts supporting the existence of a false, or misleading, representation.  *Hamilton*, 2015 WL 751492, at *2; *Goss*, 917 F. Supp. at 451.  The amended complaint is completely devoid of any allegation that Plaintiffs relied on representations made by these Defendants' misrepresentation to their detriment.  *See Fravel v. Ford Motor Co.*, 973 F. Supp. 2d 651, 658 (W.D. Va. 2013) ("Virginia courts have consistently held that reliance is required to establish a VCPA claim.").

However, Plaintiffs have sufficiently alleged a specific misrepresentation by Defendant Transurban with respect to the administrative fees they claimed they accrued while processing Plaintiffs' supposed toll violations.  These administrative fee calculations played a significant role in Transurban's calculation of the amount they sought from Plaintiffs in their summonses, and subsequently were relied on by Plaintiffs Stanfield, Amarti, and Pizarro in their decision to pay Transurban a certain amount in satisfaction of those state-court claims.  Accordingly, the Court grants Defendants' Motion to Dismiss Counts Six and Seven with respect to

Defendants Faneuil and LES, and denies Defendants' Motion to Dismiss Counts Six and Seven with respect to Defendant Transurban.

### 3. Tortious Inference with Contract

Lastly, in Claim Eight, Plaintiffs claim that Defendants have tortiously interfered with the contract between Plaintiffs and E-ZPass by charging excessive and unreasonable fees, and by assessing fees in excess of what is allowed under the underlying contract. (Am. Compl. ¶¶ 298-312.) The Court denies Defendants' Motion to Dismiss with regards to this claim.

To state a claim under Virginia law for tortious interference with contract, Plaintiffs must allege sufficient facts that establish the following elements:

> (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy was disrupted.

*Stradtman v. Republic Servs., Inc.*, No. 1:14cv1289 (JCC/JFA), 2015 WL 3650736, at *6 (E.D. Va. June 11, 2015) (quoting *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014) (quoting *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985); *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870 (Va. 2011))). It is irrelevant whether a defendant

81

intentionally acts to induce the plaintiff to terminate or breach the underlying contractual relationship, but instead, "the essence of a tortious interference claim under Virginia law is that the defendant intentionally induced *the third party* . . . to breach or terminate the relationship or expectancy with the plaintiff." *Stradtman*, 2015 WL 3650736, at *6 (citing *Rappahannock Pistol & Rifle Club, Inc. v. Bennett*, 546 S.E.2d 440, 444 (Va. 2001)).

Here, Plaintiffs allege that Transurban tortiously interfered with Plaintiffs' contract with E-ZPass by preventing Plaintiffs "from obtaining the full benefits of this contractual relationship," and that the Collection Defendants tortiously interfered "by attempting to collect debts purportedly owing for use of HOT lanes." (Am. Compl. ¶¶ 301, 307, 309.) Plaintiffs allege that Transurban's equipment frequently "registers a 'violation' even where a valid, fully funded E-ZPass account is in existence. . . assess[ing] fines and penalties for purported toll violations that were not violations at all." (Am. Compl. ¶ 55.) The Virginia, Maryland, and New York E-ZPass contracts all allow fees and penalties where a toll violation has actually occurred due to "failure to maintain a positive *E-ZPass* balance." (Am. Compl. ¶¶ 50-52.) However, none of the applicable E-ZPass contracts provide for the possibility that Plaintiffs could face any punitive action for using a properly

installed transponder connected to a funded E-ZPass account
which simply is not read by the toll operator.  In fact, the
benefit conferred to Plaintiffs in return for their subscription
to the E-ZPass system in each of these states is the promise
that Plaintiffs may "use toll roads and may be assessed tolls
and reasonable administrative fees and civil penalties *where
appropriate.*" (*Id.* ¶ 299) (emphasis added).  As Defendant
Transurban is alleged to have assessed administrative fees and
civil penalties where no violation has occurred, they have
prevented the state E-ZPass programs of Virginia, Maryland, and
New York from carrying out their promise to provide "toll road
use services." (*Id.* ¶ 298).  Thus, Defendant Transurban has
caused these state E-ZPass programs, a third party, "to breach
their contracts with Plaintiffs." *Stradtman*, 2015 WL 3650736,
at *6 (citing *Rappahannock Pistol & Rifle Club, Inc.* 546 S.E.2d
at 444).  Plaintiffs further allege that Transurban was "aware
of the existence of the User Agreement between… Plaintiffs. . .
and the E-ZPass." (Am. Compl. ¶ 300.)  This knowledge satisfies
the second of the four requirements outlined in *Stradtman.*
Plaintiffs allege that they were harmed by being denied the full
enjoyment of the benefits of their E-ZPass contract, thus
satisfying the fourth requirement laid out in *Stradtman.* (Am.
Compl. ¶ 310.)  Finally, the third requirement set out in
*Stradtman* is satisfied at this stage because a reasonable jury

could certainly infer from the facts alleged that Transurban

knew "that the interference [was] certain or substantially

certain to occur as a result of [its] action." Restatement

(Second) of Torts § 766 cmt. j.

Plaintiffs have therefore alleged facts which, if

true, can support a claim for tortious interference with

contract.  The Court accordingly denies Defendants' Motion to

Dismiss Count Eight.

### E. Request for Leave to Amend the Amended Complaint

In the event that the Court dismisses any of

Plaintiffs' claims, Plaintiffs request leave to amend the

complaint for a second time.  Leave to amend a pleading "shall

be freely given when justice so requires." Fed. R. Civ. P.

15(a).  "[L]eave to amend a pleading should be denied only when

the amendment would be prejudicial to the opposing party, there

has been bad faith on the part of the moving party, or the

amendment would have been futile." *Laber v. Harvey*, 438 F.3d

404, 426-27 (4th Cir. 2006) (citations omitted).  The Court has

considered this request in light of the dismissed claims,

specifically, three, four, six (in part), and seven (in part).

At this stage, of course, Plaintiffs have not tendered a

proposed second amended complaint.  The Court finds that

Plaintiffs could more than likely cure the pleading defects with

regards to Claim Six and Claim Seven.  Stated differently, an

84

amendment would likely save Plaintiffs' VCPA and MCPA claims against Defendants' Faneuil and LES.  Accordingly, the Court grants Plaintiffs' request to amend the Amended Complaint.

## IV. Conclusion

For the foregoing reasons, the Court grants the motions in part as follows: Claims Three and Four are dismissed in their entirety.  Claims Six and Seven are dismissed as applied to The Collection Defendants, LES and Faneuil. Claims One, Two, Six, Seven, and Eight against Transurban will remain, as will Claims Five and Eight against LES and Faneuil. Plaintiffs are granted leave to amend their complaint.

An appropriate Order shall issue.


/s/
_____
November 2, 2015                     James C. Cacheris
Alexandria, Virginia          UNITED STATES DISTRICT COURT JUDGE