IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| JO-ANN BROWN, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   1:15cv494(JCC/MSN) |
| | ) |
| TRANSURBAN USA, INC., et al. | ) |
| | ) |
| Defendants. | ) |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on named Plaintiffs
Anna Stanfield, Rachel Amarti, Mary Elixe Pizarro, and Jocelyn
Chase (collectively, "Named Plaintiffs") and Defendants
Transurban (USA) Inc. and Transurban (USA) Operations Inc.'s
(collectively, "Transurban Defendants") joint motion for final
approval of the class settlement, as well as Plaintiffs' motion
for attorneys' fees and service awards.  For the following
reasons, the Court will grant final certification of the class,
grant the Parties' joint motion for final approval of the
settlement, and grant Plaintiffs' motion for attorneys' fees and
service awards for Class Representatives.

**I.   Background**

The facts of this case are set out at length in this
Court's prior memorandum opinion.  *See Brown v. Transurban USA,*

*Inc.*, 184 F. Supp. 3d 809 (E.D. Va. 2015) (motion to dismiss). The facts are presumed known and discussed only to the extent necessary to aid the present motions.

**A.        Litigation to Date**

On April 15, 2015, Plaintiffs Jo-Ann Brown and Michele Osborne, as well as Named Plaintiff Mary Elise Pizarro, individually and on behalf of putative classes, filed a complaint in this Court against the Transurban Defendants; Faneuil, Inc. ("Faneuil") and Law Enforcement Systems, LLC ("LES") (collectively, the "Collection Defendants"); and two other entities that were subsequently terminated from the litigation.  The complaint alleged that, *inter alia*, the Defendants' attempted and actual enforcement of allegedly unpaid tolls assessed for the use of certain toll road lanes operated by Transurban on Interstate 495 and Interstate 95 in Virginia (collectively and individually, the "Express Lanes") was unlawful.

On June 8, 2015, Named Plaintiffs and several former class representatives (collectively, "Plaintiffs"), individually and on behalf of the putative classes, filed an amended complaint ("Amended Complaint") against the Transurban Defendants and Collection Defendants (collectively, the "Defendants").  [Dkt. 36]  The Amended Complaint asserted claims

2

against Transurban Defendants for violation of the Excessive Fines Clause of the United States Constitution and of the Virginia Constitution, as well as both procedural and substantive due process violations of the same.  The Amended Complaint also asserted Fair Debt Collection Practices Act ("FDCPA") claims against the Collection Defendants.  Finally, the Amended Complaint asserted claims against all Defendants for unjust enrichment, violation of the Maryland Consumer Protection Act ("MCPA"), violation of the Virginia Consumer Protection Act ("VCPA"), and tortious interference with contract.

On July 2, 2015, Defendants moved to dismiss the Amended Complaint.  [Dkt. 41, 44, 49]  After briefing by the parties and oral argument, this Court entered an Order on November 2, 2015, which granted Defendants' motions to dismiss in part and denied in part.  [Dkt. 65, 66]  The Court granted Defendants' motions with respect to the substantive due process and unjust enrichment claims, as well as the Collection Defendants' motions with respect to the consumer protection act claims.  [Dkt. 65]  The Court denied the Defendants' motions to dismiss with respect to all other claims.  [*Id.*]  The Court also held that Plaintiffs had standing to pursue their FDCPA claims against the Collection Defendants; that Plaintiffs Brown, Osborne, and Hale's claims were not moot; that Named Plaintiffs

3

had standing to sue for prospective relief; and that Plaintiffs' claims were not barred by res judicata. [*Id.*]

Immediately after the Court's order in November 2015, the parties embarked on discovery. (Mem. in Supp. [Dkt. 86] at 3.) Both Plaintiffs and Defendants served extensive discovery requests, and both parties began to respond to those requests and gather discovery materials for production. (*Id.*)

Concurrently, the parties initiated settlement discussions with the assistance of a professional mediator. (*Id.*) Those discussions were facilitated by a significant amount of data produced by Transurban Defendants at Plaintiffs' request. (*Id.*) The settlement process was intensive, including one full-day mediation meeting and several negotiation sessions via telephone, nearly all of which involved the assistance of the professional mediator. (*Id.*)

On January 21, 2016, the parties informed the Court that they had reached an agreement in principle to resolve the litigation. On March 28, 2016, the parties executed a comprehensive settlement agreement (the "Agreement"). [Dkt. 86-1] The Agreement provides that, in exchange for a release of all Defendants, Plaintiffs and the proposed class will receive both retroactive and prospective relief. The parties filed a Joint Motion for Settlement that same day. [Dkt. 85]

Plaintiffs also filed a Motion for Certification of the Settlement Class and Appointment of Class Counsel. [Dkt. 88] The Court issued two orders granting those motions after conducting a preliminary fairness hearing on April 7, 2016. [Dkt. 93, 94] Specifically, the Court certified a settlement-only class pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3); appointed named Plaintiffs as Class Representatives; appointed Hausfeld LLP, Boies Schiller & Flexner LLP, Tyko & Zavareei LLP, and DiMuro Ginsberg PC as Class Counsel; appointed Transurban as Claims Administrator; preliminarily approved the terms of Settlement according to Rule 23(e); and approved the form and manner of notice as required by the United States Constitution and Rule 23(c)(2). [Dkt. 93, 94.]

A second Joint Motion for Settlement was filed in June 2016, requesting an addendum to the Settlement Agreement that would modify some of the administrative tasks. [Dkt 95] The Court granted this request after holding a hearing on June 9, 2016. [Dkt. 98]

Pursuant to the June 2016 Court order, the Claim Administrator sent over 40,000 postcard class notices to potential Class Members. (Mem. in Supp. [Dkt. 102] at 24.) Claim Administrator also posted the court-approved notice on a website dedicated to this settlement, issued a press release

about the Settlement, and maintained a toll-free number to answer questions from potential claimants. (*Id.*) The Claim Administrator received no objections to the proposed Settlement and only one opt-out request. (*Id.*)

Both parties now move for final approval of the terms of the Settlement and Plaintiffs move for the approval of attorneys' fees and service awards. The Court held a final settlement hearing to consider these motions on September 29, 2015. For the foregoing reasons, the Court will grant the Parties' motions.

## II.  Analysis

The Court's prior orders certified a Settlement Class, appointed Class Counsel, named Class Representatives, and appointed a Claims Administrator. (*See* Order [Dkt. 93] ¶¶ 2-6; Order [Dkt. 94] ¶ 1.) Therefore, this Memorandum Opinion addresses the following four remaining issues: (1) the final certification of the class; (2) the proposed Settlement between the parties; (3) the award of attorneys' fees and costs to Class Counsel; and (4) Service Awards for Class Representatives. The Court will address each issue in turn.

### A.      Final Certification of the Settlement Class

In accordance with the proposed Settlement, the proposed Class is defined as follows:

> All Persons who had one or more E-Z Pass accounts at
> the time such Persons incurred one or more alleged
> Toll Violation(s) on the Express Lanes and paid $100
> or more to Transurban (or one of its affiliates) or
> LES in Fees/Penalties arising from such alleged Toll
> Violation(s) that, at the time of payment, were at the
> Collections Stage or Court Stage, and made such
> payment any time from the inception of the Express
> Lanes to the earlier of (a) the date the District
> Court issues an order granting preliminary approval of
> the settlement embodied in this Agreement [April 7,
> 2016] or (b) March 1, 2016 (the "Cut Off Date"),
> except that the following are excluded: (i) Rental Car
> Companies; (ii) Other Fleet Owners; and (iii) judges
> assigned to the Lawsuit.

(April 7, 2016 Order [Dkt. 93] ¶ 2.)

A settlement class, like a litigation class, must satisfy the requirements of Federal Rule of Civil Procedure 23(a). Under Rule 23(a), plaintiff must prove the threshold elements of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. Fed. R. Civ. P. 23(a). The class must also qualify as one of the three Rule 23(b) class types. Here, Plaintiffs proceed as a Rule 23(b)(3) class. Thus, Plaintiffs must show that common issues of law or fact predominate over any individual questions and that the class action is the superior method for adjudicating the controversy. *Id.* at 23(b)(3). The Court applies the preponderance of the evidence standard to this Rule 23 analysis. *See In re The Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 104 (E.D. Va. 2009) (applying preponderance standard to a Rule 23 inquiry).

The Court first addresses the 23(a) requirements, followed by the 23(b)(3) analysis.

i)   *Rule 23(a) Prerequisites*

a)        <u>Numerosity</u>

Numerosity exists when the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  There is no set minimum number or "mechanical test for numerosity." *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984) (citing *Kelley v. Norfolk & Western Ry. Co.*, 584 F.2d 34 (4th Cir. 1978)).

The numerosity requirement is easily met by the proposed Class here.  The Parties agree that there are thousands of Settlement Class Members.  Joinder of thousands of individuals would be exceedingly impracticable, so the proposed Class satisfies the first prong of Rule 23(a), numerosity.  *See Gunnells v. Healthplan Servs.*, 348 F.3d 417, 425 (4th Cir. 2003) (finding that a class of 1,400 members "easily satisfied Rule 23(a)(1)'s numerosity requirement").

b)        <u>Commonality</u>

Commonality exists when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires that a proposed class action have "the capacity . . . to generate answers" that "resolve an issue that

is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Minor factual variances will not necessarily preclude commonality, so long as the claims arise from the same general set of facts and "the class members share the same legal theory." *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 557 (D. Md. 2006); *see also Jeffreys v. Commc'ns Works of Am., AFL-CIO*, 212 F.R.D. 320, 322 (E.D. Va. 2003). Plaintiffs certifying a class under Rule 23(b) carry a related, but more demanding, burden of proving that these common questions of law or fact not only exist, but also "predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Because the predominance inquiry is "more stringent," that analysis may "subsume[] . . . or supersede[]" the Rule 23(a)(2) commonality analysis.  *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997)).  The Court, therefore, reserves its discussion of the common questions of law and fact in this case to its predominance analysis in part II(A)(ii)(a) below.  There, the Court finds that common questions of law and fact predominate over any individual issues.

c)          Typicality

The typicality prerequisite requires that the class representative "be part of the class and possess the same interest and suffer the same injury as the class members." *Lienhart*, 255 F.3d at 146 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).  "Nevertheless, the class representatives and the class members need not have identical factual and legal claims in all respects." *Fisher v. Va. Elec. and Power Co.*, 217 F.R.D. 201, 212 (E.D. Va. 2003).  The key inquiry is whether the "class representatives assert claims that fairly encompass those of the entire class, even if not identical." *Id.*  In order to satisfy typicality, the plaintiff seeking to certify the class must show: "(1) that their interests are squarely aligned with the interests of the class members; and (2) that their claims arise from the same events and are premised on the same legal theories as the claims of the class members." *Jeffreys*, 212 F.R.D. at 322.

Here, the Class Representatives, just like all Class Members, paid $100 or more in fees or penalties by March 1, 2016 at the Collections Stage or Court Stage as a result of alleged toll violations on the Express Lanes, and they had one or more E-ZPass accounts at the time they incurred the alleged violations.  The Class Representatives allege they have been

injured by paying fees and penalties at the Collections Stage and/or Court Stage that were allegedly unlawfully enforced by the Defendants when the Class Representatives were E-ZPass customers. Therefore, Class Representatives' claims rest on the same legal and factual issues as those of the Class Members, and in advancing their claims, the Class Representatives necessarily advance the claims of all Class Members.  As a result, the Court finds Plaintiffs' claims are typical of the claims of the class.

        d)        Adequacy

Lastly, the adequacy requirement is met when: (1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are "qualified, experienced, and generally able to conduct the litigation."  *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 238 (S.D.W. Va. 2005).  This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc.*, 521 U.S. at 625.

Plaintiffs represent that they "ha[ve] common interests" with the proposed Settlement Class, and the Court has identified nothing that might indicate antagonism with the Class's interests.  (Mem. in Supp. {Dkt. 89] at 6.)  As mentioned above, Plaintiffs each paid $100 or more in fees and penalties as the result of alleged toll violations on the

11

Express Lanes and had one or more active E-ZPass accounts at the time of the alleged toll violations, just like all putative Class Members would claim. *See Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998) ("The Supreme Court 'has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.'" (quoting *E. Tex. Motor Freight Sys. Inc. v. Rodriquez*, 431 U.S. 395, 403 (1977))). Furthermore, the proposed class members' claims are homogenous and nothing indicates the existence of subgroups that might require the creation of subclasses. *See Amchem Prods., Inc.*, 521 U.S. at 626 (identifying conflicts of interest between prospective class members with current asbestos-related injuries and those with only exposure to asbestos).

Plaintiffs' Counsel is also sufficiently qualified and experienced to fairly represent the interests of the class. "The inquiry into the adequacy of legal counsel focuses on whether counsel is competent, dedicated, qualified, and experienced enough to conduct the litigation and whether there is an assurance of vigorous prosecution." *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. at 239. Plaintiffs' Counsel has an extensive record of representing plaintiffs in consumer-protection class actions, which indicates counsel's ability to

12

properly leverage the value of this case into a fair settlement. (*See* Decl. of James J. Pizzirusso ("Pizzirusso Decl.") [Dkt. 86] at ¶¶ 48-60; *id.* at Exs. 1-4.)  That record was reaffirmed throughout this case, wherein Plaintiffs' Counsel argued vigorously at the motion to dismiss stage and engaged Defendants in settlement mediation.

In light of the foregoing, the Court finds that Plaintiffs have satisfied all of the Rule 23(a) class certification prerequisites.

### ii) *Rule 23(b)(3) Requirements*

In addition to meeting the threshold requirements of Rule 23(a), a plaintiff seeking class certification must prove the case qualifies as one of the three Rule 23(b) class types. In this case, Plaintiffs seek to qualify as a Rule 23(b)(3) class, which requires proof that: (1) common questions of law or fact predominate, and (2) a class action is the superior method of adjudication.  Fed. R. Civ. P. 23(b)(3).  For the following reasons, the Court finds Plaintiffs have proven these requirements by a preponderance of the evidence.

### a)        Predominance

The first requirement of Rule 23(b)(3) is that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R.

Civ. P. 23(b)(3).  "The common questions must be dispositive and over-shadow other issues." *Lienhart*, 255 F.3d at 146.  This inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.* 521 U.S. at 623.  That standard is certainly met in this consumer-protection class action case.

Here, all Class Members suffered the same injury, paying allegedly unlawful and unlawfully enforced fees and penalties as a result of alleged toll violations, despite having one or more E-ZPass accounts at the time of the alleged violation.  The theories of liability in this case are identical across the proposed Class.  Every Class Member's potential claim arises from the Defendants' same challenged practices and presents legal and factual questions that are common across the proposed Class.  Therefore, common questions predominate over this consumer-protection class action case, satisfying the first requirement for certifying a Rule 23(b)(3) class.

b)      Superiority

Turning to the second, and last, element of the Rule 23(b)(3) inquiry, the Court finds class action to be the superior method of settling this case.  Superiority exists when "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R.

14

Civ. P. 23(b)(3).  Rule 23(b)(3) directs a court to consider

four factors in its superiority analysis:

> [T]he class members' interest in
> individually controlling the prosecution or
> defense of separate actions; the extent and
> nature of any litigation concerning the
> controversy already begun by or against
> class members; the desirability or
> undesirability of concentrating the
> litigation of claims in the particular
> forum; and the likely difficulties in
> managing the class action.

*Droste v. Vert Capital Corp.*, No. 3:14-CV-467, 2015 WL 1526432,

at *8 (E.D. Va. Apr. 2, 2015) (quoting Fed. R. Civ. P.

23(b)(3)(A)-(D)).  With settlement classes, however, courts need

not consider the last factor, "whether the case, if tried, would

present intractable management problems, for the proposal is

that there will be no trial."  *Amchem Prods.*, 521 U.S. at 593.

Looking to Class Members' potential interest in

initiating separate actions, the Court finds such suits unlikely

due to the small amount of individual claims, as well as the

fact that Class Members are dispersed over multiple states.  The

small likelihood of recovery associated with individual claims

would also reduce an individual plaintiff's leverage in

settlement negotiations.  Thus, there will be little incentive

for individual litigation.  *See Amchem Prods.*, 521 U.S. at 617

("The policy at the very core of the class action mechanism is

to overcome the problem that small recoveries do not provide the

15

incentive for any individual to bring a solo action prosecuting his or her rights.") (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). A class action in this case is superior to other available methods for the fair and efficient adjudication of the controversy because a class resolution of the issues described above avoids the difficulties in management of separate and individual claims. Moreover, such a certification permits individual claimants to opt-out and pursue their own actions separately if they believe they can recover more in an individual suit. The Court finds accordingly that interest in initiating individual suits is likely low.

The second Rule 23(b)(3) factor addresses whether class members have already begun other litigation. Fed. R. Civ. P. 23(b)(3)(C). This Court is not aware of any other pending individual litigation in the United States that tracks the allegations set forth in this Complaint. The absence of independent actions weighs in favor of certifying a settlement class here.

The Court turns now to the last Rule 23(b)(3) factor, the propriety of consolidating all claims in this particular forum. Fed. R. Civ. P. 23(b)(3)(C). This Court is apprised of the facts and procedure of the case, such that it would promote judicial economy to resolve this case as a class with this

16

Court, rather than require individual plaintiffs to file separate actions elsewhere.  Furthermore, a class action presents Plaintiffs the greatest leverage for settlement when compared to individual litigation in courts, which may render inconsistent rulings.  *See EQT Prod. Co. v. Adair*, 764 F.3d 347, 371 (4th Cir. 2014) (noting concerns of judicial economy and avoidance of inconsistent judgments as factors "relevant to the superiority analysis").

In conclusion, Plaintiffs have sufficiently proven the prerequisites for certification under Rule 23(a) and that this case qualifies as a Rule 23(b)(3) class.  Therefore, this Court certifies the final Settlement Class defined in the accompanying order.

**B.      The Proposed Settlement**

*i)*   Terms of the Agreement

The Agreement provides for retrospective and prospective relief for Class Members.

In terms of retrospective relief, the Agreement establishes a settlement fund in which Transurban will provide up to $1,350,000 collectively in refund checks to class members who make valid claims.  (Mem. in Supp. [Dkt. 86] at 7.)  The amount of the refund depends on the amount the Class Member paid in Administrative Fees or Civil Penalties (collectively,

17

"Fees/Penalties"). (Agreement {Dkt. 86-1] at ¶ 3.1.1.) This fund will be comprised of two smaller funds: the $1,050,000 fund and the $300,000 fund. (Pizzirusso Decl. [Dkt. 86] at ¶ 26.)

If a person paid more than $300 in Fees/Penalties on or before March 1, 2016 arising from Express Lanes toll violations that the person incurred while having an E-ZPass account, and those Fees/Penalties were at the Collections Stage or Court Stage at the time of payment, then that person will be eligible to claim a refund of 70% of the amount paid that exceeded $300, provided that any refund check must be at least $10, from the $1,050,000 fund. (*Id.* at ¶ 28.) If a person paid greater than or equal to $100 and less than or equal to $300 in Fees/Penalties on or before March 1, 2016 arising from Express Lanes toll violations that the person incurred while having an E-ZPass account, and those Fees/Penalties were at the Collections Stage or Court Stage at the time of payment, then that person will be eligible to claim a refund of $10 from the $300,000 fund. (*Id.* at ¶ 29.)

Transurban will not pay more than $1,350,000 collectively to Class Members; thus, payments will be reduced pro rata once this cap is reached. (Mem. in Supp. [Dkt. 86] at 8.) However, if the cap is reached in one fund but not the other, money will be moved from the fund with remaining monies

18

to the other fund so as to provide Class Members with the maximum benefit under the Agreement. (Pizzirusso Decl. at ¶ 26-27.)

Additionally, Transurban will forgive all unpaid tolls and associated administrative fees that are outstanding and unpaid at the Collections Stage that, as of March 1, 2016, were more than twelve months old from the date of the toll violation at issue. (*Id.* at ¶ 31.)

The proposed Agreement also provides for significant prospective relief to members of the Settlement Class for a period of five years. The Agreement includes: (a) extending the First Time Forgiveness ("FTF") period from 60 days to 90 days; (b) renewing FTF eligibility on a yearly basis; (c) codifying FTF applied to the Collections and Court Stages in the form of reduced compromised amounts that eligible customers can pay in full satisfaction of outstanding Fees/Penalties at the Collections and Court Stages, which will result in the forgiveness of all other outstanding unpaid tolls and associated Fees/Penalties pending against such customers at prior stages of the violation process at time of payment; (d) directing the Debt Collector to report these amounts as paid in full to credit agencies; and (e) codifying the $2,200 cap on Fees/Penalties for eligible first-time violators, regardless of whether these

individuals qualify for FTF. (Mem. in Supp. [Dkt. 86-1, 86-3] at 7.)

Transurban has also agreed to provide more substantial notice to Express Lanes users so that they may avoid the issues giving rise to this lawsuit in the future, including, but not limited to: (a) new language on Transurban's website notifying customers of the availability of E-ZPass account balance warnings and the fact that FTF need not be requested in writing; (b) a new envelope design for its unpaid toll invoices; (c) establishment of a website where Express Lanes users can opt-in to receive an email from Transurban when they fail to pay a toll; and (d) postcard notices to eligible Express Lanes users with outstanding amounts at the Collections or Court Stage. (Mem. in Supp. [Dkt. 86-3 at ¶¶ 35-39] at 8.)

Moreover, the Virginia Department of Transportation ("VDOT") has agreed, in connection with the settlement, to send an email to eligible Virginia E-ZPass customers who failed to pay a toll due to insufficient funds in their E-ZPass account, reminding customers to promptly bring their account into good standing. (*Id.* at 9.) Virginia E-ZPass customers will now have ten days, instead of five, to bring their accounts into good standing, thereby avoiding administrative fees. (*Id.*)

The Agreement also provides E-ZPass users relief from

the debt collection process that was at issue in this lawsuit. Except when an unpaid toll invoice is returned to Transurban as undeliverable with no forwarding address, toll violations will not be forwarded to the debt collector for at least ninety days from the date of travel. (*Id.*) If debts were previously reported and an FTF payment is applied to those debts, Transurban will direct the debt collector to report the debts as resolved in full to the credit reporting agencies. (*Id.* at 9-10.)

Finally, the Settlement provides for the Class Representatives, Class Members who do not opt out of the Class, and those who receive postcards and pay reduced FTF amounts at the Collections or Court Stage (collectively, "Releasors") to release all Defendants from all claims that were asserted in this lawsuit or relate to unpaid toll violations on the Express Lanes.[1] (*Id.* at 10.)

*ii) Approval of the Proposed Settlement*

Before parties may settle a class action, a court must

---

[1] Released claims will not include claims for personal injury; damage to tangible property; any and all claims that pertain to anything other than the lawsuit or unpaid toll violations on the Express Lanes, including all claims pertaining to tolls that are not paid via E-ZPass and any claims pertaining to Transurban's charging of toll amounts different than amounts displayed; or any and all claims for retrospective relief related to payment made in connection with unpaid tolls incurred after March 1, 2016, except the claim of a postcard responder relating in any way to a reduced compromise amount paid by such responder or to such responder's underlying toll violations and any associated Fees/Penalties will be released.

approve the settlement.  Fed. R. Civ. p. 23(e).  Final
settlement requires a hearing to determine whether the agreement
is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).
This standard includes an assessment of both the procedural
fairness of the settlement negotiations and the substantive
adequacy of the agreement itself.  *See In re Am. Capital
S'holder Derivative Litig.*, No. 11-2424(PJM), 2013 WL 3322294,
at *3 (D. Md. June 28, 2013) (identifying procedural and
substantive prongs of settlement analysis).  The procedural
fairness inquiry protects against "the danger of counsel . . .
compromising a suit for an inadequate amount for the sake of
insuring a fee."  *Id.*  The substantive adequacy inquiry, by
contrast, "weigh[s] the likelihood of the plaintiff's recovery
on the merits against the amount offered in the settlement."
*Id.* (internal quotations omitted).  Together, these requirements
serve to protect "class members whose rights may not have been
given adequate consideration during the settlement
negotiations."  *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158
(4th Cir. 1991).

          A court may apply these same principles in a
preliminary fairness hearing, as the Court did in this case.
When a district court preliminary approves a settlement after a
hearing, the proposed settlement enjoys a presumption of

fairness.  *See Berkley v. U.S.*, 59 Fed. Cl. 675, 681 (2004)
("Settlement proposals enjoy a presumption of fairness afforded
by a court's preliminary fairness determination."); *In re Gen.
Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55
F.3d 768, 785 (3d Cir. 1995) ("This preliminary determination
establishes an initial presumption of fairness . . . ."); *Martin
v. Cargill, Inc.*, 295 F.R.D. 380, 383 (D. Minn. 2013) (accord);
*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079
(N.D. Cal. 2007) (accord).

   a)   <u>Fairness</u>

   Four factors from *In re Jiffy Lube Securities
Litigation*, 927 F.2d 155 (4th Cir. 1991), guide the Court's
analysis of whether the settlement was reached through good-
faith bargaining at arm's length.  Those factors are: "(1) the
posture of the case at the time settlement was proposed; (2) the
extent of discovery that had been conducted; (3) the
circumstances surrounding the negotiations; and (4) the
experience of counsel."  *Id.* at 159.  The proposed Settlement
satisfies these factors.

   Considering the posture of the case at the time of
settlement allows the Court to determine whether the case has
progressed far enough to dispel any wariness of "possible
collusion among the settling parties."  *In re The Mills Corp.*

23

*Sec. Litig.*, 265 F.R.D. 246, 254 (E.D. Va. 2009) (quoting *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159).   In this case, as in *In re MicroStrategy, Inc. Securities Litigation*, "the Settling Parties vigorously contested [] motion[s] to dismiss," 148 F. Supp. 2d 654, 664 (E.D. Va. 2001), and engaged in formal settlement mediation with the assistance of a professional mediator.   "These adversarial encounters dispel any apprehension of collusion between the parties." *In re NeuStar, Inc. Sec. Litig.*, No. 1:14-CV-885(JCC/TRJ), 2015 WL 5674798, at *10 (E.D. Va. Sept. 23, 2015) (finding, under similar circumstances including the assistance of a professional mediator, that the first factor weighed in favor of the fairness of the proposed settlement).

The second *Jiffy Lube* factor—the extent of discovery— ensures that all parties "appreciate the full landscape of their case when agreeing to enter into the Settlement." *The Mills Corp.*, 265 F.R.D. at 254.   This factor derives from the recognition that "a reasonable judgment of the possible merits of the case is best achieved when all discovery has been completed and the case is ready for trial." *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159.   According to Class Counsel, it conducted a "rigorous investigation" of the claims before filing the Complaint and Amended Complaint.   Moreover, during the

24

mediation process overseen by a professional mediator, Transurban Defendants provided extensive information and data to Class Counsel relating to, *inter alia*: (a) how E-ZPass functions with respect to the Express Lanes and the services that E-ZPass provides to its customers, including the availability of account balance warnings via e-mail or text message; (b) the toll violation process on the Express Lanes and Transurban's enforcement of tolls through the use of a photo-enforcement system that takes a photograph of the license plate number of every vehicle that travels on the Express Lanes; (c) the VToll process, by which unpaid tolls are, in some circumstances, collected retroactively from an E-ZPass account without any additional fees being charged, even though the E-ZPass account had insufficient funds to pay the toll at the time of travel on the Express Lanes; (d) the process by which Transurban issues unpaid toll invoices and the manner in which it charges administrative fees for unpaid tolls; (e) the process by which unpaid tolls and administrative fees are collected by a debt collector; the process by which Transurban seeks unpaid tolls, administrative fees, and civil penalties when it resorts to court action; (f) the FTF program and other policies designed to accommodate consumers; (g) the account and alleged violation history of each of the Plaintiffs; and (h) detailed accounting of the amounts of unpaid tolls, administrative fees, and civil penalties historically collected from Express Lanes users, the

amounts that remain unpaid at various stages of the collection process, and the number of unpaid accounts and the amounts owed. (Pizzirusso Decl. [Dkt. 86] at ¶¶ 16-17; *see also* Agreement [Dkt. 86] at ¶ 2.)  Thus, "although this settlement came early on—prior to the completion of formal discovery–it is clear that plaintiffs have conducted sufficient informal discovery and investigation to . . . evaluate [fairly] the merits of Defendants' positions during settlement negotiations." *In re MicroStrategy*, 148 F. Supp. 2d at 664 (internal quotation and citation omitted).

The negotiations leading to settlement were also sufficient to satisfy the third *Jiffy Lube* factor.  This factor requires the Court to consider "the negotiation process by which the settlement was reached in order to ensure that the compromise [is] the result of arm's-length negotiations . . . necessary to effective representation of the class's interests." *The Mills Corp.*, 265 F.R.D. at 255 (internal quotation and citations omitted).  Parties reached this Settlement after an informed negotiation before a professional mediator.  The parties submitted confidential mediation briefs to the mediator and engaged in a full day mediation on December, 4, 2015.  (Pizzirusso Decl. [Dkt. 86] at ¶¶ 14-15.)  Thereafter, the Parties continued their settlement discussions with the

assistance of the mediator. (*Id.* at ¶¶ 15-19.) Additionally, in advance of mediation and during subsequent settlement discussions, Transurban Defendants provided Class Counsel with extensive information and data. (*Id.* at ¶¶ 16-17; *see also* Agreement [Dkt. 86] at ¶ 2.) These negotiations were sufficiently informed, thorough, and at arm's length to conclude that the parties fairly arrived at the proposed Settlement.

Lastly, the Court is satisfied that Class Counsel is sufficiently experienced in the field of consumer-protection class action litigation to fairly represent the interests of the Class. "Counsel may be evaluated by their affiliat[ion] with well-regarded law firms with strong experience in the relevant field." *In re Neustar*, 2015 WL 5674798, at *11 (internal quotation marks and citation omitted). Class Counsel have a wealth of experience and knowledge in consumer-protection class actions. (*See* Pizzirusso Decl. [Dkt. 86] at ¶¶ 48-60; *id.* at Exs. 1-4.) Class Counsel also includes law firms recognized for their dedication to handling complex and class action litigation. Guided by this experience, Class Counsel represents the Settlement to be fair, reasonable, and adequate. (*Id.*) This factor weighs in favor of the fairness of the proposed Settlement.

Based on the foregoing factors, the Court finds that

the integrity of the arm's length negotiation process was preserved, indicating that this settlement is sufficiently "fair" under Federal Rule of Civil Procedure 23.

b)        Adequacy

The Court is also satisfied that the $1,350,000 gross recovery for the Class and other terms of Settlement are adequate.  The adequacy analysis "weigh[s] the likelihood of the plaintiff's recovery on the merits against the amount offered in settlement."  *In re Am. Capital S'holder Derivative Litig.*, 2013 WL 3322294, at *3.  The factors to consider include:

> (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

*In re Jiffy Lube Sec. Litig*, 927 F.2d at 159.

The first and second factors addressing the adequacy of a settlement require the Court to examine "how much the class sacrifices in settling a potentially strong case in light of how much the class gains in avoiding the uncertainty of a potentially difficult case."  *The Mills Corp.*, 265 F.R.D. at 256.  While Class Counsel are optimistic that Plaintiffs' claims will prevail, Defendants have vigorously and consistently argued

28

that Plaintiffs' claims lack merit and intend to challenge the
factual predicates of the Court's holding in its Memorandum
Opinion issued on November 2, 2015, should the case proceed to
trial. [Dkt. 65 at 58, 67, 77, 82-83; Dkt. 102 at 21.]
Moreover, Class Counsel have pointed out two recent state court
cases that have rejected the Excessive Fines Clause challenges
to Transurban Defendants' civil penalties on the merits. (*See*
Pizzirusso Decl. [Dkt. 86] at ¶ 20; *id.* at Exs. 5-6.) Thus, Class
Counsel believe that "any additional benefit to the [C]lass from
continued litigation could be offset by substantial costs from
protracted litigation." [Dkt. 102 at 21.] In light of the
risks inherent in proceeding to trial, the Court agrees that the
first two factors weigh in favor of the adequacy of the proposed
Settlement.

The third factor examines the anticipated duration and
expense of additional litigation. *The Mills Corp.*, 265 F.R.D.
at 256. The completion of merits and expert discovery, class
certification briefing, dispositive motions, trial, post-trial
motions, and possible appeals would entail substantial time and
expense for all Parties. [Dkt. 102 at 23.] Conversely, the
proposed Settlement would provide significant retrospective and
prospective relief quickly. This factor weighs in favor of the
adequacy of the proposed Settlement.

The fourth factor involves the solvency of Defendants and the likelihood of recovery on a litigated judgment. Transurban Defendants' solvency or the ability of the class to recover on a judgment rendered against the Defendants is not contested.  [Dkt. 102 at 23.]  However, that should not preclude final approval of the proposed Settlement.  *See Henley v. FMC Corp.*, 207 F. Supp. 2d 489, 494 (S.D. W. Va. 2002) ("[That factor] is largely beside the point given the other factors weighing in favor of a negotiated resolution.")

The final factor-the lack of opposition to the Settlement—further supports a finding of adequacy.  The court-appointed Claims Administrator distributed more than 40,000 postcards notifying potential Class members of the Settlement amount and terms.  Additionally, the notices informed interested parties how to object to the Settlement.  After providing notice through thousands of mailed postcards and issuing a press release, as well as creating a website and toll-free number for potential claimants, not a single objection was received. Therefore, all Parties, the unanimity of potential Class members, and this Court agree that the Settlement is sufficiently adequate.

In conclusion, the Court finds the proposed Settlement is fair, reasonable, and adequate under Federal Rule of Civil

Procedure 23.   Accordingly, the Court approves the proposed
Settlement.   The Court will now consider the adequacy of the
approved notice and its compliance with due process
requirements.

**C.        The Approved Notice**

          Federal Rule of Civil Procedure 23 requires that
notice of a settlement be "the best notice that is practicable
under the circumstances, including individual notice to all
members who can be identified through reasonable effort."  Fed.
R. Civ. P. 23(c)(2)(B).  In addition, the notice must state
"clearly and concisely . . . in plain, easily understood
language" the following: (1) the nature of the action; (2) the
definition of the class certified; (3) the class claims, issues,
or defenses; (4) that a class member may enter an appearance
through an attorney if the member so desires; (5) that the court
will exclude from the class any member who requests exclusion;
(6) the time and manner for requesting exclusion; and (7) the
binding effect of a class judgment on members.  *Id.*

          In its June 16, 2016 Order, this Court approved the
form and procedures for disseminating notice of the Settlement
as set forth in the proposed Settlement Agreement and Addendum.
[Dkt. 93, 94, 98]  The Court found that the notice, including
the postcard class notice, was the best notice practicable under

the circumstances, and constituted valid, due, and sufficient notice in full compliance with the requirements of applicable law. [Dkt. 98] Furthermore, the Long Form Class Notice followed the guidelines suggested by the Federal Judicial Center for consumer class settlements.[2]

The notice program, including the dissemination of the postcard class notice via first class mail to every Class Member who was reasonably ascertainable from Transurban's databases, fulfilled the requirements of due process. *See Leitz v. Kraft Foods Grp., Inc.*, No. 3:15-CV-262-HEH, 2016 WL 1043021, at *1 (E.D. Va. Mar. 10, 2016) (finding that notice by United States mail to the class was "the best notice practicable under the circumstances and in full compliance with Rule 23 of the Federal Rules of Civil Procedure, the requirements of due process[,] and applicable law"); *see also Kinder v. Meredith Corp.*, No. 14-R-11284, 2016 WL 45441, at *3 (E.D. Mich. Feb. 5, 2016) (finding that a notice regime comported with due process where the long form class notice was not mailed and there was an online claim submission option). The notice program fairly and accurately informed the Class Members of the terms of the proposed

---

[2] *See* Federal Judicial Center, "The Federal Judicial Center's 'Illustrative' Forms of Class Action Notices," available at
http://www.fjc.gov/public/home.nsf/autoframe?openform&url_1=/public/home.nsf/inavgeneral?openpage&url_r=/public/home.nsf/pages/376.

Settlement Agreement and provided sufficient opportunity for them to make informed decisions regarding their rights.

D.        **Attorneys' Fees and Expenses**

Having approved the Settlement, the next issue to discuss is Class Counsel's motion for attorneys' fees and service awards.  Class Counsel requests $675,000 in attorneys' fees and expenses—which represents only a portion of the lodestar Class Counsel has accrued in this case—and a combined service award to the Class Representatives and Former Class Representatives of $3,150.[3]  (Mem. in Supp. [Dkt. 105] at 1).  No Settlement Class Members have filed an objection to the amount of attorneys' fees and expenses allowed under the Agreement. (*Id.*)

Plaintiffs' attorneys in a successful class action lawsuit may petition the Court for compensation relating to any benefits to the Class that result from the attorneys' efforts. *See*, *e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980).  Rule 23 of the Federal Rules of Civil Procedure expressly states that "the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the Parties' agreement." Fed. R. Civ. P. 23(h).  Here, under the Agreement, Defendants

---

[3] This fee will be paid by Transurban Defendants directly and will not reduce the recovery available to the class.  (Pizzirusso Decl. [Dkt. 86] at ¶ 46.)

33

have agreed to pay up to $675,000 for Plaintiffs' fees and expenses.  (Pizzirusso Decl. [Dkt. 86] at ¶ 46.)  Thus, the only question for the Court is whether the unopposed fee is "reasonable."

The Court must determine the best method of calculating attorneys' fees to appropriately compensate Class Counsel.  There are two primary methods of calculating attorneys' fees: (1) the "percentage of recovery" or "percentage of the fund" method, which awards fees as a percentage of the benefit secured for the Class; and (2) the "lodestar" method, which awards fees based on the value of Counsel's time spent litigating the claims.  *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 681, No. CIV.A. DKC 11-1823, 2013 WL 5506027, at *10 (D. Md. Oct. 2, 2013).  With either method, the goal is to make sure that counsel is fairly compensated.  The Fourth Circuit has not decided which of the general approaches to adopt, although the "current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases." *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 462 (D. Md. 2014) (quoting *Goldenberg v. Marriott PLP Corp.,* 33 F.Supp.2d 434, 438 (D. Md. 1998)). Because there is no common fund in this case, the Court will

34

evaluate Plaintiffs' Counsel's request for fees under the lodestar method.

i)   *The Lodestar Method*

The Court's analysis begins with a calculation of Counsel's lodestar, or the reasonable hourly rate multiplied by the number of hours reasonably expended in litigation. *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). Here, the lodestar calculation weighs in favor of approval of the requested fees and costs.

a)        Reasonable Hourly Rate

To calculate the lodestar, the Court looks at the reasonable hourly rate multiplied by the hours reasonably expended in the litigation. *The Mills Corp.*, 549 F.3d at 320. To determine a reasonable hourly rate, the Court will examine three possible rates: the regular billing rate, the Laffey Matrix, and the Adjusted Laffey Matrix.

An "attorney's actual billing rate provides a starting point for purposes of establishing a prevailing market rate." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994) (internal quotation omitted). Class Counsel includes some of the area's leading experts on class action litigation. (Dimuro Decl. [Dkt. 105] at ¶¶ 4-7; Pizzirusso Fee Petition Decl. [Dkt. 105] at ¶¶ 6-7; Isaacson Decl. [Dkt. 105] at ¶¶ 4-5;

Kaliel Decl. [Dkt. 105] at ¶¶ 6-7.)  The attorneys' regular
billing rates are based on the customary rates that each firm
typically charges its paying clients.[4]  (Mem. in Supp. [Dkt. 105]
at 7.)  Further, these hourly rates are within the low range for
rates charged by attorneys with similar levels of experience and
credentials in Washington, D.C.  (Dimuro Decl. [Dkt. 105] at ¶
12; Pizzirusso Fee Petition Decl. [Dkt. 105] at ¶ 11; Isaacson
Decl. [Dkt. 105] at ¶ 9; Kaliel Decl. [Dkt. 105] at ¶ 15.)

        The Laffey Matrix is useful "as a guideline for
reasonable attorneys' fees in the Washington/Baltimore area."[5]
*In re Neustar*, 2015 WL 8484438, at *10 n.6 (E.D. Va. Dec. 8,
2015)(internal quotation omitted).  Additionally, other courts
in the Fourth Circuit have used the Adjusted Laffey Matrix to

---

[4] Tycko & Zavareei LLP ("TZ") charges $187 for paralegals, $343-421 for
associates and of counsel, and $685 for partners.  TZ also worked with Wade
Grimes Friedman Sutter & Lesichner PPLC ("WGFSL"), which charges $425 for
partners.  The DiMuro Law Firm charges $300 for associates, $350 for senior
associates, $450 for senior counsel, and $400-500 for partners.  Boies,
Schiller & Flexner LLP ("BSF") charges $210-270 for paralegals, $240 for
legal assistants, $520 for associates, and $930-980 for partners.  Finally,
Hausfeld LLP charges $187 for paralegals and law clerks, $421 for associates,
and $685-826 for partners.  Hausfeld LLP also worked with the law firm
Zimmerman Reed LLP ("ZR"), which charges $150-160 for paralegals, $375-450
for associates, and $550 for partners, all through a blended rate.  [Dkt.
105-1, 105-2, 105-3, 105-4]
[5] TZ's Laffey rates are as follows: $157 for paralegals, $322-332 for
associates and of counsel, and $465 for partners.  WGFSL's Laffey rate is
$455 for partners.  The DiMuro Law Firm's Laffey rates are as follows: $325
for associates, $455 for senior associates, $568 for senior counsel, and
$530-568 for partners.  BSF's Laffey rates are as follows: $154 for
paralegals and legal assistants, $325 for associates, and $504-530 for
partners.  Finally, Hausfeld LLP's Laffey rates are as follows: $154 for
paralegals and law clerks, $332 for associates, and $504-568 for partners.
[Dkt. 105-1, 105-2, 105-3, 105-4]

evaluate the reasonableness of a requested fee award.[6] *See*, *e.g.*, *Stuart v. Walker-McGill*, No. 1:11-CV-804, 2016 WL 320154, at *17 n.54 (M.D.N.C. Jan. 25, 2016) (noting that "using current market rates, rather than rates in effect at the time that services were performed, to calculate the lodestar may counterbalance the delay in payment as well as simplify the task of the district court").

Regardless of which rate is used here, each is within the range of reasonable rates approved in the Fourth Circuit. *See*, *e.g.*, *In re Neustar*, 2015 WL 8484438, at *10 (approving rates of $260-$310 for paralegal services, $420-$700 for associates, and $800-$975 for partners, in part because the fee award requested represented a substantial discount off the total lodestar calculated using these rates); *Hosch v. BAE Systems Info. Sols., Inc.*, No. 1:13-CV-00825(AJT/TCB), 2015 WL 12227738, at *3 n.4 (E.D. Va. Apr. 28, 2015) (finding that rates of up to $650/hour were "within the acceptable range of

---

[6] The Adjusted Laffey rates were similar for all four firms included in Class Counsel, as well as two firms that helped with this litigation: $187 for paralegals and legal assistants, $343-421 for associates and of counsel, $685 for senior associates, and $826 for senior counsel and partners. [Dkt. 105-1, 105-2, 105-3, 105-4]

reasonableness" even though the court determined the hours billed were excessive and reduced the fee award accordingly); *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 788 n.33 (E.D. Va. 2001) (concluding that $555 per hour for a senior partner and $220 per hour for a junior associate in 2001 were rates "not inconsistent with the rates charged by lawyers in large, prominent, and . . . expert law firms"); *Phillips v. Triad Guar. Inc.*, No. 1:09-CV-71, 2016 WL 2636289, at *8 (M.D.N.C. May 9, 2016) (finding that partner billing rates of $640-$880 per hour and associate billing rates of $375-$550 per hour were "within the range of reasonableness[,]" especially given that "the market for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials"); *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 467 (D. Md. 2014) (accepting as reasonable rates ranging from $325-$700 per hour).

b)      <u>Hours Reasonably Expended</u>

Class Counsel attests that they expended 1,730.2 hours litigating this case. (Dimuro Decl. [Dkt. 105] at ¶ 13; Pizzirusso Fee Petition Decl. [Dkt. 105] at ¶ 13; Isaacson Decl. [Dkt. 105] at ¶ 10; Kaliel Decl. [Dkt. 105] at ¶ 16.) Counsel also attests that they coordinated their work among the four law firms involved, as well as the work of two additional law firms

38

that assisted, to prevent duplication of effort, as well as assigned work to associates and paralegals whenever possible and appropriate.  (Kaliel Decl. [Dkt. 105] at ¶ 8.)

Over the course of this litigation, Counsel investigated and drafted the Complaint, responded to Defendants' Motions to Dismiss, engaged in initial discovery, and participated in one full-day meeting to discuss settlement and one full-day mediation.  (Mem. in Supp. [Dkt. 105] at 6.)  When no agreement was reached at the end of the mediation session, Counsel continued telephonic negotiation sessions, nearly all of which involved a professional mediator.  (*Id.*)  The hours Counsel spent litigation this action reflect the effort required to achieve a satisfactory result.

c)      Reasonableness of the Requested Fee

Class Counsel seeks $675,000 in attorneys' fees. Based upon each firm's actual billing rates and the number of hours expended, the lodestar is $876,271.20.  Under the standard Laffey Matrix, Class Counsel's lodestar is $708,614.85.  Under the Adjusted Laffey Matrix, Class Counsel's lodestar is $997,918.30.  Using each billing rate, Class Counsel's requested fee of $675,000 falls below the lodestar incurred during the course of this litigation.  Moreover, Class Counsel spent $23,766.49 in expenses on this case.  (Mem. in Supp. [Dkt. 105]

at 9.)  When combined with Class Counsel's fees based on actual billing rates, the total amount spent on this litigation is $900,037.69.  (*Id.*)  However, both sides have agreed to the $675,000 in combined fees and expenses.  (*Id.*)  Thus, the stipulated fee is a reasonable compromise for calculating Class Counsel's lodestar.

        ii)  *The Barber Factors*

        In the Fourth Circuit, twelve factors guide the Court's reasonableness analysis of Counsel's request for attorneys' fees and costs:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation[,] and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978).  The Court does not need to address all twelve factors independently "because such considerations are usually subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate."  *MTU Am. Inc. v. Swiftships*

40

*Shipbuilders LLC*, No. 1:14-CV-773(LMB/TCB), 2015 WL 4139176, at

*3 (E.D. Va. July 8, 2015) (internal quotation omitted).

Further, the "results obtained" factor is typically considered

the most important. *Imaginary Images Inc. v. Evans*, No. 3:08-

CV-398, 2009 WL 2488004, at *2 (E.D. Va. Aug. 12, 2009); *see*

*also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *Nigh v.*

*Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 190 (4th Cir.

2007).  The Court will now discuss three of the *Barber* factors,

starting with the most important factor, the results obtained.

a)   Results Obtained for the Class

  The result achieved is among the most important

factors to be considered in making a fee award.  *See Hensley*,

461 U.S. at 436 ("[T]he most critical factor is the degree of

success obtained.").  Class Counsel here achieved relief that

provides substantial benefits for tens of thousands of E-ZPass

Express Lanes users in a legally complex and novel case.  The

Settlement Agreement provides significant benefits to the Class,

including both retrospective and prospective relief, the details

of which are discussed at length in Section II(B) above.  The

Court finds that the value of this relief is substantial,

representing many multiples of the requested fee award.  Thus,

the results obtained weigh in favor of the reasonableness of the

fees requested.

41

b)        Class Member Opposition

The absence of objections to the Settlement Agreement, including the fees requested, demonstrates the Class's approval. Pursuant to the Court's June 2016 Order, the Claim Administrator sent over 40,000 postcard class notices to potential Class Members. (Mem. in Supp. [Dkt. 102] at 24.)  The notice informed interested parties of the settlement amount and that Class Counsel would seek a combined fee and expenses award of no more than $675,000.  [Dkt. 96-1 at 24]  As of September 9, 2016, the Claims Administrator received no objections to the proposed attorneys' fees or expenses.  This lack of objections supports a finding that the fee request is reasonable.  *See The Mills Corp.*, 265 F.R.D. at 262 ("Thus, while not dispositive, the dearth of legitimate objections to the requested fee of 18% enforces the reasonableness of that request in the Court's eyes.")

c)        Fee Awards in Similar Cases

Comparing the size of fee awards in other cases, while overly simplistic, "nonetheless provides a valuable point of reference." *The Mills Corp.*, 265 F.R.D. at 264.  A comparison of recent cases in the Eastern District of Virginia shows that courts have awarded fees that included "multipliers" of at or greater than two. *See*, *e.g.*, *In re Microstrategy, Inc.*, 172 F.

42

Supp. 2d at 790 (approving a multiplier of 2.6); *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 3:11-CV-754, 2014 WL 4403524, at *15 (E.D. Va. Sept. 5, 2014), *aff'd sub nom. Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015) (approving a multiplier of 1.99).

Here, Class Counsel's requested fee represents a negative multiplier of 0.77.[7] Such a low multiplier is comfortably below the range of multipliers other courts have found to be reasonable. *See Domonoske v. Bank of America, N.A.*, 790 F. Supp. 2d 466, 476 (W.D. Va. 2011) (surveying cases to conclude that a 1.8 multiplier is "well within the normal range of lodestar multipliers"); *see also Burke v. Shapiro, Brown & Alt, LLP*, No. 3:14-CV-201 (DJN), 2015 WL 2894914, at *6, (E.D. Va. May 17, 2016) ("[T]he fact that Class Counsel requested the reduced fee . . . further weighs in favor of a finding that the hours expended were reasonable."); *Triad Guar. Inc.*, 2016 WL 2636289, at *8 (reasoning that even though lead counsel's rates were on the higher end of rates approved in this Circuit, "the [0.35] multiplier is so far below those generally accepted as demonstrating reasonableness that, in the context of the facts of this case, it does suggest that the requested . . . fee is

---

[7] This multiplier is based on the lodestar that was calculated with each of Plaintiffs' Counsel's actual billing rates.  The multiplier is 0.95 if using the Laffey Matrix and 0.67 if using the Adjusted Laffey Matrix.

reasonable"). Furthermore, Counsel's requested fee also includes $23,766.49 in costs, which is another factor in favor of the reasonableness of the fees award.

Given the reasonableness of the attorneys' fees and costs requested, the Court will approve Counsel's motion for attorneys' fees in the amount of $675,000.

E.       **Requested Service Award**

Courts recognize the purpose and appropriateness of service awards to Class Representatives. *See*, *e.g.*, *Deem v. Ames True Temper, Inc.*, No. 6:10-CV-01339, 2013 WL 2285972, at *6-7 (S.D.W. Va. May 23, 2013) (approving award of $7,500 per lead plaintiff); *Manuel v. Wells Fargo Bank*, No. 3:14-CV-238(DJN), 2016 WL 1070819, at *6 (E.D. Va. Mar. 15, 2016) (approving a $10,000 service award); *Berry v. LexisNexis Risk & Info. Analytics Grp.*, No. 3:11-CV-754, 2014 WL 4403524, at *16 (E.D. Va. Sept. 5, 2014), *aff'd sub nom. Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015) (approving a $5,000 service award); *Burke*, 2016 WL 2894914, at *6 (approving a $3,000 service award). "A fairly typical practice, incentive awards are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney

44

general." *Manuel*, 2016 WL 1070819, at *6 (internal quotations omitted).

Here, Plaintiffs request, and Transurban does not oppose, a service award totaling $3,150, which will be divided among all current and former Class Representatives.[8]  Judges in the Eastern District of Virginia have approved much larger service awards in cases where the class representative took a role in prosecuting the claims on behalf of the class. *See*, *e.g.*, *Cappetta v. GC Servs. LP*, No. 3:08-CV-288(JRS) (E.D. Va. Apr. 27, 2011) (approving a $5,000 service award to each named plaintiff); *Henderson v. Verifications Inc.*, No. 3:11-CV-514 (E.D. Va. Mar. 13, 2013) (approving a $5,000 service award to named plaintiff); *Pitt v. Kmart Corp.*, No. 3:11-CV-697 (E.D. Va. May 24, 2013) (approving a $5,000 service award to the class representative); *Conley v. First Tennessee Bank*, No. 1:10-CV-1247 (E.D. Va. Aug. 18, 2011) (awarding a $5,000 service award to each named plaintiff); *Ryals, Jr. v. HireRight Solutions, Inc.*, No. 3:09-CV-625 (E.D. Va. Dec. 22, 2011) (awarding a $10,000 service award to each class representative). Here, the Class Representatives have amply fulfilled their duties, making the requested service award appropriate.

---

[8] Plaintiffs proposed $600 to each current Class Representative and $250 to each former Class Representative.

### III. Conclusion

For the foregoing reasons, the Court will grant the Parties' Joint Motion for Final Approval of the Settlement and Plaintiffs' Motion for Attorneys' Fees and expenses and service awards for Class Representatives.  An appropriate order will issue.

|  | /s/ |
| --- | --- |
| September 29, 2016 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |